STEVEN G. KALAR
Federal Public Defender
JODI LINKER
Assistant Federal Public Defender
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:     415.436.7700
Facsimile:     415.436.7706
Jodi_Linker@fd.org

Counsel for Defendant ABOUAMMO

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 19-71824 WHA |
| Plaintiff, | **DEFENDANT'S OPPOSITION TO UNITED STATES' MOTION TO REVOKE RELEASE ORDER** |
| v. | |
| AHMAD ABOUAMMO, | Date:   November 19, 2019
Time:   2:00 p.m.
Court:  The Honorable William H. Alsup |
| Defendant. | |

## INTRODUCTION

The government seeks to have defendant Ahmad Abouammo detained primarily because of an unsubstantiated and false claim that—despite not having fled for the four years since the conduct occurred or for the thirteen months since his home was raided—the filing of charges that he anticipated being filed for at least a year, would cause him to suddenly change course and flee from the United States. Such a concern is wholly without support, and certainly does not meet the government's significant burden to show that no combination of conditions would *reasonably assure* Mr. Abouammo's presence. To the contrary, Mr. Abouammo was the one that provided the government with his new address after his home was raided. Mr. Abouammo's counsel reached out to the government to assure them that he would be fully cooperative in coming in on any potential charges. Mr. Abouammo

traveled repeatedly, even to Lebanon, in the last year and a half, always returned and always informed his counsel of his whereabouts. Mr. Abouammo is a U.S. Citizen who has lived here for over twenty years. His U.S. Citizen wife, three young children (who were all born in the U.S), as well as his only sibling, niece and uncle, all reside with or near Mr. Abouammo.[1] Even though the burden is on the government to prove a serious risk of flight, Mr. Abouammo has shown that he has every desire to remain here and face the charges, which he has known for at least 13 months, if not longer, were likely to be filed.

In a case like this, the government's argument essentially becomes a per se rule: the charge alone merits detention. That, however, is contrary to the Bail Reform Act, where, as here, this is not a presumptions case. The law requires the Court look beyond the charges and consider Mr. Abouammo's individual circumstances to determine whether the government has met its burden to show by a preponderance of the evidence that no conditions can be imposed to reasonably assure his appearance. As both the U.S. Pretrial Services Office and the Magistrate Judge in Seattle determined after thoughtful consideration of Mr. Abouammo's particular circumstances, there are conditions that can be imposed to do just that. Accordingly, the Court should deny the government's motion.

## BACKGROUND

On October 20, 2018, agents from the Federal Bureau of Investigation went to Mr. Abouammo's then home to interview him. Four days later, on October 24, 2018, the FBI executed a search warrant at that residence. Mr. Abouammo retained counsel in Seattle. His counsel, Court Will and Christopher Black, began communicating with AUSA Colin Sampson about the case and potential charges. Declaration of Jodi Linker in Support of Opposition to Motion to Revoke Release Order (hereinafter "Linker Decl."), Ex. 2. In an email to defense counsel on November 7, 2018, AUSA Sampson confirmed that he and an FBI agent had spoken with defense counsel the day before and stated the following:

> [T]he government is investigating your client's participation in providing confidential user information to certain individuals associated or working for the Kingdom of Saudi Arabia during and after his employment at Twitter, Inc., accepting gifts and payments from these individuals without disclosing them to his employer, and providing false statements and documents to the FBI to obstruct its investigation. Although we did not discuss other violations, he also faces additional potential criminal liability for money laundering and a customs violation related to the

---

[1] Indeed, his wife, sister, uncle and friends all appeared in court Seattle for Mr. Abouammo's detention hearing. His wife is making arrangements to travel to San Francisco for the hearing here as well.

*US v. Abouammo,* Case No. 19-71824 MAG (WHA);
Def.'s Oppo to U.S. Mtn to Revoke Release     2

cash and watch. *Id*.

