Pages 1 - 22

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )
                                   )
   VS.                             )          NO. CR 19-mj-71824 (WHA)
                                   )
AHMAD ABOUAMMO, et al.,            )
                                   )
            Defendants.            )
_____)

                    San Francisco, California
                    Tuesday, November 12, 2019

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                    DAVID L. ANDERSON
                    United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
            BY:  **COLIN C. SAMPSON**
                 **HALLIE M. HOFFMAN**
                 **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant Abouammo:
                    FEDERAL PUBLIC DEFENDER'S OFFICE
                    450 Golden Gate Avenue
                    19th Floor
                    San Francisco, California 94102
            BY:  **JODI LINKER**
                 **ATTORNEY AT LAW**

Reported By:  Ruth Levine Ekhaus, RDR, FCRR
              Official Reporter, CSR No. 12219

PROCEEDINGS

1    <u>**Tuesday - November 12, 2019**</u>                    <u>**2:15 p.m.**</u>

2                    <u>P R O C E E D I N G S</u>

3                        ---o0o---

4        **THE CLERK:**  Calling Criminal Action 19-mj-71824,

5    United States versus Ahmad Abouammo.

6        Counsel, please step forward and state your appearances

7    for the record.

8        **MR. SAMPSON:**  Good afternoon, Your Honor.  Colin

9    Sampson for the United States.

10       **MS. LINKER:**  Good afternoon, Your Honor.  Jodi Linker

11   specially appearing on behalf of Ahmad Abouammo.

12       I just want to make clear for the record:  I was notified

13   late Friday that this matter was put on Your Honor's calendar.

14   He had retained counsel at that time.  I have not spoken to

15   him.  I thought he would be brought down here for today's

16   hearing.  He hasn't been brought here.

17       So I'm specially appearing on his behalf.  I spoke to his

18   retained counsel late yesterday.  They informed me they did not

19   believe they would continue to represent him.

20       **THE COURT:**  Retained counsel in Seattle?

21       **MS. LINKER:**  Correct.  So I'm specially appearing.

22       **THE COURT:**  So he hasn't even appeared here?

23       **MS. LINKER:**  Correct.

24       **THE COURT:**  I thought he was on the way here.

25       What is the expected time of arrival?

PROCEEDINGS

1          **MS. LINKER:**  Your Honor stayed the release order;

2   otherwise, he would have been here today.

3      Had Your Honor not stayed the release order, he would have

4   been here today.  So he was ordered released on Friday and he

5   would have gotten here today, or whatever day was ordered by

6   the Court; but Your Honor stayed that order, so he is still in

7   the custody of the Marshals Service.

8          **THE COURT:**  I ask the Government:  When will he be in

9   this district?

10          **MR. SAMPSON:**  Your Honor, I'm not sure.  This is an

11   appeal of the magistrate judge's release order in Seattle.  I'm

12   not sure how long it will take.  It is the Government's

13   position that he be detained and transferred in detention to

14   the district.

15          **THE COURT:**  What if it's three months?

16          **MR. SAMPSON:**  I don't believe it will take that long,

17   Your Honor.  I'm not sure how long it will take.  A number of

18   weeks.

19          **THE COURT:**  Weeks?

20          **MR. SAMPSON:**  I'm not sure, Your Honor.

21          **THE COURT:**  Well --

22          **MS. LINKER:**  Your Honor, of course, I am seeking his

23   release because he could be here immediately if Your Honor

24   releases him.

25          **THE COURT:**  I know.  Well, I'm not going to release

**PROCEEDINGS**

1    him today.  We're going to put this over one week, and he

2    should be here in one week.

3        If the Government doesn't --

4        **MS. HOFFMAN:**  Your Honor, if I may.  Hallie Hoffman

5    for the Government.

