Pages 1 - 27

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. C HEN

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. CR 19-0621 EMC |
| | ) | |
| AHMAD ABOUAMMO, | ) | |
| | ) | San Francisco, California |
| Defendant. | ) | Thursday |
| | ) | November 21, 2019 |
| | ) | 8:30 a.m. |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:          DAVID L. ANDERSON
                        United States Attorney
                        450 Golden Gate Avenue
                        San Francisco, California  94102
                  BY:   **COLIN SAMPSON**
                        **ASSISTANT UNITED STATES ATTORNEY**


For Defendant           STEVEN G. KALAR
                        Federal Public Defender
                        450 Golden Gate Avenue
                        San Francisco, California 94102
                  BY:   **JODI LINKER**
                        **ASSISTANT FEDERAL PUBLIC DEFENDER**


Also Present:           **TIM ELDER - PRETRIAL SERVICES**


*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
        *Official Reporter - US District Court*
        *Computerized Transcription By Eclipse*

| | |
|---|---|
| 1 | **Thursday - November 21, 2019**                    **8:37 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---000--- |
| 4 | (Defendant present, in custody.) |
| 5 | **THE CLERK:**  Calling Criminal Case No. 19-621, United |
| 6 | States of America versus Ahmad Abouammo. |
| 7 | Counsel, please state your appearances for the record. |
| 8 | **MR. SAMPSON:**  Good morning, Your Honor.  Colin |
| 9 | Sampson for the United States. |
| 10 | **THE COURT:**  Good morning, Mr. Sampson. |
| 11 | **MS. LINKER:**  Good morning, Your Honor.  Jodi Linker |
| 12 | appearing on behalf of Ahmad Abouammo.  He is present in the |
| 13 | custody of the Marshal Service. |
| 14 | **THE COURT:**  All right.  Good morning, Mr. Abouammo. |
| 15 | **THE DEFENDANT:**  Good morning. |
| 16 | **PRETRIAL SERVICES OFFICER:**  Good morning, Your Honor. |
| 17 | Tim Elder here on behalf of Pretrial Services. |
| 18 | **THE COURT:**  Great.  Thank you, Mr. Elder. |
| 19 | Has Pretrial had a chance to -- I know this came from |
| 20 | Washington, but has your office had a chance to look at this |
| 21 | file? |
| 22 | **PRETRIAL SERVICES OFFICER:**  We did, Your Honor.  And |
| 23 | we also reached out to Seattle to address some additional |
| 24 | questions.  I don't know if they were brought up at the last |
| 25 | hearing, but we agree with the recommendation from Seattle. |

1          **THE COURT:**  Okay.  Do you have some -- any more

2    information than what was in the Seattle bail report?

3          **PRETRIAL SERVICES OFFICER:**  Well, your Honor, we did

4    interview two sureties, and that's the defendant's wife and

5    sister.  And wife is willing to act as a third-party custodian.

6          Neither of them, I think, are probably viable sureties at

7    this time, but his wife is here on his behalf and sister was

8    not able to be here today.

9          **THE COURT:**  All right.  And they are not viable

10   because of the financial circumstances?

11         **PRETRIAL SERVICES OFFICER:**  Not working and, yes, I

12   would say financial situation.

13         **THE COURT:**  And what is the financial situation with

14   respect to the house and bankruptcy?

15         **PRETRIAL SERVICES OFFICER:**  Your Honor, it's my

16   understanding that the home is in the process of being sold in

17   lieu of a foreclosure.

18         **THE COURT:**  So there is no equity in the home.

19         **PRETRIAL SERVICES OFFICER:**  That's my understanding.

20         **THE COURT:**  Is that correct?

21         **MS. LINKER:**  My understanding is there is very

22   little, if any, and it's all being taken care of with the

23   bankruptcy proceeding.

24         Mr. Abouammo hasn't paid his mortgage on it for about six

25   months, so I actually think it might end up getting foreclosed.

1   They have not been living there since October of 2018.

2          MR. SAMPSON:   Your Honor, I believe that the

3   bankruptcy filings indicated that there was equity in the

4   property; that he had bought it for about 950,000 and that he

5   had about a $700,000 mortgage.   So I believe that there was

6   about 100,000 in equity as of August.

7          MS. LINKER:   And I think that just might be because

8   they haven't paid the mortgage for so long.

