DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

COLIN C. SAMPSON (CABN 249784)
    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    Colin.Sampson@usdoj.gov

JOHN C. DEMERS
Assistant Attorney General
National Security Division

BENJAMIN J. HAWK (NJBN 030232007)
Trial Attorney, National Security Division
    950 Pennsylvania Avenue NW
    Washington, DC 20530-0001
    Telephone: (202) 307-5176
    Benjamin.Hawk@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 19-621 EMC |
| Plaintiff, | UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR LACK OF VENUE (ECF NO. 82) |
| v. | |
| AHMAD ABOUAMMO, | Date: January 6, 2021 |
| Defendant. | Time: 2:30 p.m. |
| | Courtroom: 5, 17th Floor |

1

2

**TABLE OF CONTENTS**

I.    BACKGROUND ...................................................................................................1

  A.  The Charges against Defendant Abouammo ..............................................1

  B.  Overview of the Fraud Schemes .................................................................2

  C.  Defendants Abouammo and Abzabarah Owed a Fiduciary Duty to Twitter ...................2

  D.  Allegations Specific to Defendant Abouammo ..........................................3

II.   APPLICABLE LAW ...........................................................................................6

  A.  Venue for Counts Twenty to Twenty-Two Is Sufficiently Alleged ...........7

  B.  Superseding Indictment Sufficiently Alleges Venue for Count Twenty-Three..........................10

    1.  Intent to Influence, Impede, or Obstruct an Investigation Is an Essential Conduct Element Drafted to Describe the Effects of the Offense ...................10

    2.  Intent to Influence, Impede, or Obstruct an Investigation Is Not a Circumstance Element of the Offense ...................12

    3.  Sections 1512 Should Guide the Court's Analysis and Ruling ...........13

    4.  Section 1001 Provides Additional Support for Interpreting § 1519 as an Effects-Based Crime for Venue Purposes...................15

    5.  The Cases Cited by Defendant Are Distinguishable and the Court Should Disregard Them ...................16

    6.  The Facts Alleged in the Superseding Indictment Support Venue in the Northern District of California...................17

IV.   CONCLUSION...................................................................................................18

1

## TABLE OF AUTHORITIES

2

3

Cases

4

*United States v. Angotti*,
   105 F.3d 539 (1997)................................................................................................. 10, 15

5

*United States v. Bowens*,
   224 F.3d 302 (4th Cir. 2000) ............................................................................. 10, 12, 16

6

*United States v. Brennan*,
   452 F. Supp. 3d 225 (E.D. Pa. 2020) ........................................................ 10, 11, 13, 15

7

*United States v. Brugnara*,
   856 F.3d 1198 (9th Cir. 2017) ..................................................................................... 15

8

*United States v. Cabrales*,
   524 U.S. 1 (1998).................................................................................................... 10, 12

9

*United States v. Casch*,
   448 F.3d 1115 (9th Cir. 2006) ....................................................................................... 6

10

*United States v. Coplan*,
   703 F.3d 46 (2d Cir. 2012)..................................................................................... 15, 16

11

*United States v. Delia*,
   749 F. Supp. 500 (S.D.N.Y.1990)............................................................................... 11

12

*United States v. Ermoian*,
   752 F.3d 1165 (9th Cir. 2013) ..................................................................................... 13

13

*United States v. Golb*,
   69 F.3d 1417 (9th Cir. 1995) ..................................................................................... 7, 8

14

*United States v. Gonzalez*,
   922 F.2d 1044 (2d Cir. 1991) ...................................................................................... 13

15

*United States v. Hoskins*,
   73 F. Supp. 3d 154 (D. Conn. 2014)......................................................................... 8, 9

16

*United States v. Jensen*,
   93 F.3d 667 (9th Cir. 1996) ........................................................................................... 6

17

*United States v. Johnson*,
   297 F.3d 845 (9th Cir. 2002) ......................................................................................... 6

18

*United States v. Liersch*,
   No. 04CR02521, 2005 WL 6414047 (S.D. Cal. May 2, 2005) .................................... 7

19

*United States v. Marsh*,
   144 F.3d 1229 (9th Cir. 1998) ......................................................................... 16, 17, 18

20

*United States v. Moran*-Garcia,
   966 F.3d 966 (9th Cir. 2020) ......................................................................................... 6

21

*United States v. Motz*,
   652 F. Supp. 2d 284 (E.D.N.Y. 2009) ................................................................... 13, 16

22

*United States v. Pace*,
   314 F.3d 344 (9th Cir. 2002) ................................................................... 6, 10, 12, 15, 16

23

*United States v. Reed*,
   773 F.2d 477 (2d Cir. 1985)........................................................................... 11, 12, 14

24

*United States v. Rodriguez-Moreno*,
   526 U.S. 275 (1999)............................................................................................... 10, 16

25

*United States v. Singh*,
   979 F.3d 697 (9th Cir. 2020) ....................................................................................... 11

26

*United States v. Spivey*,
   956 F.3d 212 (4th Cir. 2020) ....................................................................................... 12

27

*Yates v. United States*,
   574 U.S. 528 (2015).................................................................................................... 13

28

Statutes

18 U.S.C. § 951 ........................................................................................................... 1
18 U.S.C. § 1001 ........................................................................................................ 13
18 U.S.C. § 1071 ........................................................................................................ 16
18 U.S.C. § 1349 .......................................................................................................... 1
18 U.S.C. § 1503 ........................................................................................................ 16
18 U.S.C. § 1512 ........................................................................................................ 13
18 U.S.C. § 1519 ..................................................................................................... 1, 10
18 U.S.C. § 3237 ........................................................................................................ 10
18 U.SC. §§ 1343 ......................................................................................................... 1
26 U.S.C. § 7212(a) .................................................................................................... 17

1    The government respectfully submits its Opposition to Defendant Ahmad Abouammo's Motion

2    to Dismiss Counts Twenty through Twenty-Three for Lack of Venue [Dkt. No. 82].  For the reasons set

3    forth below, the Court should deny the Defendant's motion.  The facts in the Superseding Indictment,

4    which the Court must accept as true, properly allege venue in the Northern District of California for

5    Counts Twenty to Twenty-Two (International Money Laundering) and Twenty-Three (Falsification of

6    records).  Furthermore, though the government need not do so for purposes of this motion, the

7    government will prove at trial that venue is proper in this district for all four counts.