Government counsel and Mr. Abouammo's counsel continued communications both via email and telephone. *Id.* On November 19, 2018, Mr. Abouammo's counsel assured government counsel that they would continue to work with the government: "[Co-counsel] and I remain available to discuss Mr. Abou Ammo's case moving forward. I don't know your time line or precise plan, but if you are amendable to reaching out prior to simply seeking an indictment, we would welcome that." *Id*. Importantly, without any obligation to do so whatsoever, but in a clear showing of Mr. Abouammo willingness to face the charges, counsel then went on to provide the new address where Mr. Abouammo had moved. *Id*.

Based on his interview with the FBI, the search of his home, and more concretely, his attorneys' communications with the government, Mr. Abouammo was well aware of the serious likelihood of federal charges being filed against him. Indeed, the email from the government on November 7, 2019, makes that perfectly clear. He kept in regular contact with his attorneys so that they would know his whereabouts at all times should he need to come to Court or otherwise address any issues related to the case. He had quit working at Twitter in May 2015, but began working for Amazon shortly thereafter as a senior marketing manager. The search of his home, however, caused Mr. Abouammo a great deal of stress and anxiety. He and his family decided they could no longer live in their home and they moved in with his sister and her daughter. That was the new address provided to the government. Mr. Abouammo's stress from the search of his home also made it difficult to work and he quit his job at Amazon. He continued, however, taking online classes through Harvard Extension to earn a Master's Degree.[2] Without a job, he and his family were left to survive on his limited financial aid for his studies, as well as food stamps. In August 2019, with debts piling up, he filed for bankruptcy.

On November 5, 2019, the government filed the instant complaint against Mr. Abouammo. Rather than offering Mr. Abouammo the opportunity to voluntarily appear in Court, as he certainly would have, on or about November 6, he was arrested by the FBI at the very address he had provided to the government. On November 8, 2019, the magistrate judge in Seattle ordered him released on several

---

[2] He had already earned an undergraduate degree from the University of Washington many years prior.

conditions, including electronic location monitoring. The same day, in response to the Government's request, this Court stayed the release of Mr. Abouammo and scheduled a hearing for November 12, 2019. Undersigned counsel specially appeared for Mr. Abouammo as it appears he does not have the means to continue to retain counsel.[3] Despite the government having three full days to have Mr. Abouammo transferred to San Francisco for that appearance, he was not brought to Court. At the hearing on November 12, 2019, the Court continued the matter and kept Mr. Abouammo in custody at least until the hearing scheduled for November 19. This is the longest Mr. Abouammo has ever been in custody, as it is the first time he has ever been even arrested in his entire life.

## ARGUMENT

### I. THE GOVERNMENT BEARS THE HEFTY BURDEN TO PROVE THAT NO COMBINATION OF CONDITIONS WOULD REASONABLY ASSURE MR. ABOUAMMO'S APPEARANCE IN COURT

Prior to a conviction, the Bail Reform Act of 1984 requires a court to release a person charged with an offense pending trial, "unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b).[4] If the court does not believe that a person's pretrial release on his or her own recognizance will reasonably assure the person's appearance or the safety of the community, the judge should impose the "least restrictive further condition, or combination of conditions" necessary to mitigate the risks of nonappearance or danger to the community. 18 U.S.C. § 3142(c)(1)(B). "Only in rare cases should release be denied, and doubts regarding the propriety of release are to be resolved in favor of the defendant." *United States v. Santos-Flores*, 794 F.3d 1088, 1090 (9th Cir. 2015) (citing *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir.1985)).

Here, the government is only seeking to detain Mr. Abouammo based on the "serious" risk of nonappearance as there is no suggestion whatsoever that Mr. Abouammo presents a danger to the

---

[3] The Federal Public Defender's office has not been formally appointed as the government has not brought Mr. Abouammo to this District to complete a financial declaration and meet with counsel. Based on the government's proffer regarding Mr. Abouammo's bankruptcy, as well as a review of the Pretrial Services report, it appears that Mr. Abouammo will qualify for appointed counsel.