6        So the defendant is charged in this district.  He had his

7    initial appearance up in Seattle.  The judge in Seattle -- we

8    asked for his detention.  The judge in Seattle ordered him

9    released.  We asked for a stay of the release order.  The stay

10   was granted both by the Seattle magistrate judge and Your Honor

11   so we could hear the detention appeal.

12       In cases such as this, there's a couple of options.  We

13   could have him brought down here for the appeal of the release

14   order.  Or it has occurred where -- when parties consent that

15   it be done by BTC or phone when he is in Seattle.

16       **THE COURT:**  Well, let's -- those are good options, but

17   I'm a little dumbfounded, I guess.

18       I thought that when he was arrested -- this is, I get most

19   of this from the paperwork and the newspapers -- that

20   automatically he would be brought down here pronto.

21       How could he be in limbo for such a long time between

22   Seattle -- he is being charged down here?

23       **MR. SAMPSON:**  Your Honor, he was arrested last week in

24   Seattle, the district where he was found, where he lives.  He

25   was brought before a judge in that district under the criminal

**PROCEEDINGS**

1  rules, and arraigned in that district.

2      And then the question of his release is to be decided by a

3  judge, a magistrate in this district; however under 3145, Your

4  Honor, the review of that release order is to be done in the

5  district with original jurisdiction over the case.  That is

6  this district.

7      3145 states that the matter will be decided promptly.  It

8  does not provide that the defendant is required to be present

9  for that determination.

10     **THE COURT:**  Well, what is the law that maybe doesn't

11 require, but maybe the Sixth Amendment requires that.  He has

12 the right to be present at every phase of his proceeding.

13     True?

14     So is there some exception for this kind of procedure?

15     **MR. SAMPSON:**  Well, Your Honor, 3145 just says

16 "promptly".  It doesn't even say that there needs to be a

17 hearing.

18     I understand that Your Honor may not want to decide the

19 release issue without him being present.  And we will try to --

20 the Government will try to arrange for his presence here;

21 however that sometimes takes time.

22     **THE COURT:**  Why?

23     **MR. SAMPSON:**  Your Honor, in Marshals custody, he has

24 to be transferred here, Seattle to San Francisco.

25     My understanding of the travel arrangements are that he

1   may have to go to Las Vegas first, which is a hub for transfer

2   of people in custody.  And it make take some time logistically

3   to arrange for his travel to get to here.

4         THE COURT:  Well, even so, I can't see why it would

5   take more than a few days.

6         MS. HOFFMAN:  Your Honor, I'm not sure if -- I'm not

7   sure if we have the information how long it will take.  I'm

8   happy to look into that.

9         MR. SAMPSON:  That's right, Your Honor.  My

10  understanding is, it can be a little as few days, but it can

11  take more than a week, Your Honor.

12        THE COURT:  Ms. Linker, is there anything in this

13  paperwork that on -- something under oath by him where he

14  promises that he will make his appearances here?

15        MS. LINKER:  Yes, Your Honor.  So just to give the

16  Court a little bit of background information, because I'm not

17  sure if Your Honor got the filings that were done, actually, in

18  Seattle.  I just -- just got my hands on them because I just

19  found out that I was doing this.

20        THE COURT:  All I got, it was a big package from the

21  US Attorney's Office.

22        MS. LINKER:  Okay.  So Mr. Abouammo's attorneys in

23  Seattle submitted some exhibits that I think are really

24  relevant.  The most important of which is the last exhibit

25  which shows e-mail communications between government counsel,

PROCEEDINGS

1    Mr. Sampson, and his retained lawyers.

2         They provided the address where Mr. Abouammo was living.

3    It's the address where they arrested him.  They told him they

4    anticipated that the charges would be filed, and that he would

5    come in at any time to respond to those charges.

6         And so any issue regarding flight, he would have just

7    showed up.  He had an attorney.  The attorney was in contact

8    with government counsel.  And so I can hand those up to the

9    Court.

10         I think the Government orchestrated this, that he was

11    arrested in Seattle and held there, and moving for the

12    detention.  And there is absolutely no basis for detention.