9          There might be some equity, as I said.   I just don't know

10  where that's going to go.   There is a small delta.   I just

11  don't know where it's going to go given also the great amount

12  of debt that's reflected in the bankruptcy filing.   I think

13  there is over $150,000 combined debt.   I could be wrong about

14  that.   Mr. Sampson has the -- has it in front of him, but there

15  is quite a bit of debt.

16         So I don't think that Mr. Abouammo is going to end up with

17  some amount, significant amount of money.

18         THE COURT:   All right.   Has Pretrial identified any

19  other possible sureties that could serve?

20         PRETRIAL SERVICES OFFICER:   We have not been

21  presented with any other sureties that I'm aware of.

22         THE COURT:   Let me ask you, Ms. Linker.

23         MS. LINKER:   So, your Honor, I actually was the one

24  that asked Pretrial to interview the potential sureties, even

25  though no sureties were proposed.

1        But I don't think that Mr. Abouammo's wife or his sister

2   are not viable sureties.  I understand there is a concern about

3   their not having finances available, but all the time in this

4   district we have people who sign on as sureties without jobs,

5   that don't have a substantial amount of money, because the

6   point is not just whether they have money, it's whether they

7   are going to influence this person to abide by the conditions

8   of their pretrial release.

9              **THE COURT:**  Right.  Because they suffer jeopardy if

10   he flees --

11              **MS. LINKER:**  Absolutely.

12              **THE COURT:**  -- and they are put in future financial

13   jeopardy even if they don't have much now.

14              **MS. LINKER:**  Not just financial jeopardy.  There is

15   so much at stake for their reputations, for everything that

16   goes on should they not.  Especially his wife, as the

17   custodian.  She would have the duty to report to the Court if

18   he's not abiding by the conditions.

19        And I do just want to note.  Neither Pretrial in Seattle,

20   Pretrial here, Judge Alsup, Judge Kim or the magistrate judge

21   in Seattle even thought sureties were necessary.  So to have

22   the addition of sureties, I'm fine with Your Honor doing that,

23   but I do think his wife as a custodian and a surety is

24   satisfactory.

25              **THE COURT:**  Let me ask whether the family have

1  passports?

2          **MS. LINKER:**  So Mr. Abouammo's passports have been

3  seized by the Government.  I'm sure his wife is willing to

4  surrender her passport, if that's what the Court would want.

5      His kids only -- I don't even know if they have passports.

6  They are all U.S. citizens.  They don't have dual citizenship.

7      Can I just check with the wife?

8      (Brief pause.)

9          **MS. LINKER:**  Thank you, Your Honor.

10     The wife and the kids all have passports, and she's happy

11  to surrender all of them.

12          **THE COURT:**  All right.

13          **MR. SAMPSON:**  Your Honor, the Government's concerns

14  are slightly broader than that.  The question of a surety, his

15  wife or his sister, it doesn't matter if they all flee with

16  him.

17          **THE COURT:**  Which is why I asked for passports.

18          **MR. SAMPSON:**  Well, your Honor, I have an argument to

19  make about the assistance that the government of Saudi Arabia

20  can lend individuals who are fleeing the United States, and I

21  would like to make that at the right time.

22          **THE COURT:**  For all five members.

23          **MR. SAMPSON:**  Well, Your Honor, Mr. Alzabarah fled

24  with his wife and daughter on one day's notice with one phone

25  call.

1          **THE COURT:**  But his passports weren't confiscated.

2          **MR. SAMPSON:**  Well, Your Honor, the government of

3    Saudi Arabia would not have a problem issuing new passports

4    potentially in new names.

5          **THE COURT:**  So a Saudi Arabia-issued passport, as

6    opposed to a U.S. passport, to leave the country?

7          **MR. SAMPSON:**  Your Honor, Mister -- this is part of

8    my argument that I'd like to make a record on, but Mr.

9    Alzabarah was assisted officially by the government of Saudi

10   Arabia and the consulate in Los Angeles, who assisted him in

11   getting out of the United States.

12         **THE COURT:**  Did he have a wife and kids here?

13         **MR. SAMPSON:**  Mr. Alzabarah had a wife and daughter

14   here.

15         **THE COURT:**  How old is the daughter?

16         **MR. SAMPSON:**  One or two -- one.

17         **THE COURT:**  And so she got -- the daughter got a

18   passport?