8    **I.      BACKGROUND**

9    **A.      The Charges against Defendant Abouammo**

10   On November 5, 2019, a Complaint was issued charging Defendant Abouammo and two co-

11   defendants – Ali Alzabarah and Ahmed Almutairi – with acting as agents of a foreign government

12   without notifying the Attorney General, in violation of 18 U.S.C. § 951.  Dkt. No. 1 ("Complaint").

13   Defendant Abouammo also was charged with falsification of records, in violation of 18 U.S.C. § 1519.

14   *Id.*  Defendant Abouammo was arrested on the same day.  Warrants have been issued for the arrests of

15   Defendants Alzabarah and Almutairi, who are believed to be in Saudi Arabia.

16   On November 19, 2019, the Grand Jury returned an Indictment, which charged the same offenses

17   alleged in the Complaint.  Dkt. No. 13.  Defendant Abouammo was further charged with falsification of

18   records.  *Id.*  On April 7, 2020, after the Grand Jury was suspended due to COVID-19, the government

19   filed a Superseding Information, charging the defendants with the same counts from the Indictment, as

20   well as one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and fifteen

21   substantive counts of wire fraud, in violation of 18 U.SC. §§ 1343 and 1346.  Dkt. No. 42 ("Superseding

22   Information").  Defendant Abouammo was also charged with three counts of international money

23   laundering, in violation of 18 U.S.C. § 1956(a)(2)(B)(i).  *Id.*  On July 28, 2020, after the Grand Jury

24   resumed in limited capacity, it returned a Superseding Indictment, charging the same offenses alleged in

25   the Superseding Information.  Dkt. No. 53 ("Superseding Indictment").

26   //

27   //

28   //

## B.    Overview of the Fraud Schemes

As alleged in the Superseding Indictment, between approximately November 2014 and March 2016, the Kingdom of Saudi Arabia and its Royal Family, who hold most of the country's governmental posts, sought to identify the users of certain Twitter accounts that posted information critical of, or embarrassing to, the Saudi government and members of the Royal Family, including "Saudi Royal Family Member-1." *See* Superseding Indictment ¶¶ 8, 22.  To carry out this scheme, "Foreign Official-1" and Defendant Almutairi, both of whom were closely associated with and performed work for Saudi Royal Family Member-1, secretly recruited Defendants Abouammo and Alzabarah, both of whom worked for Twitter, to access proprietary and confidential Twitter information. *See id*. ¶¶ 9, 10, 17, 21. Such protected Twitter information included user-provided names and birthdates, device identifiers, relationships, phone numbers, internet protocol ("IP") addresses and session histories, among other things, all of which could have been used by the Saudi government to identify and locate the individuals behind the accounts. *See id*. ¶ 17.  During the course of the scheme, while acting beyond their job duties and contrary to Twitter's policies, Defendants Abouammo and Alzabarah used their access privileges as employees and fiduciaries of Twitter, to obtain confidential Twitter-user data for the Saudi government in exchange for gifts, cash payments, and promises of future employment. *See id*. ¶¶ 21, 23-24.

## C.    Defendants Abouammo and Abzabarah Owed a Fiduciary Duty to Twitter

Twitter was a company headquartered in the Northern District of California that operated a social-networking website. *See id*. ¶ 4.  As employees of Twitter, Defendants Abouammo and Alzabarah agreed to abide by Twitter's policies. *See id*. ¶¶ 14-15.  As part of their confidentiality agreements they affirmed a relationship of confidence and trust between themselves and Twitter with respect to any information of a confidential or secret nature that Twitter disclosed to them related to its business. *See id*. ¶ 14.  Those agreements further required the defendants to keep and hold all proprietary information in strict confidence and trust, including Twitter's customer lists and data, and forbid them from disclosing such information without Twitter's express written consent or using it for any other business or employment. *See id*. ¶ 14.  Additionally, Twitter's security policies, which the defendants acknowledged reading and understanding, prohibited them from sharing Twitter's confidential user data with third parties without approval. *See id*. ¶ 15.  While the defendants had access

1  to Twitter-user data, their job duties did not involve a need to access such private information, and doing

2  so was a reportable violation of Twitter's policies.  *See id.* ¶ 18.

3    In addition to agreeing to protect Twitter's proprietary and confidential information, Defendants

4  Abouammo and Alzabarah agreed to abide by Twitter's gift policy.  *See id.* ¶ 16.  That policy required

5  the defendants to notify their managers and the vice president of human resources of any gifts exceeding

6  $100 in value before returning them.  *See id.*

7      **D. Allegations Specific to Defendant Abouammo**

8    In furtherance of the scheme, Foreign Official-1 compensated Defendant Abouammo with

9  valuable gifts and cash payments for his access to confidential Twitter-user data that was of interest to

10  the Saudi government.  *See id.* ¶ 26.  Specifically, on December 5, 2014, during a meeting in London,

11  England, Foreign Official-1 provided Defendant Abouammo with a luxury watch worth at least $20,000,

12  which Defendant Abouammo concealed from Twitter, contrary to Twitter's gift disclosure policy.  *See*

13  *id.* ¶¶ 26(f), 27(b).  One week later, on December 12, 2014, in exchange for the $20,000 watch and the

14  expectation of additional payments from Foreign Official-1, Defendant Abouammo began accessing,

15  without authorization, confidential data for "Twitter User-1," an account that had posted critical

16  information about the Saudi Royal Family, including Saudi Royal Family Member-1.  *See id.* ¶ 26(g).