[4] There are a certain class of cases that have a rebuttable presumption for detention. 18 U.S.C. § 3142(e). Notably, the government concedes that no such presumption exists here. Instead, the default of release under the statute exists and the Court may only detain Mr. Abouammo if it concludes that no conditions would reasonably assure his appearance.

*US v. Abouammo,* Case No. 19-71824 MAG (WHA);
Def.'s Oppo to U.S. Mtn to Revoke Release           4

community. U.S.' Motion for Revocation of Magistrate Judge Order of Release on Bond Conditions at 4. The government bears the burden of proving by a preponderance of the evidence that there is a "serious risk" that Mr. Abouammo "will flee," *United States v. Wasendorf*, 2012 WL 4052834 (N.D. Iowa 2012), *and* that no combination of conditions would reasonably assure Mr. Abouammo's appearance in court. *Santos-Flores*, 794 F.3d at 1090; 18 U.S.C. § 3142(c)(1)(B). Under the Bail Reform Act, the factors to be considered include:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . .
> (2) the weight of the evidence against the person;
> (3) the history characteristics of the person, including (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

## II. THE GOVERNMENT HAS NOT MET ITS BURDEN TO SHOW THAT THE CONDITIONS IMPOSED BY THE MAGISTRATE COURT WOULD NOT REASONABLY ASSURE HIS APPEARANCE IN COURT

The government has presented several arguments for detaining Mr. Abouammo, none of which either individually or combined warrant detention in this case.[5]

First, the government argues that the nature and circumstances of the offense and the weight of the evidence against Mr. Abouammo support detention. That is not the case. The weight of the evidence against the defendant is the least important factor for the Court's consideration. *United States v. Hir*, 517 F.3d 1081, 1090 (9th Cir. 2008). "[T]he statute neither requires nor permits a pretrial determination of guilt." *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991). "The Fifth and Eighth Amendments' prohibitions of deprivation of liberty without due process and of excessive bail require careful review of pretrial detention orders to ensure that the statutory mandate has been respected." *Motamedi*, 767 F.2d at 1405.

It is important to look at what the Complaint alleges about Mr. Abouammo in particular, not

---

[5] The Pretrial Services report includes a detailed recitation of certain background facts relevant to the factors under § 3142(g), much of which will not be repeated here.

*US v. Abouammo,* Case No. 19-71824 MAG (WHA);
Def.'s Oppo to U.S. Mtn to Revoke Release          5

about other individuals. The complaint alleges that between January 5, 2015 and February 24, 2015, Mr. Abouammo accessed personal information for a total of *two* Twitter users. It alleges that he accessed User-1's email address and phone number several times during that seven week period, and that he accessed User-2's email address on one occasion. Complaint, ¶ 42. Unlike his co-defendant, who accessed thousands and thousands of user account information, Mr. Abouammo is only alleged to have accessed the information of two individuals. Moreover, the information that he allegedly accessed is more limited than what his co-defendant accessed. Mr. Abouammo is *not* alleged to have accessed any IP information, which would have provided valuable location information. Instead, Mr. Abouammo is alleged to have accessed the email address and phone number of one user and just the email address of another.[6]

Second, the government argues that the crimes charged are "extremely serious" and carry a maximum potential sentence of 30 years. Such a high maximum penalty is common in federal criminal cases and is hardly a reason for detention. Indeed, Congress has explicitly listed the most serious charges that warrant a presumption in favor of detention and none of the charges here are included therein. 18 U.S.C. § 3142(e). More importantly, Mr. Abouammo has absolutely zero criminal history. He has never been arrested, detained or otherwise involved with the criminal justice system his entire life. Given his lack of criminal history, there is reason to doubt that he would receive even close to the maximum sentence if he were convicted on the circumstantial evidence presented.