13         A bond was signed.  He signed the bond promising to

14    appear.  The judge ordered that he be placed on location

15    monitoring, that he be under pretrial supervision.  The

16    Government has his passports.  It's really one of the most

17    straightforward cases for release.

18         The Government's argument for detention is that a

19    co-defendant fled the United States and went to Saudi Arabia, I

20    think, four years ago.  But Mr. Abouammo did the exact

21    opposite.  He retained counsel.  His counsel has been in

22    contact with the Government on this case, and he has not fled.

23         The Government's other argument is that Saudi Arabia is

24    expert at extracting people from the United States when they

25    face criminal charges.  Again, knowing that this has been

PROCEEDINGS

1    ongoing, the Government raided his home in October of 2018,

2    over a year ago.

3        He had to move out of his home into his sister's home

4    because of the anxiety from that arrest.  He gave his

5    Government his arrest -- his new address, excuse me.  He has

6    been living there the entire time.  Government counsel knew of

7    that.  And he has not gone anywhere, nor has Saudi Arabia come

8    in with black helicopters and extracted him.

9        He has been exactly where he said he would be and

10   continued to be there.  That's why the magistrate judge in

11   Seattle orders his release.

12        MR. SAMPSON:  Your Honor, Mr. Abouammo is accused of

13   acting as an agent of the government of Saudi Arabia.  He is

14   accused of using his position at Twitter to access and unmask

15   anonymous dissidents against the government of Saudi Arabia,

16   Your Honor.

17        His co-defendant, someone he knew at Twitter, someone he

18   introduced to the same people, when that co-defendant was

19   confronted by his employer, the Saudi Arabian government --

20   through the Consul General in Los Angeles -- assisted in

21   getting Mr. Alzabarah and his family out within a day.

22        What has changed now is that Mr. Abouammo has been

23   arrested -- and it wasn't orchestrated, just where he lives in

24   Seattle -- that he now has had the opportunity to read the

25   Government's detailed complaint laying out the weight of the

**PROCEEDINGS**

1  evidence -- the numerous search warrants, information from

2  Mr. Abouammo's own statements, his own cell phone -- which

3  indicates that he was aligned with the government of

4  Saudi Arabia, a country that he used to live in.  He is dual

5  citizen in Lebanon.  He has a family in Lebanon and Egypt.

6      And he has reported his bankruptcy liquidation recently in

7  Seattle, Your Honor.  So he has assets, and potential assets,

8  and potential assistance abroad, and would be incentivized to

9  flee.

10     Additionally, Your Honor, the Saudi Arabian government is

11  incentivized to assist him in fleeing, as they have done in

12  many cases.  And they have done it in this case with the

13  co-defendant Mr. Alzabarah.

14         **THE COURT:**  We can't tag Mr. Abouammo with the

15  misdeeds of his co-defendant.

16         **MR. SAMPSON:**  No, Your Honor; however, when confronted

17  by the FBI, at a time when Mr. Abouammo was not known to the

18  world to be part of this scheme, the press had not run his name

19  like his co-defendant, Mr. Alzabarah, at the time he lied to

20  the agents of the FBI.  He is alleged to have generated a false

21  document and transmitted it to agents of the FBI to send them

22  on a different trail, Your Honor.

23     So for those reasons, the Government is very concerned

24  about the risk of fight.  GPS monitoring is not going to be

25  able to address that risk.  He lives in Seattle.  Even a

1  diligent pretrial services officer would not know if he slipped

2  into Canada, or made a flight out of the country with the

3  assistance of the Saudi consulate.

4          THE COURT:  What could the Saudi consulate do to get

5  him out of the country?

6          MR. SAMPSON:  Your Honor, they can provide him with a

7  Saudi passport.

8          THE COURT:  Where does his family live?

9          MS. LINKER:  He lives with his family; his wife and

10  his three young children.  He has three children.  Their ages,

11  I think, three, seven, and ten, and his wife, they all live in

12  Seattle.  His uncle lives in Washington as well.  His sister is

13  who he lives with.