19         **MR. SAMPSON:**  The daughter was born in the United

20   States, your Honor.

21         **THE COURT:**  I mean, to leave.  You said the whole

22   family fled.

23         **MR. SAMPSON:**  The whole family fled.  I don't know

24   the circumstances of the passports.

25         I don't think it's an unsurmountable problem with official

1   help from the government of Saudi Arabia.

2          THE COURT:  Well, it is a little different; right?

3   And you would concede that it's at least slightly more

4   difficult to arrange for travel for an entire family than for

5   one individual.

6          MR. SAMPSON:  They arranged for travel for three, and

7   this is seven.

8          THE COURT:  Without passports.

9          MR. SAMPSON:  Well, it may be more difficult Your

10  Honor, but I -- I do not submit that it's insurmountable for a

11  foreign government to lend that kind of assistance.

12         THE COURT:  Well, all right.  The big issue here,

13  there is a tie here.  This defendant has been in this country

14  20 years.  He's got a wife and U.S. born children that are

15  young of age.  And normally there is a lower chance of flight

16  or risk of flight when somebody has families.  That's the best

17  community tie one can have.

18      And so, yes, some people do leave their families.  Some

19  people do leave their children.  I admit that.  All right.

20  Acknowledge that.  But that diminishes the chances.  That's a

21  significant community tie under the Bail Reform Act that I'm

22  supposed to consider.

23      So then the counter to that is that, well, the entire

24  family could flee.  But if they surrender their passports, that

25  makes that task somewhat more difficult and that begins to move

1    the needle, it seems to me.

2         What's the -- what is the guideline range here?

3              MR. SAMPSON:  Your Honor, there are no guidelines for

4    18 U.S.C. 951.  It's a ten year -- it could be anywhere up to

5    ten years, Your Honor.  No guidelines under the guidelines.  No

6    range.

7              THE COURT:  There's no guidelines?

8              MR. SAMPSON:  There is no range.  There is no

9    guideline for this charge.

10             THE COURT:  Wow.  I've never seen that before.

11             MS. LINKER:  So, your Honor, I've never seen it, too.

12   And I looked into it and saw the same thing.

13        One of the things -- I've just got on to this case, so I'm

14   just starting to research it.  I think one of the things that's

15   often looked at in a case like this is the amount of alleged

16   financial gain and then using the 2B1.1 guidelines, like the

17   Fraud Economic Crimes guideline.

18        And as Your Honor is aware, for the amount of loss even

19   alleged in this case, which is approximately -- the

20   Government -- at the Government's highest allegation I think

21   it's $320,000.  It would not be a high guideline.

22             THE COURT:  What would it be if you looked at

23   the financial?

24             MR. SAMPSON:  41 to 51, I believe, under that

25   guideline, without enhancements for assisting a foreign

1    government or victim related enhancements, which the Government

2    might submit there are.

3          **MS. LINKER:**  I don't know that that's true, Your

4    Honor.  I haven't calculated under that.  That seems high to me

5    for a loss this low.

6          **THE COURT:**  And how does that compare, just out of

7    curiosity, to the co-defendant, Mr. Alzabarah?

8          **MR. SAMPSON:**  Your Honor, it's similar.  Again, the

9    951 charge does not carry a guideline.  And the amount of the

10   loss is -- would be either the same or greater.  It would not

11   potentially be substantially higher.  It would not be lower for

12   Mr. Alzabarah.

13         **THE COURT:**  What if one were to look at the amount of

14   harm inflicted as between the two defendants?

15         **MR. SAMPSON:**  Well, the victim related enhancement,

16   Your Honor?  There is a just a two-point enhancement for ten or

17   more victims or a substantial financial loss.  It would be

18   victim number based, so it might be two points higher.

19         **THE COURT:**  How many victims, remind me the facts of

20   Mr. Alzabarah's.

21         **MR. SAMPSON:**  Mr. Alzabarah's, several thousand.

22         **THE COURT:**  And in this case there were two?

23         **MR. SAMPSON:**  There are two alleged in the

24   indictment, Your Honor, but to satisfy the statute it -- it's

25   not based on any number of victims.  And the Government has

1    arguments about --

2          **THE COURT:**  Right.  Under 3553(a), if we ever got to

3    that point, any Court, including this Court, any sentencing

4    Court would look at it.  It seems to me that's a very relevant

5    factor going to the seriousness of the offense, the very first

6    factor under 3553(a).