17  Among other account information, Defendant Abouammo accessed the email address and telephone

18  number for Twitter User-1, which the Saudi government could have used to identify and locate the user

19  of that account.  *See id.*  Defendant Abouammo accessed user data for Twitter User-1 again on January

20  5, 2015.  *See id.*  Twelve days later, on January 17, 2015, Foreign Official-1 emailed information

21  concerning Twitter User-1 to Defendant Abouammo with the following brief message: "as we discussed

22  in London."  *See id.* ¶ 26(h).  Thereafter, between January 27 and February 24, 2015, Defendant

23  Abouammo accessed user data for Twitter User-1 on five more occasions.  *See id.* ¶ 26(g).

24    Further, on February 5, 2015, Foreign Official-1 sent a second email to Defendant Abouammo

25  with information concerning a second Twitter account ("Twitter User-2") that he claimed was

26  impersonating a member of the Saudi Royal Family.  *See id.* ¶ 26(i).  Within two days, on February 7,

27  2015, Defendant Abouammo accessed, without authorization, Twitter's confidential data for that

28  account, including the user's email address, which the Saudi government could have used to identify and

locate the user of that account.  *See id.*  Less than a week later, on February 13, 2015, Foreign Official-1 wired $100,000 to a recently opened bank account in Lebanon in the name of Defendant Abouammo's close relative, which Defendant Abouammo could access online.  *See id.* ¶ 26 (j).  Around this same time, on February 16, 2015, Defendant Abouammo facilitated an introduction between Defendant Almuitari and Defendant Alzabarah, who thereafter also began accessing confidential Twitter information for Foreign Official-1 and the Saudi government.  *See id.* ¶ 26(m), (o).  As with the $20,000 luxury watch he received from Foreign Official-1 for accessing Twitter's confidential information, Defendant Abouammo also concealed his receipt of $100,000 from Foreign Official-1.  *See id.* ¶ 27(c).

On February 24, 2015, while Defendant Abouammo was employed by Twitter and residing in the Northern District of California, he caused $9,963 of the money he received from Foreign Official-1 to be transferred from the account in Lebanon to his Bank of America account in the United States.  *See id.* ¶¶ 2, 12, 26(j).  On March 8, 2015, shortly after Defendant Abouammo accessed data for Twitter User-1, he sent the following message to Foreign Official-1: "proactive and reactively we will delete evil my brother."  *See id.* ¶ 26(j).  Then, on March 12, 2015, while Defendant Abouammo remained employed by Twitter and continued to reside in the Northern District of California, he caused another $9,991 to be transferred from Lebanon to his Bank of America account in the United States.  *See id.* ¶¶ 2, 12, 26(j), and 40.  Not too long after, Defendant Abouammo caused another $40,000 of the money he received from Foreign Official to be transferred from Lebanon to the same account.  Specifically, $10,000 was transferred on June 11, 2015, *see id.* ¶ 42, and $30,000 was transferred on July 2, 2015, *see id.* ¶ 42.

Defendant Abouammo left Twitter on May 22, 2015.  *See id.* ¶ 26(k).  Shortly after, and at some point before July 9, 2015, Foreign Official-1 wired a second $100,000 to the aforementioned account in Lebanon.  *See id.*; Complaint ¶ 46 (specifying that Foreign Official-1 sent Defendant a receipt for this wire transfer on July 9, 2015).  Foreign Official-1 then sent a Twitter message to Defendant Abouammo showing the wire receipt and apologizing for the delay in sending the "late" payment.  *See id.* ¶¶ 26(j), 38 (Count 11).  Based on Foreign Official-1's message and other facts, the government will prove that this second payment of $100,000 related to Defendant Abouammo's access to confidential information while he was employed by Twitter prior to May 22, 2015.

1  Defendant Abouammo continued to act as an agent of the Saudi government after he left Twitter

2  by engaging employees of the company on the Saudi Arabian government's behalf and by performing

3  other acts at Foreign Official-1's direction.  *See id.* ¶ 26(k).  On December 31, 2015, Defendant created

4  a sole proprietorship, CYRCL, LLC, and registered it with the State of Washington.  *See* Complaint ¶

5  49; Superseding Indictment ¶ 46.  On January 12, 2016, he opened a business checking account in the

6  United States, and on January 25, 2016, Foreign Official-1 wired a third payment of $100,000 to that

7  account. *See* Complaint ¶ 49; Superseding Indictment ¶ 26(k).

8  On October 20, 2018, FBI agents conducted a voluntary interview of Defendant about his receipt

9  of the aforementioned luxury watch and his communications with Foreign Official-1 and others.  *See*

10  Complaint ¶ 51.  Agents informed Defendant that they had come from Palo Alto, California (within the

11  Northern District of California) and were conducting an investigation there.  *See id.*  During the

12  interview, Defendant Abouammo admitted that he accessed Twitter User-1's nonpublic account

13  information after receiving an email from Foreign Official-1 about the account.  *Se id.* ¶ 52(a).  He

14  further admitted that he had met with Foreign Official-1 in London and received a watch from him.  *See*

15  *id.* ¶ 52(b).  However, he falsely described it as "plasticky" and "junky" and claimed it was valued at only

16  $500.  *See id.*  Additionally, Abouammo appeared to regret showing FBI agents the July 9, 2015 Twitter

17  message from Foreign Official-1, referenced above, regarding a late payment; after doing so, FBI agents

18  observed him delete it.  *See id.* ¶ 52(d).

19  Related to the money he had received from Foreign Official-1, Defendant falsely stated that he

20  only received $100,000 from Foreign Official-1 (when, in fact, he had received at least $300,000) and

21  claimed that it was payment for consulting and media strategy work related to CYRCL, LLC (which, in

22  fact, he did not register until December 31, 2015).  *See id.* ¶¶ 52(c), 54; Superseding Indictment ¶ 46.

23  After making that claim, Defendant Abouammo offered to obtain a copy of the consulting contract from

24  a desktop computer in his bedroom and requested that the FBI agents not follow him into the bedroom.