Third, the government argues, quite incredibly, that "his lack of flight prior to arrest is *no indication* of the likelihood that he will flee now that he has actually been charged with serious crimes carry a statutory maximum of 30 years in prison." U.S. Motion at 5 (emphasis added). Such an argument is preposterous. To the contrary, Mr. Abouammo's actions in the thirteen months since his home was raided and he began discussions with the government about these potential charges is the *only and strongest* evidence regarding his likelihood to flee. It more than sufficiently establishes that he is not going anywhere. The government would like to rely on pure speculation rather than evidence. It

---

[6] Additionally, while the government makes much of its allegation that Mr. Abouammo continued to seek user information after he left Twitter, there is no suggestion that any of that was done surreptitiously or contrary to his employment at Twitter as he no longer even worked at Twitter and openly stated for whom he was seeking the information.

*US v. Abouammo,* Case No. 19-71824 MAG (WHA);
Def.'s Oppo to U.S. Mtn to Revoke Release          6

1 imagines that Mr. Abouammo "may have" believed the case would not be charged. U.S. Motion at 5. To
2 the contrary, the email chain between the government and Mr. Abouammo's counsel, as well as the raid
3 on his home, as well as the press surrounding his co-defendants, made it very obvious to Mr.
4 Abouammo that there was a high likelihood of being charged.

5  Detaining Mr. Abouammo based on the government's speculation, rather than the evidence of
6 his conduct, runs contrary to the Bail Reform Act. *United States v. Sanchez*, 2011 WL 744666 (C.D.
7 Cal. 2011). Like the defendant in *Sanchez*, Mr. Abouammo's awareness of the charges against him and
8 decision to stay put strongly militates in favor of release. *Id*. at *2. Mr. Abouammo has been aware of
9 the threat of prosecution for over a year, if not longer. Like the defendant in *Sanchez*, his counsel has
10 been in discussions with the government over the particulars of the charges, and the U.S. Attorney
11 explicitly listed several potential serious charges to Mr. Abouammo's counsel repeatedly. *Id*. In
12 *Sanchez*, the government made the same argument that it does here: now that the defendant is
13 "officially" charged, "the risk of going to prison must be much more imminent to him, making flight
14 more attractive." Just as the court did in *Sanchez*, this court should reject such an argument. The
15 possibility of being prosecuted and sentenced to prison has been very real to Mr. Abouammo all along.
16 Mr. Abouammo has been suffering from severe anxiety and depression since the raid on his home and
17 moved out of his home as a result. He fully and completely internalized the potential of these charges
18 long before the complaint was filed. The filing of the Complaint has not so dramatically changed the
19 landscape as to meet the government's significant burden for detention.

20  The government similarly argues that Mr. Abouammo "may have" believed that he would
21 receive assistance from Saudi Arabia to escape if he were ever prosecuted. U.S. Motion at 5. Again, this
22 conjecture is wholly without support, and is contradicted by what has actually happened. Knowing full
23 well that the federal government had raided his home and was likely to bring charges, he did not flee or
24 seek assistance from Saudi Arabia to escape. Instead, he informed the government of his whereabouts
25 and continued to stay in close contact with his counsel so that they would know where he was at all
26 times. He traveled several times, including to Lebanon on 2018 and Boston approximately a month ago,
27 and did as any other person would do: he returned home to Washington.

28  The government knows that Mr. Abouammo's actions belie its arguments about his potential for

*US v. Abouammo,* Case No. 19-71824 MAG (WHA);
Def.'s Oppo to U.S. Mtn to Revoke Release     7

flight so it attempts to use the actions of his co-defendant against him. The government argues, again quite incredibly, that the fact that his co-defendant Ali Alzabarah escaped the U.S. within hours after he was confronted with his activities as evidence that Mr. Abouammo will later flee *even though Mr. Abouammo did the exact opposite.* When Mr. Abouammo was confronted with his activities in October 2018, he retained a lawyer, continued communicating with the government through those lawyers, updated the government as to his whereabouts, and stayed put. The suggestion that the public's awareness of the charges would somehow completely change the behavior that he has exhibited for over a year is completely without support and contrary to common sense. Mr. Abouammo is the one most affected by the government's investigation, and regardless of any press attention, this has been causing him a great deal of distress and anxiety for over a year, and yet he has not attempted to flee or avoid detection in any way whatsoever.