14      He also, as reported in the pretrial report, went to

15  Lebanon in August of 2018.  Had he wanted to leave he would

16  have stayed there.  He came right back.

17      So what the Government is saying is kind of remarkable,

18  that GPS doesn't work in Seattle.  I think, probably, the Court

19  in Seattle would beg to differ that it doesn't work in Seattle.

20  I think GPS works there just fine.

21      And had the Saudi government wanted to get him out,

22  knowing that he had been -- his home had been raided, that he

23  had been under investigation since 2018, why would they have

24  not done it sooner?

25      So to break down what the Government said, the only thing

**PROCEEDINGS**

1    that has literally changed is this complaint being filed.

2    Nothing else has changed.  None of the other stuff is new.  The

3    only thing that's changed is this complaint being filed.  A

4    complaint that he and his attorney knew was likely to come and

5    that is why they gave the Government his address, where he

6    would be, in the hope that he would do the reasonable and

7    appropriate thing of giving him a date to come in, which he

8    gladly would have done.

9        **MR. SAMPSON:**  Your Honor, what isn't in the Pretrial

10   Services report is his access to a bank account in his father's

11   name.  His father, who lives in Beirut, Lebanon -- and which he

12   opened a bank account in his father's name in 2015 to directly

13   receive $200,000 from Foreign Official Number 1, an official of

14   the government of Saudi Arabia and the Saudi royal family.

15       Your Honor, he moved $59,000 of that back to the United

16   States to buy his house.  That leaves $140,000 that Pretrial

17   doesn't know where that money is.  And, frankly, Your Honor he

18   may still have access to it.

19       Not just the $140,000, but look at his co-defendant,

20   Mr. Alzabarah.  His family and he were whisked away from the

21   United States to avoid being sued or prosecuted.  And he now

22   has a job with the Saudi government.

23       So, Your Honor, the Government is extremely concerned that

24   there is no combination of conditions that can assure that he

25   will not flee if he gets the opportunity to get to Vancouver,

**PROCEEDINGS**

1    or get a different passport, and flee with the assistance of a

2    government which is known to assist people in fleeing when it's

3    in its interest.

4         **MS. LINKER:**  We're back to the co-defendant.  And I

5    hope Your Honor does not take that in account and use that

6    against Mr. Abouammo.  He has done the complete -- they live on

7    food stamps right now.

8         They live on food stamps right now.  They couldn't afford

9    to hire their own lawyer.  They are not living off of some

10   largess, the amount of money that the Government says.  That's

11   an allegation.  I have not had time to look into that.  But,

12   it's not some huge amount of money sitting out there that, if

13   he needed it, he would have fled before.

14        There is just nothing that's changed.  That's not a

15   changed circumstance.

16        Since he has known of this investigation he has done

17   everything asked of him, everything required, and he will show

18   up for court.  There is nothing, really nothing about him,

19   personally, that suggests otherwise.  And there is, in fact,

20   everything that suggests he will.  There is everything that

21   suggests that he is planning on staying here.  He is not going

22   anywhere.

23        And to be clear about the allegations, in just reading the

24   complaint -- as, again, opposed to co-defendant, who I think

25   the Government would have a really strong case against -- the

**PROCEEDINGS**

1    co-defendant accessed at least 10,000, if not more, users of

2    Twitter accounts and accessed their personal information.

3        The allegation for Mr. Abouammo in the complaint is that

4    he accessed two users' information.  One user he accessed

5    several times during a two -- not even a two-month period and

6    got the personal e-mail address and the phone number of that

7    person and that is it.  And, on the second user, he accessed,

8    on one occasion, and got an e-mail address.

9        So that's the entirety of the allegation.  And I

10   understand the weight of the evidence is the least important

11   factor.  But, the weight of the evidence against Mr. Abouammo

12   is not strong.  It's not extensive evidence like they have

13   against the co-defendant.