7          There is a difference between compromising the integrity

8    of two people versus thousands of people.  I'm not condoning.

9    This is very serious.  I mean, you know, condoning the -- I

10   mean, jeopardizing the identity and safety of one person could

11   lead to serious consequences under these.  So I'm very aware of

12   that.  We've seen enough of that.  But there is some difference

13   between the two in terms of the magnitude here.  Just a factor.

14         **MR. SAMPSON:**  That is a factor, Your Honor.

15         **THE COURT:**  Well, I guess the question is -- let me

16   ask one more question about sureties.  Are there any other

17   family members or anybody else that could serve as a surety?

18         **MS. LINKER:**  I think that there are.  I just don't

19   know that they are necessary.  I think his uncle potentially

20   could be a surety as well.

21         I do want to respond though, Your Honor, to the -- the

22   arguments about getting Mr. Abouammo out of the country and the

23   comparison to the co-defendant.

24         What the government alleges is that Mr. Abouammo and his

25   co-defendant knew each other and that they worked together in

 1    Twitter, at Twitter, and that his co-defendant was taken away,

 2    swept away by the Saudi Arabian government in 2015.  So five

 3    years ago.  Presumably if they knew each other, Mr. Abouammo

 4    was aware of that.  It was also, I think, in the newspaper that

 5    his co-defendant fled the country.

 6         Mr. Abouammo did no such thing for four years.  Then in

 7    October of 2018 his home was raided.  Before his home was even

 8    raided, the FBI came and interviewed him.  He sat down with the

 9    FBI agent for, I think, over three hours.  He did a full

10    interview with him.  Several days later they came back with a

11    search warrant.  They searched his home.

12         He did not flee.  He hired a lawyer.  His lawyer started

13    communicating with Mr. Sampson and the U.S. Attorney's Office.

14         Mr. Abouammo was so distraught by the search of his home

15    that he and his family moved out of his home and he moved in

16    with his sister.  His attorney provided the U.S. Attorney's

17    Office with his address, where he was living.  He did not flee.

18         Mr. Sampson, in the email that I submitted to Your Honor,

19    made very clear that they were looking into charges and that it

20    was coming down.  Mr. Abouammo, because of that, kept in close

21    contact with his attorneys the entire time.  There was not a

22    moment of time where they did not know where he was in the hope

23    that the Government would contact him so he could come in and

24    face the charges.  He would have been -- could have been

25    summonsed to court.  He would have voluntarily appeared, and he

1    kept in contact with his lawyer so that he could do that.

2         So to compare him to his co-defendant I actually think

3    completely and totally inures to the benefit of Mr. Abouammo

4    because he did the complete opposite while knowing full well

5    that he was likely to be indicted; that he was likely to have

6    these serious charges brought against him.  He went nowhere.

7    He did everything right.

8              MR. SAMPSON:  Your Honor, responding to that.

9         There was no communication between my office and his

10   attorneys after November, I believe it was 18th.  So one year

11   ago.  And circumstances have substantially changed since he

12   became aware of the investigation, Your Honor.

13        He has moved out of the house.  That may be for financial

14   reasons.  He does not -- he's not employed.  He has not been

15   employed for some time, Your Honor.  He's taken his children

16   out of school.  And he is filed for bankruptcy.  And he's in

17   dire financial straits, Your Honor.  We have some concerns

18   about the accuracy of that bankruptcy filing based on the

19   jewelry he was given and the bank account in Lebanon.

20        But, Your Honor, his situation has certainly changed in

21   the last year since the Government executed a search warrant

22   and he became aware that he was a subject of the investigation,

23   Your Honor.

24        And additionally, I -- he certainly may not have

25   appreciated that he would be arrested, especially as time went

1    by, Your Honor.  When he was arrested, he asserted that -- he

2    attempted to bargain with the arresting agents and asked to

3    come in voluntarily, Your Honor.  He appeared to be laboring

4    under the assumption that he would be summonsed to court.

5         And so his arrest took him by surprise, Your Honor.  And I

6    think that's important because his co-defendant, when he was

7    confronted with his accesses and suspended from Twitter, all he

8    had to do was make one phone call and he was assisted with the

9    full power and weight of the Saudi government and consulate in

10   assisting him in getting out.