25  *See* Complaint ¶ 54.  They complied.  *See id.*  A few minutes later, he emailed an undated invoice to one

26  of the FBI agents, which was received by the FBI in the Northern District of California.  *See id.*;

27  Superseding Indictment ¶ 46.  As the evidence at trial will show, Defendant Abouammo fabricated that

28  invoice, which purported to show services rendered in 2015 and 2016, during the interview with the

1    intent to impede, influence, and obstruct the FBI's investigation in the Northern District.  *See id.* ¶ 55;

2    Superseding Indictment ¶ 46.  Specifically, the invoice identified Defendant Abouammo's current

3    address in Washington, which he did not purchase until August 2017.  *See* Complaint ¶ 55.  Further, the

4    metadata properties associated with the file indicate that it was created on October 20, 2018, the date of

5    the FBI interview.  *See id.*

6    ## II.    APPLICABLE LAW

7    Generally speaking, venue is a question of fact that the government must prove by a

8    preponderance of the evidence at trial.  *United States v. Casch*, 448 F.3d 1115, 1117 (9th Cir. 2006)

9    ("Venue is a question of fact: is there a match between the place of commission of the crimes and the

10   state where the trial is taking place?").  "[D]irect proof of venue is not necessary where circumstantial

11   evidence in the record as a whole supports the inference that the crime was committed in the district

12   where venue was laid."  *United States v. Pace*, 314 F.3d 344 (9th Cir. 2002); *see also United States v.*

13   *Moran*-Garcia, 966 F.3d 966, 969-71 (9th Cir. 2020) ("Venue, like most facts, can be proved as

14   effectively by circumstantial evidence as by direct evidence.").

15   Prior to trial, a defendant must object to a defect in venue that is clear on the face of the

16   indictment, otherwise venue is waived.  Fed. R. Crim. P. 12(b)(3)(A)(i) (venue must be raised by pretrial

17   motion where it can be determined without a trial on the merits); *see also United States v. Johnson*, 297

18   F.3d 845, 861 (9th Cir. 2002) (holding that venue is waivable where the defect in the indictment is

19   clear).  When resolving motions to dismiss for lack of venue, courts may not consider extrinsic evidence

20   and must determine "whether the indictment contained allegations of fact that, if true, would sustain

21   venue in the [the district]."  *Johnson*, 297 F.3d at 861; *see also United States v. Jensen*, 93 F.3d 667, 669

22   (9th Cir. 1996) (finding that district court erred in dismissing indictment for lack of venue by

23   considering evidence provided by the defendant).

24   ## III.    LEGAL ANALYSIS

25   Defendant moves the Court to dismiss Counts Twenty to Twenty-Three for lack of venue.  *See*

26   Dkt. No. 82 ("Def. Mot").  His arguments are purely factual, and while they may be appropriate to raise

27   at trial when the full weight of the evidence is before the Court, they are premature at this stage of the

28   proceedings.  As discussed herein, the Superseding Indictment sufficiently alleges facts that, when taken

as true, show that some part of the essential conduct for each count occurred in the Northern District of California, which is all the law requires.  According, there is no clear defect on the face of the indictment requiring dismissal, and the Court should deny Defendant's motion.

### A.    Venue for Counts Twenty to Twenty-Two Is Sufficiently Alleged

Counts Twenty to Twenty-Two charge Defendant Abouammo with international money laundering, in violation of 18 U.S.C. § 1956(a)(2)(B)(i).  As Defendant correctly notes, the money laundering statute contains a specific venue provision.  *See* Def. Mot. at 4-5.  However, he asks the Court to read it quite narrowly, when, in fact, it is rather broad (and understandably so, given how financial transactions are conducted, particularly in the internet age, and the relationship between such transactions and the underlying unlawful activity).

The money laundering statute provides that venue can exist in "*any district* in which the financial or monetary transaction [was] conducted."[1]  § 1956(i)(1)(A) (emphasis added).  The statute further defines the terms "conducts" and "transaction."  Conducts means "initiating, concluding, or *participating* in initiating, or concluding a transaction."  § 1956(c)(2) (emphasis added).  Transaction means, among other things, "a deposit, withdrawal, [or] transfer between accounts . . . or any other payment, transfer, or delivery by, through, or to a financial institution, by whatever means effected."  § 1956 (c)(3).  Furthermore, the "transfer of funds from one place to another, by wire or any other means, shall constitute a *single, continuing transaction*."  § 1956(i)(3) (emphasis added).  "Any person who conducts [i.e., *participates in*] . . . *any portion* of the transaction may be charged in *any district* in which the transaction takes place."  *Id.* (emphasis added).  In other words, under the money laundering statute, venue is proper in a district so long as any aspect of the conduct, transaction, or proceeds touched that district.  *See United States v. Golb*, 69 F.3d 1417, 1427 (9th Cir. 1995) (concluding that, because the financial transaction includes "initiating, concluding, and participating in initiating or concluding" a transaction, venue was proper in district in which defendant traveled or made phone calls to arrange financial transaction); *United States v. Liersch*, No. 04CR02521, 2005 WL 6414047, *6 (S.D.

---

[1] Under the statute, venue also exists in "any district where a prosecution for the underlying specified unlawful activity could be brought, if the defendant participated in the transfer of the proceeds . . . from that district to the district where the financial or monetary transaction [was] conducted." § 1956(i)(1)(B).

Cal. May 2, 2005) (concluding that venue was proper in the district where defendant gave instructions to move money from Switzerland to Austria, because "conducting a financial transaction" includes initiating transaction).

Defendant wrongly claims that the "allegations are patently insufficient to establish venue." *See* Def. Mot. at 5. In doing so, Defendant plainly ignores – with one limited exception in a footnote, *see id.* at 6 n.2 – *all* of the introductory allegations of the Superseding Indictment, which are incorporated by reference into each count, *see* Superseding Indictment ¶¶ 1-28, 39, 41, 43. Instead he notes only a limited set of allegations – that the conduct occurred in the Northern District of California and elsewhere,[2] the different dates for the transactions, and the involvement of his U.S. bank account. *See* Def. Mot. at 5-6.

When read as a whole (and accepting the facts as true), the indictment plainly alleges that, on or about February 13, 2015, while residing and working in the Northern District, Defendant initiated a scheme to conceal the nature and source of the bribes he unlawfully received from Foreign Official-1 by directing the money into a close relative's newly opened foreign bank account.[3] *See* Superseding Indictment ¶¶ 2, 12, 26(j), 26(k), and 39-44. In furtherance of that scheme, between on or about February 24 and July 2, 2015, in the Northern District, Defendant caused a portion of the funds to be transferred incrementally into his personal Bank of America Account.

With respect to Count Twenty, which involves the March 12th transfer into Defendant's Bank of America account, the indictment alleges, among other facts, that Defendant participated in the financial transaction while residing and working in the Northern District, which Defendant appears to concede, *see* Def. Mot. At 6 n.2. Thus, venue is properly alleged. *See Golb*, 69 F.3d at 1427.