Indeed, the government's argument that Mr. Abouammo is aware that his co-defendants fled the United States only further supports Mr. Abouammo's release. It was not as if he was unaware of a potential to leave or the ability to leave. He was well aware of that and **did not flee**. Just as the court concluded in *Sanchez*, the filing of the Information "simply has not changed the situation so much that Defendant who could have fled at any point in the last two years and several months, is now significantly more likely to flee." *Sanchez*, 2011 WL 744666, *2.

Finally, the government argues that Mr. Abouammo's ties to foreign countries warrant detention. Mr. Abouammo has lived in the U.S. for 20 years (since 1999) and has been a U.S. Citizen for 13 years (since 2006). His wife of 10 years is a U.S. Citizen, and his three minor children, ages 2, 7 and 9, are all U.S. Citizens, born in the U.S. The United States is his home. While his father resides in Lebanon, Mr. Abouammo has no desire to live there. He went there in 2018 for a visit and returned to his home, the United States. The government's theory that he "may seek to escape to Lebanon" or Saudi Arabia is pure speculation contradicted by what has actually happened. The government argues that he has loads of money abroad (less than $150,000) and absolutely no money here and therefore has every incentive to flee. But this is nothing new. To the contrary, the government's allegation is that he has less than $200,000 in accounts in Lebanon in 2015, and that he filed for bankruptcy in August 2019. He did not flee to get that supposed money when he went had no money many months ago. If that were such an

incentive to flee, it would have happened. He never would have filed for bankruptcy because what would be the point if he were just going to flee. With everything going on—awareness of serious federal charges, suffering serious mental health issues, not working, collecting food stamps, piled up debt—he stayed put and did everything above board.

The government has offered no evidence that those funds still exist today or that Mr. Abouammo has any access to those funds. He did not flee to these supposedly wealthy contacts in Saudi Arabia. He did what any responsible U.S. Citizen who faces their problems does under the law: he filed for bankruptcy in a court. All he has shown time and time again is that he is an individual who plays by the rules and faces the consequences of his actions.

The government utterly ignores all that has and will continue to keep Mr. Abouammo in the United States to defend against these charges. Mr. Abouammo has a solid and stable family life. After his two older children were bullied in school, he and his wife decided to home school their children and he has been actively participating in their education. He is enrolled in a Master's degree program at Harvard Extension and is doing everything he can to provide for his family. His U.S. Citizen children do not have dual citizenship to any other country and the government is in possession of Mr. Abouammo's passports. Mr. Abouammo and his family have every intention of staying in the U.S. and have proven as much by their actions.

Pretrial Services Office—the office tasked with supervising Mr. Abouammo should he be released—determined that the conditions proposed would reasonably assure his appearance. The Bail Reform Act "does not seek ironclad guarantees, and the requirement that the conditions of release 'reasonably assure' a defendant's appearance cannot be read to require guarantees against flight." *United States v. Chen,* 820 F.Supp. 1205, 1208 (N.D. Cal. 1992). The government has not met its burden to show that the conditions proposed are insufficient. As such, Mr. Abouammo's respectfully requests that the Court deny the government's motion and order him released from custody forthwith.[7]

///

///

---

[7] Should the Court believe that additional conditions are necessary, Mr. Abouammo's wife is willing to serve as both a custodian and surety on the bond.

## CONCLUSION

Pretrial release in non-capital cases "should be denied only for the strongest of reasons." *Motamedi,* 767 F.2d at 1407 (citation omitted). Here, where there is no presumption in favor of detention based on the charge itself, in consideration of the particular facts and circumstances, the government has not met its burden of demonstrating that no combination of release conditions would reasonably assure Mr. Abouammo's appearance. Thus, for the aforementioned reasons, the Court should deny the government's motion to revoke the magistrate judge's release order.

Dated: __11/18/19_____                    Respectfully submitted,

                                                /s/ Jodi Linker
                                                JODI LINKER
                                                Assistant Federal Public Defender