14       **MR. SAMPSON:**  Your Honor, he was paid $300,000 and a

15   luxury watch in the space of under 14 months.  The Twitter user

16   who Mr. Abouammo accessed is an extremely influential figure in

17   Saudi Arabia.  That person's identity is a secret.

18       Your Honor, finding out that person's e-mail and phone

19   number is potentially sufficient for the Saudi government to

20   have found that person.  I hope Your Honor understands that

21   that's a very serious breach of Mr. Abouammo's employment

22   responsibilities and trust, putting it into the hands of a

23   foreign government, while acting inside the United States, Your

24   Honor.

25       The Saudi government has every incentive to signal to the

**PROCEEDINGS**

1    world, at least in this case, that it will help get someone

2    out, that it will help get its people out if they are in

3    trouble, Your Honor.  For that reason we think the Court should

4    at least order Mr. Abouammo to this district to appear here

5    before he is released.

6        **MS. LINKER:**  Your Honor, they haven't done it.  If

7    they wanted to do it, they would have done it.  They had all

8    the time.

9        The conduct is from -- the last conduct is from 2015.

10   That's when he last worked at Twitter.

11       **THE COURT:**  What's he been doing in the meantime?

12       **MS. LINKER:**  What has he been doing?  He worked for

13   Amazon.  He is also getting a master's from a Harvard extension

14   program.  He flew to Boston just a month ago to go -- to have a

15   course in -- at his Harvard extension program.  He flew back.

16   He was in touch with his attorneys the whole time in case this

17   came down because he knew that it was a potential for this to

18   come down.

19       So after the search on his house, he has been suffering

20   from some depression and anxiety, according to the pretrial

21   report, and hasn't been working as much; but prior to that he

22   has been working at Amazon.  I'm getting this from the pretrial

23   report, Your Honor.

24       He is scheduled to complete the program at Harvard

25   extension in December, as I understand it.

PROCEEDINGS

1          THE COURT:  That's in Seattle?

2          MS. LINKER:  He does -- it's an extension program that

3    he does online.

4          THE COURT:  When will we -- who will be the -- what's

5    the procedure for getting a judge assigned to this case?

6          MR. SAMPSON:  Your Honor, I believe, that he would

7    have to -- if he was brought down in the next week or so, he

8    would appear before a magistrate judge on a complaint, Your

9    Honor.  The Government may seek a preliminary hearing.

10   I believe, this is one currently scheduled in Seattle for the

11   21st.

12        And, Your Honor, he might be charged by indictment before

13   then.

14         MS. LINKER:  Just short answer --

15         THE COURT:  When will we know who the assigned judge

16   is?

17         MS. LINKER:  The short answer is:  If and when he is

18   indicted, then a district court judge would be assigned to the

19   case.

20         THE COURT:  Well, isn't it your plan to try to get an

21   indictment?  Or why does this work?

22         MR. SAMPSON:  That would be in the regular course of

23   things, Your Honor.

24         THE COURT:  Because he has right to an indictment.

25         MR. SAMPSON:  Yes, Your Honor.

**PROCEEDINGS**

1          **THE COURT:**  I don't like the fact that the Government

2    torpedoed my ability to have him here.

3          **MR. SAMPSON:**  The Government had no involvement in

4    that, Your Honor.

5          **THE COURT:**  Yeah, you did.  You got him detained.  I

6    think Ms. Linker is right, he probably would have been here if

7    he had been on his own.

8          **MR. SAMPSON:**  He also could have escaped in that time,

9    Your Honor.

10         **THE COURT:**  Yes, maybe.  Maybe.

11        The magistrate judge didn't think he would.  The

12   magistrate judge ruled against you.  And I thought it was easy

13   enough to keep him in detention until today, only to find out,

14   no, the Government has no clue when he will show up.