11             THE COURT:  What was his tie to the Saudi government,

12   Mr. Alzabarah?

13             MR. SAMPSON:  Mr. Alzabarah?  He was in contact with

14   Foreign Official 1, who works for a high member of the Saudi

15   Royal family.  And he was accessing and acting in a similar way

16   to Mr. Abouammo, but in a more extensive and more prolonged

17   way.

18             THE COURT:  And he is a citizen --

19             MS. LINKER:  Excuse me.  He is a Saudi citizen.

20             MR. SAMPSON:  He is a Saudi citizen, yes.

21             MS. LINKER:  He's a Saudi citizen, which is --

22             THE COURT:  Excuse me.  I was about to read.  He's a

23   Saudi citizen.

24             MR. SAMPSON:  That's correct, yes.

25             THE COURT:  Isn't that slightly different?

1          **MR. SAMPSON:**  Mr. Abouammo is a Lebanese citizen.

2     Mr. Abouammo has ties to Saudi Arabia.  He used to live and

3     work there.

4          **THE COURT:**  There's a slight difference between being

5     a citizen of the country and committing their help and also

6     having committed at least a numerically more massive crime

7     than -- than somebody who is not a citizen, who appears to be a

8     smaller player.

9          **MR. SAMPSON:**  Perhaps Mr. Abouammo did not -- perhaps

10    Mr. Abouammo believed he was flying under the radar and would

11    not be prosecuted because of that.

12         And, Your Honor --

13         **THE COURT:**  My point is about -- my point is about

14    your scenario, your feared scenario that the KSA is going to

15    reach in and make an effort to extract and assist the

16    extraction of Mr. Abouammo from this country, along with his

17    family, based on what happened to Mr. Alzabarah.

18         So I'm -- I only ask the question about citizenship

19    because that is one factor that informs the probability of that

20    scenario.  I'm not saying nothing is possible.  I'm saying that

21    is one factor.

22         **MR. SAMPSON:**  Your Honor, what better way to solve a

23    problem and an embarrassment for the country right now than to

24    assist someone in getting out and avoiding either prosecution

25    or cooperation or the proving of the facts that are

1  inconvenient to that country, Your Honor.  And what a better

2  signal could the government of Saudi Arabia give to it's spies

3  and moles in tech companies and elsewhere that they will assist

4  people in getting out, as they do their own citizens.

5          THE COURT:  Well, that wouldn't be particular to

6  Saudi Arabia.  There are a lot of countries out there in the

7  same situation.

8      So anybody who is -- suffers, experiences an arrest for

9  violation of the law regarding being an agent for a foreign

10  government -- and there are many.  We know who they are, some

11  of them, who are willing to undertake extraordinary efforts to

12  tilt the scales, as you put it.  And so that -- that suggests

13  the Bail Reform Act just kind of goes out the window any time

14  there is a charge.

15          MR. SAMPSON:  Well, it is an exceptional charge, Your

16  Honor, but we're talking about state powers.  We're talking

17  about the ability of other governments.

18          THE COURT:  And I'm saying the KSA is not alone in

19  that.

20          MR. SAMPSON:  That's fair, Your Honor.  I made a

21  similar argument in a case involving China recently.

22      However, Your Honor, Mr. Abouammo is now, versus a year

23  ago, in a much more vulnerable state.  He has almost no

24  finances.  He is in bankruptcy.  He is not employed.  His

25  family is not employed, Your Honor.  And his family reports and

1    his attorney reports that he has developmental conditions

2    recently, Your Honor.  He is particularly vulnerable at this

3    point.  And his contacts are extremely powerful.

4        And the Government's concern, Your Honor, is that it may

5    only take a phone call to get that assistance from a government

6    with vast resources and ability to assist someone in escaping

7    the U.S. justice system, as it has done.

8        **THE COURT:**  What's your response, that this is a

9    particularly vulnerable person?  Even though he has ties, there

10   is some incentive, reverse incentive here.

11       **MS. LINKER:**  So the peak of his vulnerability was in

12   October of 2018 when the Government came and raided his home.

13   It's reflected even in the presentence -- in the Pretrial

14   report, that his mental health issues have gotten dramatically

15   better.  He's on medication.  He's getting treatment.  He is

16   doing so much better.  So I don't think that that is anything,

17   any reason to keep him in custody.