Defendant cites *United States v. Hoskins*, 73 F. Supp. 3d 154 (D. Conn. 2014), but that case actually supports venue for Count Twenty. In *Hoskins*, the defendant caused a wire transfer between

[2] Defendant curiously emphasizes "elsewhere" while plainly ignoring "in the Northern District of California." Def. Mot. at 5. Money laundering, as with many other crimes, can occur in more than one district at the same time or as part of a continuing offense. Venue is appropriate in any of those districts. *See* § 1956(i).

[3] At Defendant's direction, Foreign Official-1 deposited approximately $100,000 into this account on or about February 13, 2015, and a second "late" payment of $100,000 prior to July 9, 2015. He further deposited a third payment of $100,000 in or about January 2016.

two out-of-state banks while in the district where he was charged.  Those facts are nearly identical to the facts here.  Perhaps recognizing that *Hoskins* is so similar (the court in *Hoskins* also rejected the defendant's motion to dismiss), Defendant attempts to distinguish it in a footnote, where he prematurely (and incorrectly) argues that he did not conduct a transaction in the Northern District, despite residing here at the time.  Def. Mot. at 6 n.2.  Defendant, of course, is free to make those factual arguments at trial, but for purposes of a motion to dismiss, Count Twenty sufficiently alleges venue.

Venue for Counts Twenty-One and Twenty-Two, which involve the June 11th and July 2nd transfers into Defendant's Bank of America Account,[4] is also proper in the Northern District.  While Defendant implicitly argues that his move to Seattle around the time of these transfers was legally sufficient to deprive this Court of venue, the facts as alleged, which must be taken as true, are sufficient to prevail over a motion to dismiss.  The Superseding Indictment alleges that, in the Northern District, and in connection with his scheme to conceal the funds of his unlawful activity, Defendant participated in financial transactions to deposit $200,000 into a foreign bank account between February 13 and July 9, 2015, and participated in financial transactions to transfer some of those funds to his domestic bank account on or about June 11 and July 2, 2015.  *See* Superseding Indictment ¶¶ 42, 44.  Although Defendant moved to Seattle at some point after he resigned from Twitter on May 22, 2015, those facts by themselves do not remove venue from this District.  Any questions about where Defendant was when he participated in the initiation and conclusion of the June 11th and July 2nd financial transactions (including the initiation and conclusion of those transactions) – or how the financial institutions processed the transfers through this District – are most appropriate for the jury to resolve at trial, when the government must prove venue by a preponderance of the evidence.[5]

---

[4] While the indictment does not specify the bank account used for the June 11th and July 2nd transfers, it is a reasonable inference that the transfers involved the same Bank of America account used for the February 24th and March 12th transfers, *see* Superseding Indictment ¶ 26(j).  Moreover, the Complaint specifies that Defendant used the same Bank of America account for all of the transfers.  *See* Complaint ¶¶ 40, 41, 45.

[5] As it relates to Defendant's demand for a Bill of Particulars, which he references in his motion, the government has produced discovery concerning these transactions. For example, bank records confirm the transfer of money to Defendant's Bank of America account, which is identified by his address in the Northern District, on or about March 12, June 11, and July 2, 2015.  Those transfers involved Wells Fargo, which is headquartered in this District, as an intermediary and/or correspondent bank and Bank of America, which has branches throughout.  Moreover, Defendant's bank statements indicate ATM withdrawals, purchases, and similar transactions in this District through at least June 22,

1

**B.      Superseding Indictment Sufficiently Alleges Venue for Count Twenty-Three**

2       Count Twenty-Three charges Defendant Abouammo with falsifying a document to impede,

3  influence, and obstruct the FBI's investigation in the Northern District of California, in violation of 18

4  U.S.C. § 1519.  As discussed herein, venue is appropriate in the Northern District because the essential

5  conduct of the offense affected, and the intended harm was directed at, the District.[6]

6              *1.      Intent to Influence, Impede, or Obstruct an Investigation Is an Essential*

7                    *Conduct Element Drafted to Describe the Effects of the Offense*

8       In determining venue, the Court "must initially identify the conduct constituting the offense (the

9  nature of the crime) and then discern the location of the commission of the criminal acts."  *United States*

10  *v. Rodriguez-Moreno*, 526 U.S. 275, 279 (1999) (citing *United States v. Cabrales*, 524 U.S. 1, 6-7

11  (1998)).  This requires the Court to determine the "essential conduct elements" of the crime.  *Rodriguez-*

12  *Moreno*, 526 U.S. at 280; *see also Pace*, 314 F.3d at 349.  While the verbs of the statute may be helpful

13  to identify the conduct constituting the offense, the Supreme Court has warned that "the verb test . . .

14  cannot be applied rigidly, to the exclusion of other relevant statutory language."  *Id.* at 349 n.2 (quoting

15  *Rodriguez-Moreno*, 526 U.S. at 280) (quotation marks omitted).  Furthermore, where the essential

16  conduct elements are defined in terms of their particular effects, venue exists where those effects are

17  felt.  *See United States v. Bowens*, 224 F.3d 302, 311-14 (4th Cir. 2000) (holding that *Rodriguez-Moreno*

18  and *Cabreles* "did not . . . alter[] the well-established rule that Congress may, consistent with the venue

19  clauses of Article III and the Sixth Amendment, define the essential conduct elements of a criminal

20  offense in terms of their effects, thus providing venue where those effects are felt"); *see also United*

21  *States v. Brennan*, 452 F. Supp. 3d 225, 235 (E.D. Pa. 2020) (agreeing with the majority of circuits that

22

23  including around the time of the June 11th transfer.  And Defendant's bank statements through June 17, 2015, are directed to his address in this District.  While his statements also show transactions in Seattle

24  and his July bank statement identifies his Seattle residence, he is free to offer evidence to rebut the government's proof of venue at trial.

25       [6] Because the effects-based test clearly establishes venue for § 1519 in the Northern District of California, the government has not fully briefed alternative theories of venue, as the Court need not

26  reach them to resolve Defendant's motion.  The government, however, does not concede those theories. For example, Defendant's conduct continued from the Western District of Washington to the Northern

27  District of California, because the falsified document (both the invoice and the email it was attached to) was received here.  *See* 18 U.S.C. § 3237; *see also United States v. Angotti*, 105 F.3d 539, 542 (1997)

28  (finding venue in district where false statement "reached the audience whom it was intended to influence," even though the statement was made in a different district).