15        Here is what we're going to do:  I will not rule on this

16   right now.  We're going to come back in one week.  And I want

17   the Government to know that if he is not in the courtroom in

18   one week, he is very likely to be released.

19        I believe the Government could get him here if they wanted

20   to, and you're somehow torpedoing the process.  That's what I

21   think.  So you got one week to get him here.  We're coming back

22   in one week, 2:00 p.m.

23        Now, I would also -- another factor here is, I think the

24   assigned judge should be deciding this, rather than the general

25   duty judge.  I'm the general duty judge.  So I -- I don't like

**PROCEEDINGS**

 1 | that part of it either, because whatever decision I make, the

 2 | assigned judge will probably feel the opposite.  So I would

 3 | rather know who the assigned judge is.  So maybe you should try

 4 | to get your indictment as soon as you can.

 5 |     Do we have anyone from pretrial here?

 6 |         **MS. LINKER:**  We do, Your Honor.

 7 |         **THE COURT:**  I got a question or two for you.

 8 |     Okay.  What's your name?

 9 |         **MS. MENCIA:**  Good afternoon, Your Honor.

10 | Denise Mencia with Pretrial Services.

11 |         **THE COURT:**  You sent me that stuff; right?

12 |         **MS. MENCIA:**  Yes, I sent you the copies of the report.

13 |         **THE COURT:**  Thank you for sending that to me.

14 |     Now, I don't know what the options here are, but if he

15 | comes -- one thing that would be to reduce the Government's

16 | anxiety over him slipping across the border to Vancouver, we

17 | could have him stay here at a halfway house.  So you should be

18 | looking into a halfway house possibility.

19 |         **MS. MENCIA:**  We can do that, Your Honor.  I would like

20 | to know --

21 |         **THE COURT:**  And also to find out if your electronic

22 | monitoring works, or whether the Saudi government has

23 | infiltrated that system.

24 |         **MS. MENCIA:**  Well -- yeah.  There is --

25 |         **THE COURT:**  Or any other government.

PROCEEDINGS

1          MS. MENCIA:  There is no way for us to really verify

2    that.

3          THE COURT:  You can find out.  Check and see.

4          MS. MENCIA:  We will do our best.

5          THE COURT:  I don't know the answer here.

6    The guy has never been convicted of anything in his life.

7    He does have a considerable number of roots here.  On the other

8    hand, he has relatives in Lebanon.

9          MS. MENCIA:  Correct, Your Honor --

10         THE COURT:  I had a case like this once.  Ask

11   Robin Harris about it.

12   She had ten agents following the guy and he did go to the

13   embassy at midnight, get a passport, and leave.  He was caught

14   at the airport with $10,000 in his pocket.  He wound up serving

15   17 years in federal prison.  I wasn't the assigned judge at

16   that point, but the -- I know all about it.

17   So it is possible for someone who appears to be a good,

18   upstanding citizen to flee the country.  I have had that very

19   scenario.  But I also know how good the FBI is at following

20   them.

21   Nevertheless, the halfway house might be a way to reduce

22   the risk.

23   So if I'm going to made make this decision, I would like

24   to have that information when he comes down here.  Now, that

25   would mean he would be housed here, where he is being charged.

**PROCEEDINGS**

1          MS. LINKER:  Your Honor, can I just make a couple of

2     points?

3          THE COURT:  Sure.

4          MS. LINKER:  The burden is on the Government here to

5     show why he should be detained.  And Your Honor just said,

6     which is the truth, which is he probably would have shown up.

7          And the way the Bail Reform Act is written, it doesn't

8     mean that -- the Court doesn't have to definitively assure that

9     he will appear.  It's to -- subject to the least restrictive

10    condition or combination of conditions that will reasonably

11    assure the appearance of the person.  Reasonably assure the

12    appearance of the person.