18       Second, he left his job at the same time of this raid

19   happening because of the mental health issues he suffered, and

20   he didn't flee then.  So if he were so vulnerable at that

21   point, that would have been the time to leave.

22       Third, the financial situation.  The financial situation

23   has been bad since he left his job because he didn't have an

24   income.  If the financial situation was going to be the thing

25   that got them to leave, why would he have filed for bankruptcy?

1   Why would he have gone through the process of hiring someone.

2   It looks like he had someone, a lawyer or someone assist him in

3   filing for bankruptcy and go through all of the legal and

4   correct procedures to do that, instead of just taking off and

5   saying:  I've got over $150,000 of debt.  I have potential

6   charges coming against me.  I can't work.  I'm going to just

7   go.  He would have gone then.  He didn't.

8           So, in fact, all of the evidence that the Government

9   points to existed prior to this, and he did not leave.

10          Fourth, with respect to KSA and their incentives to get

11  him out.  KSA, if these allegations are true, presumably know

12  about Mr. Abouammo, know about the potential for charges, and

13  had they wanted to get him out, they would have done it sooner.

14  So the filing of the charges doesn't change that.  The

15  filing -- they could file charges even if he weren't here.

16  They filed charges against two other individuals who aren't

17  here.

18          So it doesn't relieve them of embarrassment or anything.

19  So if they wanted to get him out, they would have gotten him

20  out.  He has stayed here.  He has done everything right.  He

21  wants to stay here.  He will stay here.  His family is here.

22  This is his home.  This is his country.

23              THE COURT:  All right.  You say the sister is not

24  here.

25              MS. LINKER:  The sister didn't come down, no.  She

 1  has a disabled child, so she was unable to travel.

 2          THE COURT:  She's in Seattle.

 3          MS. LINKER:  She's in Seattle.

 4          THE COURT:  Just curious.  Does the uncle reside in

 5  Seattle?

 6          MS. LINKER:  The uncle resides outside of Seattle.

 7  He's in Washington, but in another city.  It's called -- how do

 8  you say it?

 9          THE DEFENDANT:  Wenatchee.  Wenatchee, Washington.

10          THE COURT:  What is his current?  Is he working or

11  what's his financial situation?

12          THE DEFENDANT:  Yeah, he's working.

13          THE COURT:  Okay.  Would he be willing to sign onto a

14  bond?

15          MS. LINKER:  I -- I didn't check with him.  I don't

16  know if he contacted Pretrial.  He may have called them.

17          PRETRIAL SERVICES OFFICER:  Your Honor, I don't have

18  information on that.  I wasn't working on the investigation.

19  But I don't have information today from him, if he did contact

20  him.

21          THE COURT:  I am prepared to order the release of

22  Mr. Abouammo under terms and conditions in addition to those

23  that were specified in the Washington order.  Namely, the

24  condition that there be a surety and a custodian.  As

25  suggested, that the wife serve as a responsible custodian with

 1   reporting duties, as well as to sign onto a surety bond.  And,

 2   again, even though they may not qualify under normal

 3   circumstances as sureties, the point here is that they would

 4   have responsibilities, the sureties would have responsibility

 5   and jeopardy that would reach into the future.

 6        So even if they don't have much by way of finances now,

 7   Mr. Abouammo, if you were to flee or if you were to not comply,

 8   the bond is revoked.  That would put your wife and whoever else

 9   signs on as surety in jeopardy because there would be a

10   judgment against them.  So that means anything they earn in the

11   future would be subject to attachment or lien or anything else.

12        So long as the -- I'd like the sister to sign on, and I

13   would like the uncle to sign on.  I'm not going to require a

14   huge amount.  I'm going to require a $50,000 bond.  That

15   doesn't mean you have to put up 50,000.  That means they have

16   to stand behind that bond.  And I think that amount is

17   calibrated to have a meaningful impact upon those sureties.

18        Does Pretrial Services recommend any other further

19   conditions?

20            **PRETRIAL SERVICES OFFICER:**  No, Your Honor.

21            **THE COURT:**  Because we have had location monitoring

22   here; right?

23            **PRETRIAL SERVICES OFFICER:**  GPS, yes.

24            **THE COURT:**  I find that the Government under these

25   circumstances, with these conditions in place, has not

demonstrated sufficient likelihood of risk of flight.