1  the crime of making materially false statements "allows for an effects-based venue analysis," because it

2  involves conduct that has *the potential to influence* a decision-maker).

3         The essential conduct elements of § 1519 are as follows: 1) the defendant knowingly altered,

4  destroyed, concealed, or falsified a record, document or tangible object; and 2) the defendant acted with

5  the intent to impede, obstruct, or influence an actual or contemplated investigation of a matter within the

6  jurisdiction of any department or agency of the United States.  Model Crim. Jury Instr. 9th Cir. 8.131A

7  (2020).  In short, the essential conduct is the falsification of a document *to influence, impede, or obstruct*

8  *an investigation*.  Congress clearly drafted the statute – which is titled "Destruction, alteration, or

9  falsification of records in Federal investigations and bankruptcy" – in terms of the effects of the falsified

10 document.  *See United States v. Delia*, 749 F. Supp. 500, 504 (S.D.N.Y.1990) (holding that under

11 statute, "which explicitly requires the intent to deceive an organization as an element of the offense, the

12 locus of the intended effects of the criminal acts is . . . the ultimate destination of the deception, the

13 location of the organization.").  Congress did not make it a federal crime merely to falsify a document.

14 *See Brennan*, 452 F. Supp. 3d at 234 ("Not all lies are illegal under § 1001 – only material lies. Congress

15 drew a line between proscribed and permissible conduct, and it used the word 'materially' to draw that

16 line.").  Rather, by enacting §1519, Congress sought to protect the integrity of criminal investigations by

17 prohibiting conduct intended to obstruct justice.  *See United States v. Singh*, 979 F.3d 697, 1715 (9th

18 Cir. 2020) (explaining that the statute "was intended to prohibit, in particular, corporate document-

19 shredding to hide evidence of financial wrongdoing").  Thus, venue is appropriate in the district where

20 the underlying crime is being investigated, because that is where the effects of any obstructive conduct

21 would be felt.  *See United States v. Reed*, 773 F.2d 477, 482 (2d Cir. 1985) ("Where essential elements

22 of a crime are related to the integrity of the proceedings of judicial tribunals in districts other than where

23 the acts took place . . . those tribunals should not be left to the generosity of prosecutors or judges in

24 other districts to defend their powers.").

25 //

26 //

27 //

28

1

2

        **2.**       ***Intent to Influence, Impede, or Obstruct an Investigation Is Not a Circumstance Element of the Offense***

3           Defendant at first concedes that § 1519 requires "that [the] conduct be undertaken with the intent

4 to obstruct [an investigation]." *See* Def. Mot. at 8. But then, he asks the Court to disregard that same

5 language, perhaps appreciating that it establishes venue in the Northern District. *See id.* Instead,

6 Defendant asks the Court to look only to the verbs described in § 1519 (e.g., to "falsifies"), a rigid

7 application of the verbs test that the Supreme Court explicitly warned against. *See Pace*, 314 F.3d at

8 349 n.2. Doing so here would exclude other relevant statutory language – i.e., the harm associated with

9 the falsification of documents. *See id.*

10       Contrary to Defendants' unsupported claims otherwise, the language "with the intent to impede,

11 obstruct, or influence [an] investigation" is not a mere "circumstance element of the offense." *See id*.

12 Circumstance elements, so to speak, are elements that do not contribute to determining the *locus delicti*

13 of the crime. *See United States v. Spivey*, 956 F.3d 212, 215-16 (4th Cir. 2020); *see, e.g., Cabrales*, 524

14 U.S. at 7 (holding that the existence of criminally generated proceeds is a circumstance element of

15 money laundering); *Bowens*, 224 F.3d at 310-11 (holding that for the crime of concealing a fugitive, 18

16 U.S.C. § 1071, the issuance of an arrest warrant was a circumstance element). Elements that go to "the

17 very *conduct* at which Congress took aim," however, are not circumstance elements. *Spivey*, 956 F.3d at

18 216 (rejecting defendant's argument that the element of interstate travel in 18 U.S.C. § 2250(a) was "an

19 inconsequential element . . . merely present to generate federal jurisdiction") (emphasis in original).

20 With respect to § 1519, the *federal nature* of the investigation in question may perhaps be a

21 circumstance element, but the intent to influence, obstruct, of impede that investigation certainly is not.

22 The obstruction of an investigation, even one only contemplated by a defendant, is "an aspect of harm

23 Congress sought to punish." *See id*, 956 F.3d at 216.

24       Defendant's primary rationale for why "intent to influence, impede, or obstruct [an]

25 investigation" is a circumstance element is unsound. *See* Def. Mot. at 8. Defendant posits that, because

26 the statute does not require that "an investigation or other matter exist," Congress somehow was not

27 taking aim at obstructive conduct when it drafted § 1519. *See id.* Such an argument is further from the

28 truth, as Congress specifically enacted § 1519 – placing it squarely in Chapter 73 (Obstruction of

Justice) – to address gaps in the law and to broaden the scope of the existing obstruction statutes.  *See Yates v. United States*, 574 U.S. 528, 536 (2015) (explaining that, while 18 U.S.C. § 1512 made it a crime to cause another person to destroy evidence, no statute imposed liability on the person destroying the evidence; Congress broadened prior law by extending § 1519 to conduct intended to obstruct "any [federal] matter"); *cf. United States v. Ermoian*, 752 F.3d 1165, 1172 (9th Cir. 2013) (holding that the term "official proceeding" in § 1512 does not extend to "criminal investigations").  Furthermore, as discussed below, courts analyzing venue for 18 U.S.C. § 1001 – a similar statute directed at conduct that has the potential to influence decisions – have rejected Defendant's exact argument.  *See, e.g.*, *Brennan*, 452 F. Supp. 3d at 237 (explaining that its "conclusion is not altered by the fact that § 1001 only requires proof of *potential* rather than *actual* effects).