13         So with electronic monitoring, having him come down --

14    Your Honor could order he appear here on Wednesday, tomorrow,

15    Thursday, whatever day he will get here and show up.

16         And Your Honor just said that someone, one person out of

17    all of the defendants that we release, all the time, one person

18    tried to go to a consulate and tried to leave, but didn't make

19    it.  Didn't make it.

20         THE COURT:  Because ten agents were following him.

21         MS. LINKER:  Well, fine.  Have them put ten agents on

22    him.

23         He does not get to be detained when there is nothing on

24    his record; literally not a single thing that warrants

25    detention.

**PROCEEDINGS**

1          **THE COURT:**  The argument though is the nature of the

2    crime and the connections to the Saudi government, where they

3    have already gotten one guy out of the country --

4          **MS. LINKER:**  And haven't gotten this guy.

5       They have had four years.  Four years, Your Honor.  I

6    don't understand.  It's not four days.  It's not four months.

7    It's four years.  And over a year since the raid on his house.

8          **MR. SAMPSON:**  This is not something they are going to

9    forget, Your Honor.  This is in the news.  It's well known.

10   Mr. Abouammo is now associated with the case.  He wasn't

11   before.

12         **MS. LINKER:**  Your Honor, I don't think that he should

13   be detained for another week.

14         **THE COURT:**  I'm going to make a decision right now.

15   I'm going to make him come here in a week.  I'm ordering the

16   Government to get him here in a week.  But, if he is not here

17   in a week, then I have a feeling I'm just going to say the

18   magistrate judge's ruling in Seattle will stand.

19       So I believe you're trying to sabotage the Court process

20   here by just making, you know, a fait accompli.  That's what

21   you want is, he is in custody somewhere between here and

22   Las Vegas.  So I don't like that.  I think you should get him

23   here.

24         **MR. SAMPSON:**  Your Honor, we're following 3145.

25         **MS. LINKER:**  Your Honor, they could get him here in a

**PROCEEDINGS**

1  day.

2         **MR. SAMPSON:**  If we devoted -- if we chartered a

3  plane, maybe we could, Your Honor.  It's a question of

4  reasonableness.

5         **THE COURT:**  Somebody could drive up there.

6         **MS. LINKER:**  I have had that happen for many of my

7  clients.  It can be done.

8         **MR. SAMPSON:**  We will definitely --

9         **THE COURT:**  Either have him here or I'm going to

10 release him on Tuesday.

11        **MR. SAMPSON:**  We will do everything we can, Your

12 Honor, to get him here.  We will ask the Marshals to expedite

13 him.  I'm not sure what the result will be.  We will attempt to

14 do that.

15        **THE COURT:**  Please, check out the halfway house.

16    And, Ms. Linker, he should be prepared, as a contingency

17 only, to be spending some time down here so he should bring his

18 toothbrush.

19        **MS. LINKER:**  I can argue about it next week.  I don't

20 think that's a fair or reasonable solution; but we can talk

21 about it next week.

22        **THE COURT:**  I want to have my options.  I'm not making

23 a decision now.  I am -- I feel like he should have been here.

24 We should not even be having this discussion.

25        **MS. LINKER:**  And now he is staying in custody for an

**PROCEEDINGS**

1    extra week because of that, Your Honor.

2         THE COURT:  I'm sorry.  Life is not so great.  But I

3    can't solve every problem.  I can only solve a few.  He will be

4    in custody an extra week.  Maybe longer.

5         Help me out here -- will you -- instead of coming up with

6    excuses.

7         All right.  That's all the damage I can do for one day.

8         MR. SAMPSON:  Thank you, Your Honor.

9         MS. LINKER:  Thank you, Your Honor.

10              (Proceedings adjourned at 2:43 p.m.)

11                        ---o0o---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                         **<u>CERTIFICATE OF REPORTER</u>**

3            I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    DATE:    Thursday, December 12, 2019

7

8

9

10   _____

11         Ruth Levine Ekhaus, RDR, FCRR, CSR No. 12219
             Official Reporter, U.S. District Court
12