Mr. Abouammo's ties to this country are substantial.  He has been here for 20 years.  He's got citizenship here.  He's whole family has citizenship here.

Also, the passports will be surrendered by the wife and the three children, so that those would not be available.

He has substantial ties here.  And as counsel has pointed out, there have been previous opportunities to flee and he's not taken any steps to flee.

And the point about the financial situation is also one indicator that rather than fleeing or disregarding his debts, the fact that he filed bankruptcy indicates that he is, if anything, vested in this process.

**MR. SAMPSON:**  It's a liquidation, Your Honor.

**THE COURT:**  But still, why go through that?  My view is that that is one sign of being vested in this community.

His situation is different from Mr. Alzabarah because, number one, he's not a citizen.

Number two, the allegations, while very serious and could result in substantial penalty if he is convicted, is different and less severe than Mr. Alzabarah, who is a Saudi citizen and -- and, therefore -- and passports had not been taken away from his family, et cetera, et cetera.  So what happened to him appears to be different, and so it's not a fair comparison in this case.

 1          So I find that given the community ties and the

 2    restrictions that we are placing, which includes a

 3    forfeiture -- not forfeiture, but the withholding of the

 4    passports of the entire family, and the three sureties that I'm

 5    asking for, that these are adequate conditions to assure the

 6    appearance of the defendant in any future proceedings.

 7              MR. SAMPSON:  Would Your Honor consider a curfew

 8    provision?

 9              THE COURT:  Is that in there?  What is the provision

10    now?

11              MR. SAMPSON:  I don't think there is a curfew

12    provision in the Seattle magistrate judge's bond.

13              THE COURT:  What is it?

14          MS. LINKER:  There is not, because there is no need

15    for a curfew in this case.  A curfew is imposed at times when

16    you think somebody is going to go out and do stuff at night and

17    not show up.

18          He's going to be on GPS monitoring.  There is no need to

19    further restrict his movement.

20              THE COURT:  What does Pretrial think?

21              PRETRIAL SERVICES OFFICER:  We are not recommending a

22    curfew.  GPS is actually more restrictive than a curfew would

23    be.

24              THE COURT:  All right.  Then I'm going to leave that

25    condition.

1      So the new conditions are custodian, sureties and

2 passport, turning in the passports of the family.

3           **MS. LINKER:**  Can we have his wife sign the bond now?

4 I don't know if Your Honor has bond forms up here.  I could run

5 down to 15 and grab one.

6           **THE CLERK:**  Judge Kim is the duty judge.

7           **THE COURT:**  Why don't you just appear before Judge

8 Kim, she will be on in minutes, and have her -- she has all the

9 equipment.

10           **MS. LINKER:**  Could I ask one or thing?  Could Your

11 Honor order him released today and have the sister and uncle

12 sign within 24 hours up in Washington?

13           **THE COURT:**  What does Pretrial think of that?

14           **PRETRIAL SERVICES OFFICER:**  Your Honor, we -- that's

15 possible for them to sign in Seattle.  I think it seems

16 appropriate in this situation.

17           **THE COURT:**  The question is whether he should be

18 released pending that or not until those are signed.

19           **PRETRIAL SERVICES OFFICER:**  Pretrial initially didn't

20 recommend sureties, so I think we would not be opposed to that.

21           **MR. SAMPSON:**  The Government does oppose.

22           **MS. LINKER:**  His wife would sign here, so his wife

23 would be on there.  And then the advantage of that, he can fly

24 home with his wife and kids today.  He's been here for several

25 days now.

1          **THE COURT:**  Might it be possible immediately to

2     have -- today to have the uncle and the sister?  Are they

3     anywhere near the Seattle or Tacoma courthouse?

4          **MS. LINKER:**  I don't know.  I would have to call.  I

5     could call right now.  I don't know if Your Honor -- I know

6     Your Honor has another matter.  So I could call right now and

7     see if they could get there today.

8          **THE COURT:**  Well, you know, I am sympathetic for him

9     to be able to fly home, but these are important conditions.  I

10    would like those fulfilled.  So if they can do it today, that's

11    fine, but I -- I want to have those signatures.

12         **MS. LINKER:**  Okay.

13         **PRETRIAL SERVICES OFFICER:**  Your Honor, regarding the

14    passports.  I don't know that they have their passports here

15    today.  So would they be able to surrender those at a later

16    date?