### 3. Sections 1512 Should Guide the Court's Analysis and Ruling

While courts have not analyzed venue for § 1519,[7] it is not without close analogies.  As noted above, § 1519 was enacted to address gaps in § 1512 and to reach broader obstructive conduct.  Sections 1512 and 1519 also contain near identical language.  For example, § 1512(b)(1) makes it a crime to intimidate a person "*with intent to influence*, delay, or prevent" that person's testimony.  Most importantly, venue for § 1512(b)(1) exists in districts where a proceeding is contemplated, pending, or ongoing, *see* § 1512(i) (extending venue to such districts "whether or not [the proceed is] pending or about to be instituted"), because, like § 1519, Congress drafted its elements in terms of their effects.

The fact that § 1512 contains a venue provision is instructive and supports venue in the Northern District of California.  Congress enacted § 1512's venue provision in 1988 to resolve a circuit split and to clarify that venue for crimes involving obstruction is proper both in the district "*intended to be affected*" and the district in which the obstructive conduct occurred.  § 1512(i) (emphasis added); *see United States v. Gonzalez*, 922 F.2d 1044, 1054-55 (2d Cir. 1991) (explaining the history of the statute's venue provision); *see also Ermoian*, 752 F.3d at 1171 n.5 (noting that the Second Circuit in *Gonzalez*

---

[7] Defendant cites to *United States v. Motz*, 652 F. Supp. 2d 284, 296 (E.D.N.Y. 2009).  But the court in that case was not asked to decide the questions before this Court.  In *Motz*, for reasons not specified in the court's extremely brief ruling, "the Government concede[d] . . . that the evidence developed thus far is insufficient to prove that the charged acts of document alteration took place in this district."  *Id.*  The court's decision, which of course has no precedential value, contains no analysis of relevant facts that would be helpful here.

1    "never considered that the venue provision could extend to investigations, not through the term 'official

2    proceeding,' but through the subsequent parenthetical phrase – '(whether or not pending or about to be

3    instituted).").  Thus, at the time, Congress sought to make clear that it had drafted § 1512 in terms of its

4    effects.  *See also Reed*, 773 F.2d at 482 ("[P]laces that suffer the effects of a crime are entitled to

5    consideration for venue purposes.  Such districts have an obvious contact with the litigation in their

6    interest in preventing such effects from occurring.").  Section 1519 – enacted years later to address gaps

7    in the statutes criminalizing obstruction – contains nearly identical language (e.g., with intent to

8    influence), evidencing Congress's intent to also draft it in terms of its effects.[8]  Accordingly, venue for

9    § 1519, like § 1512, exists both in the district where the investigation was intended to be affected (e.g.,

10   the Northern District of California) and the district where the obstructive conduct occurred (e.g., the

11   Western District of Washington).

12          The following hypothetical example illustrates the point: a defendant intimidates a witness while

13   destroying documents in one district with the intent to influence a grand jury investigation in another

14   district.  Under Defendant's reading of the statutes and law – which carves out "intent to influence" –

15   the hypothetical defendant should be prosecuted for the underlying crimes under investigation and his

16   obstructive acts under § 1512 in the first district but not § 1519.  Such a result makes no sense, which is

17   why Congress drafted both statutes in terms of their effects.

18          Here, Defendant asks this Court to limit the government's prosecution in the Northern District to

19   wire fraud, money laundering, and acting as a foreign agent, and then require different prosecutors and

20   agents in the Western District of Washington to prosecute him for his conduct intended to obstruct that

21   very same investigation.  The sole reasoning for Defendant's proposed result?  He moved to Seattle

22   before the investigation commenced, and agents logically sought to interview him at his residence

23   (rather than, for example, lure him into the Northern District or take other some other unnecessary

24

25          [8] It is irrelevant that § 1519 does not contain a similar venue provision, as most federal statutes

26   do not contain them.  The Supreme Court has made clear that courts must look to the essential elements
     of the crime.  Statute-specific venue provisions exist when Congress decides it necessary to clarify its

27   statutory intent in response to court decisions.  Both § 1512(i) and § 1956(i) are such examples.
     Defendant appears to hold the mistaken belief that an effects-based venue provision in one statute

28   negates effects-based venue for another.  *See* Def. Mot. at 9.  Defendant offers no authority or
     meaningful discussion for why the Court should read the law and interpret the statutes so narrowly.

1  measure to establish venue).  Defendant's rationale would also give him the significant tactical

2  advantage of deciding whether to move for change of venue pursuant to Rule 21 of the Federal Rules of

3  Criminal Procedure.  Ironically, had the government initiated related charges in the two districts,

4  Defendant might also have asked for a change of venue to avoid two trials (based virtually on the same

5  evidence).

6  **4.  *Section 1001 Provides Additional Support for Interpreting § 1519 as an Effects-***

7  **     *Based Crime for Venue Purposes***

8          Though different in some respects, § 1001 and § 1519 are similar in at least one critical respect.

9  Section 1001 prohibits *materially* false statements.  As the Ninth Circuit has explained "[a] statement is

10  material if it has a natural tendency to *influence*, or was capable of influencing, the decision of the

11  decision-making body to which it was addressed."  *United States v. Brugnara*, 856 F.3d 1198, 1209 (9th

12  Cir. 2017) (emphasis added) (quotation marks omitted).  Thus, both § 1001 and § 1519 (like § 1512)

13  describe conduct that is capable of influencing (i.e., having an effect on) a matter.

14          The First, Second, and Fourth Circuits, as well as a district court in the Eastern District of

15  Pennsylvania, have all held that venue for § 1001 exists where the effects are felt.  *See Brennan*, 452 F.

16  Supp. 3d at 235-36 (collecting cases and analyzing the majority and minority views on venue for §

17  1001)[9]; *see, e.g., United States v. Coplan*, 703 F.3d 46, 79-80 (2d Cir. 2012) (holding that venue was

18  proper in Southern District of New York, because the crime "began in Tennessee, where [the defendant]

19  made the false statements to IRS officials, but continued into the Southern District of New York, where

20  his deposition transcript was reviewed and discussed by IRS officials in connection with [an] ongoing . .

21  . audit").  The courts in those cases concluded that "§ 1001's 'essential conduct' is making a 'materially

22  false statement,' rather than merely making any false statement."  *See Brennan*, 452 F. Supp. 3d at 236.