17         **THE COURT:**  I will set a surrender date for that.

18    That's got to be this week.

19         **MS. LINKER:**  That's fine.  Today is Thursday.  So

20    "this week" meaning -- let me see if she has them.

21         **THE COURT:**  Does she have hers?

22         **MS. LINKER:**  I don't know if she used it to fly and

23    needs it to fly back home.

24         **THE COURT:**  Why don't you see.

25         (Brief pause.)

1          **MS. LINKER:**  Your Honor, she has all the passports

2    with her.  She can surrender them today.  She has another I.D.

3    she can use to fly home.

4        The sister is close to the courthouse.  The uncle lives

5    about three hours from the courthouse.

6          **THE COURT:**  All right.  I'll do this.  If the

7    passports are surrendered now and the sister can sign on today,

8    I will allow Mr. Abouammo to be released pending the uncle,

9    because the uncle is an add-on.  But I would like him to sign

10   on within the next -- let's say, by early next week.

11         **MS. LINKER:**  Thank you, Your Honor.

12         **MR. SAMPSON:**  So to be clear, Your Honor, we'll go

13   down to Judge Kim and do a bond signing.

14         **THE COURT:**  Yes.

15         **MR. SAMPSON:**  And Mr. Abouammo will be released?

16         **THE COURT:**  Well, I've got to get the sister.  I do

17   want the sister to sign on.

18         **MR. SAMPSON:**  Okay.  Thank you.

19         **THE COURT:**  You should call her right away and see if

20   she can get in front of the duty magistrate judge.

21         **MS. LINKER:**  I will do it immediately.

22         **THE COURT:**  As soon as word is that the sister has

23   signed on, then he will be released with the condition that the

24   uncle needs to sign on, let's say, within the next five days.

25         **MS. LINKER:**  Thank you, Your Honor.

1           MR. SAMPSON:  Just a couple of additional matters,

2    Your Honor.  Should we set a status?  And I would like to

3    exclude time.

4           THE COURT:  Okay.  Let's set a status.  What is the

5    parties' preference?

6           MR. SAMPSON:  I defer to the Court on a period of

7    time.  I'm not sure if there is enough time before the holiday.

8           MS. LINKER:  I would prefer to set it in January.

9    Also, he's going to have to fly back down and I want to have it

10   be a meaningful appearance.  So if we could set it

11   January 15th?

12          MR. SAMPSON:  January 8th?

13      (Discussion held off the record between counsel.)

14          MR. SAMPSON:  I would prefer the 8th, if you can do

15   that.  Is Your Honor available January 8th?

16          THE CLERK:  No.

17          MR. SAMPSON:  No?  Okay, on the 15th.

18          THE COURT:  I guess that takes care of that.  15th?

19          MR. SAMPSON:  It's a Wednesday afternoon.  I can do

20   that.

21          THE COURT:  15th at 2:30.  And in terms of discovery,

22   what's happening with discovery?

23          MR. SAMPSON:  So, Your Honor, yesterday on the record

24   I provided 136 or 138 pages of discovery, some bank records.

25   I'm crafting a protective order relating to the user data and

1  some other sensitive items.

2      Subject to that being filed, the Government is preparing

3  discovery, which is quite voluminous.  We do intend to produce

4  it.  But based on what's been produced to date, we would ask

5  for an exclusion of time under the Speedy Trial Act between now

6  and January 15th.

7          **MS. LINKER:**  No objection.

8          **THE COURT:**  Time will be excluded between now and

9  January 15th on the grounds that time is needed for effective

10  preparation of defense in light of the ongoing discovery.  I

11  find that the ends of justice outweighs the parties' and the

12  defendant's interest in a speedy trial.

13      Mr. Sampson, if you could prepare an exclusion order for

14  the record, I'd appreciate it.

15          **MR. SAMPSON:**  Thank you, Your Honor.

16          **THE COURT:**  So we'll see you back here in January.

17          **MS. LINKER:**  Thank you, your Honor.

18          **THE COURT:**  All right.  Thank you.

19          **THE DEFENDANT:**  Thank you.

20      (Proceedings adjourned.)

21

22

23

24

25

## <u>CERTIFICATE OF OFFICIAL REPORTER</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Wednesday, January 29, 2020