23

24          [9] The *Brennan* court's reasoning for rejecting the minority view held by the Tenth and Eleventh

25  Circuits, which "simply ignores that [§ 1001 criminalizes *material* lies] and expands § 1001's scope
   beyond its textual limit," is sound.  *See* 452 F. Supp. 3d at 235 (emphasis added).  While the Ninth

26  Circuit has not addressed this specific question, it has held that the making of a false statement is a
   continuing offense that is not complete until the statement is received and the effects are felt.  *See*

27  *Angotti*, 105 F.3d at 542 (finding venue in district where false statement "reached the audience whom it
   was intended to influence," even though the statement was made in a different district); *cf. Pace* 314

28  F.3d at 351-52 (finding venue in Arizona where defendant provided false information for tax return,
   which was prepared in Ohio and signed by the defendant in New York).

"By using the word 'materially,' Congress defined this conduct element in terms of its effects." *Id.*; *see also Coplan*, 703 F.3d at 79 ("[Section 1001's] materiality requirement proves dispositive with respect to venue . . . [because materiality] turns on the tendency or capacity of [a defendant's] statements *to influence* the decisionmaking body at issue . . . .") (emphasis added). The same rationale holds true here. By using the words "with the intent to impede, obstruct, or influence the investigation," Congress also defined § 1519 in terms of its effects.

### 5. *The Cases Cited by Defendant Are Distinguishable and the Court Should Disregard Them*

The several cases cited by Defendant are readily distinguishable and the Court should disregard them. *See* Def. Mot. at 8-9. First, as noted above, the district court in *Motz* was not presented with the questions before this Court. 652 F. Supp. 2d at 296. The government in that case conceded venue for reasons that are unclear from the court's decision. *Id.* The government here does not concede that venue is proper only in the Western District of Washington.

Second, the Fourth Circuit in *Bowens* acknowledged a "line of cases in which [it] . . . held that in prosecutions for crimes in the nature of obstruction of justice, venue is proper in the district where the obstruction would take effect." 224 F.3d at 311. The Fourth Circuit, however, declined "to reach the question whether harboring a fugitive is in some sense an obstruction of justice crime." *Id.* Instead, it followed Supreme Court precedent and looked to the essential elements of 18 U.S.C. § 1071 and determined that "[t]he essential conduct element of § 1071, 'harboring or concealing a person,' is not defined in terms of its particular effects." *Id.* at 313. In its analysis, and relevant to § 1519, the Fourth Circuit observed that "the essential conduct elements of [a former version of 18 U.S.C. § 1503] were defined not just in terms of the forbidden act, i.e., 'assault' or 'retaliate,' but rather in terms of their effects (intimidation of a witness or obstruction of the administration of justice)." *Id.* Therefore, "venue was proper in the district where those proscribed effects would be felt." *Id.*

Third, the statute at issue in Ninth Circuit in *United States v. Marsh*, 144 F.3d 1229 (9th Cir. 1998), is not "similar to Section 1519," as Defendant wrongly claims, *see* Def. Mot. at 9. Moreover, the decision came well before Congress enacted § 1519 and the Supreme Court cautioned against a rigid application of the verb test. *See Pace*, 314 F.3d at 349 n.2 (citing *Rodriguez-Moreno*, 526 U.S. at 280).

1    Moreover, because the statutes in question are different, the Ninth Circuit was not asked to resolve the

2    same questions before this Court.

3         In *Marsh*, the defendants were charged in the Northern District of California with 26 U.S.C. §

4    7212(a) for "endeavoring to impede the administration of the tax laws by filing the commercial liens in

5    Nevada and Washington against the government officials named in them." 144 F.3d at 1233. Following

6    a brief analysis, the Ninth Circuit held that "[t]he filing of the lien is the crime" under that statute and

7    that "[n]o effect need be proved." *Id.* at 1242. Section 1519 and 7212(a) are very much different

8    statutes with different elements passed by Congress for different purposes to address different criminal

9    activity. Section 7212 – titled "Attempts to interfere with administration of internal revenue laws" –

10   criminalizes attempts (i.e., endeavors) to interfere with the administration of the tax laws. Section 1519,

11   however, criminalizes the destruction, alteration, or falsification of records in federal investigations.

12   Furthermore, as discussed at length above, § 1512 and § 1519 are companion statutes; the latter was

13   enacted to address gaps in the former with respect to the destruction of evidence. They are both

14   contained in the same chapter and their statutory language, setting forth the essential elements, is

15   comparably the same. Both were also drafted in terms of their effects, and there is no question that

16   venue for conduct intended to influence an official proceeding exists in the district where the proceeding

17   is contemplated, pending, or ongoing, *see* § 1512(i). It follows that venue for conduct intended to

18   influence a criminal investigation also exists in the district where the investigation is contemplated,

19   pending, or ongoing. As described above, a finding otherwise would produce strange results.

20
21
         **6.    The Facts Alleged in the Superseding Indictment Support Venue in the
                 Northern District of California**

22        Finally, the facts of this case support venue in the Northern District of California. As Defendant

23   acknowledges, the government alleges that FBI agents from the Northern District of California (who

24   were investigating Defendant's criminal conduct in the District) traveled to Defendant's residence in

25   Seattle to interview him. Def. Mot. at 2. FBI agents identified themselves as being from the Northern

26   District. *See* Complaint ¶ 51. During the course of the interview, Defendant fabricated and falsified an

27   invoice intending to influence, impede, and obstruct the FBI's investigation of his crimes in the

28   Northern District (specifically as it relates to his communications with Foreign Official-1 and bribes

Foreign Official paid to him).  *See* Superseding Indictment ¶ 46.  Defendant then attached that falsified document to an email that he sent to the FBI in the Northern District.  *See id.*  Those facts, which must be accepted as true, establish that the effects of Defendant's obstructive conduct were felt in the Northern District.

## IV.   CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny Defendant's motion to dismiss for lack of venue.

DATED:  December 7, 2020.

Respectfully submitted,

DAVID L. ANDERSON
United States Attorney,

*/s/ Benjamin J. Hawk*
COLIN C. SAMPSON
Assistant United States Attorney
BENJAMIN J. HAWK
Trial Attorney, National Security Division