UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>AHMAD ABOUAMMO,<br>Defendant. | Case No. 19-cr-00621-EMC-1<br><br>**ORDER DENYING DEFENDANT'S MOTION TO DISMISS FOR FAILURE TO STATE AN OFFENSE**<br><br>Docket No. 84 |

Pending before the Court is Defendant Ahmad Abouammo's motion to dismiss the following counts leveled against him in the superseding indictment, Docket No. 53, for failure to state an offense:

**Count Four:** Conspiracy to commit wire fraud and honest services fraud in violation of 18 U.S.C. § 1349;

**Counts Five through Nineteen:** Wire fraud and honest services fraud in violation of 18 U.S.C. §§ 1343, 1346;

**Count Twenty through Twenty-Two:** Money laundering in violation of 18 U.S.C. § 1956(a)(2)(B)(i).

Docket No. 84 (Mot.). For the following reasons, Mr. Abouammo's motion is **DENIED**.

## I.   BACKGROUND

On November 11, 2019, the Government arrested Ahmad Abouammo and charged him and two co-defendants with failing to notify the Attorney General that they were allegedly acting on behalf of a foreign government, in violation of 18 U.S.C. § 951. *See* Docket No. 1.

("Compl.").[1] The complaint also charged Mr. Abouammo with falsification of records, in violation of 18 U.S.C. § 1519. *Id.*

On November 19, 2019, the Grand Jury returned an indictment charging the same offenses alleged in the complaint. *See* Docket No. 13. On April 7, 2020, after the Grand Jury was suspended due to COVID-19, the Government filed a superseding information, charging the defendants with the same counts from the indictment, as well as one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and fifteen substantive counts of wire fraud, in violation of 18 U.SC. §§ 1343 and 1346. *See* Docket No. 42 ("Superseding Information"). Defendant Abouammo was also charged with three counts of international money laundering, in violation of 18 U.S.C. § 1956(a)(2)(B)(i). *Id.* On July 28, 2020, after the Grand Jury resumed in limited capacity, it returned a superseding indictment charging the same offenses alleged in the superseding information. *See* Docket No. 53 ("Superseding Indictment").

The alleged victim of the fraud charged in the superseding indictment is Mr. Abouammo's former employer, Twitter, Inc. ("Twitter" or the "Company"). *Id.* ¶ 12. The gravamen of the wire and honest services fraud charges is that, between approximately November 2014 and March 2016, Mr. Abouammo received cash payments, gifts, and promises of future benefits, including employment, from the Kingdom of Saudi Arabia and its Royal Family in exchange for confidential account information[2] of certain Twitter users who posted information critical of, or embarrassing to, the Saudi government and members of the Saudi Royal Family. *Id.* 8, 21, 22, 24.

On November 18, 2020, Mr. Abouammo filed a series of motions to dismiss, including the instant motion to dismiss Counts Four through Twenty-Two for failure to state an offense. *See* Mot.

## II. LEGAL STANDARD

An indictment must contain a "plain, concise, and definite written statement of the

---

[1] Warrants have been issued for the arrests of the other Defendants, who are believed to be in Saudi Arabia. *See* Docket No. 88 ("Opp'n") at 1.

[2] The confidential Twitter user account information Mr. Abouammo provided the Saudi government included users' names and birthdays, device identifiers, relationships, phone numbers, internet protocols ("IP") addresses and session history, among other information. *Id.* ¶ 17.

2

essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). The sufficiency of an indictment is to be measured by two main criteria: "first, whether the indictment contains the elements of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet, and, secondly, in case any other proceedings are taken against him for a similar offense whether the record shows with accuracy to what extent he may plead a former acquittal or conviction." *Russell v. United States,* 369 U.S. 749, 763–64 (1962); *see also United States v. Fernandez,* 388 F.3d 1199, 1217–18 (9th Cir.2004) ("Generally, an indictment is sufficient if it sets forth the elements of the charged offense so as to ensure the right of the defendant not to be placed in double jeopardy and to be informed of the offense charged." (quoting *United States v. Rodriguez*, 360 F.3d 949, 958 (9th Cir. 2004)). "Because it is a drastic step, dismissing an indictment is a disfavored remedy." *United States v. Rogers,* 751 F.2d 1074, 1076–77 (9th Cir.1985) (citing *United States v. Blue,* 384 U.S. 251, 255 (1966)).

The Ninth Circuit has repeatedly made clear that "an indictment setting forth the elements of the offense is generally sufficient" to survive a motion to dismiss. *See Fernandez,* 388 F.3d at 1219. In fact, "[i]n the Ninth Circuit, '[t]he use of a "bare bones" information—that is one employing the statutory language alone—is quite common and entirely permissible so long as the statute sets forth fully, directly and clearly all essential elements of the crime to be punished.'" *United States v. Woodruff,* 50 F.3d 673, 676 (9th Cir.1995) (quoting *United States v. Crow,* 824 F.2d 761, 762 (9th Cir.1987)). Moreover, the Ninth Circuit has instructed that an indictment "'should be read in its entirety, construed according to common sense, and interpreted to include facts which are necessarily implied.'" *United States v. Berger,* 473 F.3d 1080, 1103 (9th Cir.2007) (quoting *United States v. King,* 200 F.3d 1207, 1217 (9th Cir.1999)).

In evaluating Mr. Abouammo's motion to dismiss, this Court is "bound by the four corners of the indictment in analyzing whether a cognizable offense has been charged." *United States v. Boren,* 278 F.3d 911, 914 (9th Cir. 2002). Consequently, it is well settled that "a bill of particulars cannot save an invalid indictment." *Russell,* 369 U.S. at 770; *see also United States v. Cecil,* 608 F.2d 1294, 1296 (9th Cir.1979) ("We begin our analysis stating the established rule that a bill of particulars cannot save an invalid indictment."). This is because "the purpose of a bill of

3

particulars is to clarify *ambiguities* in an indictment," *United States v. Ablett,* No. C 09–749 RS, 2010 WL 3063145, at *3 (N.D. Cal. Aug. 3, 2010) (emphasis added), so as to "inform the defendant of the nature of the charge against him with sufficient precision to enable him to prepare for trial, to avoid or minimize the danger of surprise at the time of trial, and to enable him to plead his acquittal or conviction in bar of another prosecution for the same offense when the indictment itself is too vague, and indefinite for such purposes," *United States v. Giese,* 597 F.2d 1170, 1180 (9th Cir.1979) (quoting *United States v. Brimely*, 529 F.2d 103, 108 (6th Cir. 1976)).

Where an indictment is not "ambiguous," but rather is simply devoid of sufficient allegations to meet the standard of Rule 7, the proper remedy is dismissal of the indictment, not preparation of a bill of particulars. *See Cecil,* 608 F.2d at 1296 ("If a bill of particulars were allowed to save an insufficient indictment, the role of the grand jury as intervenor would be circumvented."). The converse is also true: where an indictment satisfies the fairly forgiving standard of Rule 7, but the defendant nevertheless legitimately needs to know more about the precise criminal conduct alleged in order to prepare for trial, the proper remedy is preparation of a bill of particulars, not dismissal of the charges. *See, e.g., Ablett,* 2010 WL 3063145, at *6 (denying defendant's motion to dismiss the indictment, but granting defendant's alternative request for a bill of particulars); *United States v. Martinez,* No. CR 13–794–WHA, 2014 WL 998183, at *1 (N.D. Cal. Mar. 12, 2014) (same).

### III.     WIRE FRAUD

To state an offense for wire fraud under § 1343, the Government must allege "(1) the existence of a scheme to defraud; (2) the use of [a] wire . . . to further the scheme; and (3) a specific intent to defraud." *United States v. Lindsey*, 850 F.3d 1009, 1013 (9th Cir. 2017). The Ninth Circuit recently held that "the crime of wire fraud requires the specific intent to utilize deception to deprive the victim of *money or property*, *i.e.*, to cheat the victim." *United States v. Miller*, 953 F.3d 1095, 1099 (9th Cir. 2020) (emphasis added). Mr. Abouammo argues that the Government has failed to allege (1) that he made a material misrepresentation or omission in furtherance of the alleged fraudulent scheme and (2) that he deprived Twitter of its "property." The Court will address these arguments in turn.

4

A.  **The Superseding Indictment Alleges That Mr. Abouammo Made Several Material Misrepresentations and Omissions**

Wire fraud consists of using wires in "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343. To state an offense of this wire fraud statute, courts in this circuit require the Government to allege "some affirmative act of deception." *United States v. Keuylian*, 23 F. Supp. 3d 1126 (C.D. Cal. 2014). In other words, the superseding indictment must contain "enough facts to apprise a defendant of what defense should be prepared for trial." *United States v. Holmes*, No. 15-cr-00258-EJD, 2020 WL 666563, at *6 (N.D. Cal. Feb. 11, 2020). "Hence, the Government need not allege specific misstatements to meet the 'fair notice' requirement." *Id.*; *see also United States v. Buckley*, 689 F.2d 893 (9th Cir. 1982) (""[A]n indictment should be: (1) read as a whole; (2) read to include facts which are necessarily implied; and (3) construed according to common sense."); *Cecil*, 608 F.2d 1at 1296 ("[T]he indictment must set forth the elements of the offense charged and contain a statement of the facts and circumstances that will inform the accused of the specific offense with which he is charged." (citing *Hamling v. United States*, 418 U.S. 87, 117-18 (1974)); *United States v. Curtis*, 506 F.2d 985, 990 (10th Cir. 1974) ("While the particulars of the scheme . . . must be described with a degree of certainty sufficient to . . . fairly acquaint the defendant will [sic] the particular fraudulent scheme charged against him, still the scheme itself need not be pleaded with all the certainty in respect of time, place, and circumstance.").

Mr. Abouammo argues that the superseding indictment here fails to allege specific misstatements or omissions sufficient to put him on fair notice of what defense should be prepared at trial. According to Mr. Abouammo, the only affirmative misrepresentation alleged in the superseding indictment is that he "used private means of communication, including personal telephones, email addresses, and Twitter DMs, to communicate with representatives and officials of the government of KSA and Saudi Royal Family . . . to avoid detection of the scheme by Twitter." Superseding Indictment ¶ 27(a). Even if that is true, the superseding indictment recites plenty material omissions Mr. Abouammo made in furtherance of the fraudulent scheme to defraud Twitter, including that he failed to inform Twitter (1) that he had shared its users'

confidential account information with the Saudi government; (2) that he received a $20,000 watch from the Saudi government on December 5, 2014; (3) and that he received $100,000 in cash from the Saudi government on February 13, 2015.  Superseding Indictment, ¶¶ 14, 21, 23–24, 26(f), 26(j), 27(b), 27(c).  These allegations go far beyond what was alleged in the "rather barren" indictment in *Cecil*, which merely "track[ed] the language of the pertinent statutes in setting out the elements of the offenses with which the defendants were charged," stated that the offenses took place in Arizona and Mexico, and offered the names of the alleged co-conspirators.  608 F.2d at 1296–97.  Similarly, *Keuylian*—on which Mr. Abouammo heavily relies—is distinguishable because the indictment there "simply track[ed] the statutory language without any fair indication of the scheme to defraud, or the false pretenses, misrepresentations, or promises forming a part of it."  23 F. Supp. 3d at 1129.  The allegations here also go beyond what was alleged in the *Curtis* indictment, which the Tenth Circuit invalidated as unconstitutionally vague because the government only alleged that the defendant's dating service was a sham, without providing any detail as to *why* it was a sham, or *what* conduct formed the illegal scheme.  *See* 506 F.2d at 989.

Alternatively, Mr. Abouammo argues that the omissions regarding the transfer of confidential information to the Saudi government, the luxury watch, and the transfer of cash funds are immaterial because Mr. Abouammo did not have a duty to disclose any of this information to Twitter.  Mot. at 6.  Indeed, in *United States v. Dowling*, the Ninth Circuit explained that "nondisclosures [can] form the basis of a scheme to defraud only when there exists an independent duty (either fiduciary or derived from an explicit and independent statutory requirement) and such a duty has been breached."  739 F.2d 1445, 1450 (9th. Cir. 1984).  The problem with this argument is that the superseding indictment sufficiently alleges that Mr. Abouammo had fiduciary duties not to provide Twitter's confidential user account information to third parties and to disclose any gifts he received in exchange for doing so.  Superseding Indictment ¶¶ 14–18.  For example, the superseding indictment explains that Mr. Abouammo affirmed Twitter's employment policies which explicitly prohibited him from engaging in outside employment "or any other business activity that would create a conflict of interest with the Company," *id.* ¶ 14, and from

6

receiving "gifts exceeding $100 in value," *id.* ¶ 16.  The policies also described "a relationship of confidence and trust" between Mr. Abouammo and Twitter "with respect to any information of a confidential or secret nature that may be disclosed to [him] by the Company or a third party that relates to the business of the Company." *Id.* ¶ 14.  In fact, the superseding indictment states that accessing Twitter's user account information—let alone providing it to a foreign country—"was a reportable violation of the Twitter Playbook policies regarding handling and protecting user data." *Id.* ¶ 18.  In sum, it is abundantly clear from the superseding indictment that Mr. Abouammo had a fiduciary duty not to disclose Twitter's confidential user account information and to report any expensive gifts he received in exchange for that information.  *See id.* ¶ 23 (Messrs. Alzabarah and Abouammo had "access privileges as employees *and fiduciaries* of Twitter" (emphasis added)).

The Court therefore rejects Mr. Abouammo's contention that the superseding indictment lacks allegations that he made material misrepresentations or omissions.

B.      Mr. Abouammo Allegedly Deprived Twitter of Its "Property"

Mr. Abouammo also argues that the superseding indictment falls short of alleging that he deprived Twitter of its money or property because Twitter's confidential user account information is not "property" under California law.  Opp'n at 2–4 (citing *Cleveland v. United States*, 531 U.S. 12, 15 (2000)).

The Supreme Court has found that confidential business information can be property for purposes of the federal mail and wire fraud statutes.  *Carpenter v. United States*, 484 U.S. 19, 25 (1987).  In *Carpenter*, journalists at the Wall Street Journal were convicted of mail and wire fraud for sending the contents of a popular and influential investment column to outside investors before the column was published.  *Id.* at 21–23.  At the time, the Journal's official policy and practice was that, prior to publication, the contents of the column were the Journal's confidential information.  *Id.* at 23.  The Court held that the journalists were liable for wire and mail fraud because "[t]he Journal had a property right in keeping confidential and making exclusive use, prior to publication, of the schedule and contents of the 'Heard' column." *Id.* at 26.  The Court also rejected the journalists' argument that they did not interfere with the Journal's use of the information:

> The confidential information was generated from the business, and the business had a right to decide how to use it prior to disclosing it to the public. Petitioners cannot successfully contend based on *Associated Press* that a scheme to defraud requires a monetary loss, such as giving the information to a competitor; it is sufficient that the Journal has been deprived of its right to *exclusive* use of the information, for *exclusivity is an important aspect of confidential business information and most private property for that matter*.

*Id.* at 26–27 (emphasis added). Put simply, confidential business information can be property under the mail and wire fraud statutes precisely because it is confidential.

The Government argues that Twitter's confidential user account information, which "was generated from [Twitter]," is "property" under *Carpenter* because Twitter has "a property right in keeping confidential and making exclusive use, prior to publication" of that confidential user information. *Id.* at 26. Indeed, like the Journal in *Carpenter*, Twitter had a written policy—the "Security Handbook"—"which defined user data as confidential data and prohibited sharing confidential data with third parties without approval." Superseding Indictment ¶ 15. Moreover, Mr. Abouammo, like the journalists in *Carpenter*, signed a "Playbook Acknowledgment" stating that he "would read, understand, and abide by Twitter's policies, including the Security Handbook." *Id.* Therefore, because the *Carpenter* Court "ha[d] little trouble holding that the conspiracy [] to trade on the Journal's confidential information is not outside the reach of the mail and wire fraud statutes," the Government argues that this Court should also hold that Mr. Abouammo's alleged conspiracy to trade in Twitter's confidential user account information is also within reach of those statutes. 484 U.S. at 28.

The problem with the Government's argument is that "[w]hile *Carpenter* concluded that 'confidential business information' *could* be property fraudulently acquired under [the wire and mail fraud] statutes, [] whether information *actually* constitutes 'property' must be determined by reference to applicable state laws." *Planned Parenthood Fed'n of Am. v. Ctr. for Med. Progress*, 214 F. Supp. 3d 808, 824 (N.D. Cal. 2016) (emphasis added). For example, in *Borre v. United States*, 940 F.2d 215, 219–20 (7th Cir. 1991), and *United States v. Shotts*, 145 F.3d 1289, 1293 (11th Cir. 1998), the Seventh and Eleventh Circuits explained that *Carpenter* concluded that confidential business information was property by citing to prior Supreme Court cases that relied

8

exclusively on state common law for the proposition that confidential business information is a form of property. Indeed, *Carpenter* cited to *Ruckelahus v. Monsanto Co.*, where the Supreme Court relied on the Restatement of Torts to hold that the deprivation of commercial data was a "taking" under the Fifth Amendment. 567 U.S. 986, 1001–04 (1984). The *Carpenter* Court also cited to *Dirks v. SEC*, which addressed the state common law duty not to mismanage corporate assets, "of which confidential information is one." 463 U.S. 646, 653 n. 10 (1983). Even in *Carpenter* itself the Court noted that the Journal's confidential business information was property because "New York courts have recognized . . . 'that a person who acquires special knowledge or information by virtue of a confidential or fiduciary relationship with another is not free to exploit that knowledge or information for his own personal benefit but must account to his principal for any profits derived therefrom.'" 484 U.S. at 27–28 (quoting *Diamond v. Oreamuno*, 248 N.E.2d 910, 912 (N.Y. 1969); and citing to Restatement (Second) of Agency §§ 388, Comment c, 396(c) (1958)). In sum, the *Carpenter* decision does not stand for the proposition that confidential business information is *always* property for purposes of the federal mail and wire fraud statutes. Instead, confidential business information *can* constitute property for purposes of the federal mail and wire fraud statutes *if* state law also recognizes such information as a form of property.

Turning to California law, therefore, Mr. Abouammo cites *Planned Parenthood Federation of America* to argue that Twitter's confidential user account information is only "property" for purposes of the federal wire fraud statute if it qualifies as a trade secret under California's Uniform Trade Secrets Act (CUTSA), Cal. Civ. Code §§ 3426–3426.11. *See* 214 F. Supp. 3d at 823 ("[B]ecause plaintiffs have failed to allege facts identifying trade secrets that were allegedly acquired through wire or mail fraud, plaintiffs have failed to plead these predicate acts."). Indeed, under the reasoning in *Planned Parenthood Federation of America*, it may be contended that the Government has failed to properly allege that Mr. Abouammo deceived Twitter with the specific intent of depriving it of its "property" because the superseding indictment does not specifically allege that Twitter's confidential user account information is a trade secret, or any other form of property under California state law. *See Id.* at 823 ("[I]f confidential information [does] not qualify as [a] trade secret under CUTSA, then there [is] no common law claim

9

protecting against its misappropriation."); *SunPower Corp. v. SolarCity Corp.*, 2012 WL 6160472, at *5 (N.D. Cal. Dec. 11, 2012) (dismissing plaintiff's claims of wrongful misappropriation of confidential information where plaintiff failed to allege that CUTSA or another provision of positive law created a property right in that information); *Silvaco Data Sys. v. Intel Corp.*, 109 Cal. Rptr. 3d 27, 53 n. 22 (2010), *disapproved of on other grounds by Kwikset Corp. v. Sup. Ct.*, 246 P.3d 877 (Cal. 2011) ("Information that does not fit th[e trade secret] definition, and is not otherwise made property by some provision of positive law, belongs to no one, and cannot be converted or stolen.").

The Government's opposition does not address—let alone distinguish—the reasoning in *Planned Parenthood Federation of America*; it does not argue that Twitter's confidential user account information is a trade secret under CUTSA.[3] *See* Cal. Civ. Code § 3426.1(d) ("'Trade secret' means information . . . that: (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."). The indictment also does not expressly allege that Twitter's user account information qualifies as a trade secret under CUTSA. Instead, the Government rests its case on the proposition that *Carpenter* held that confidential business information has always been recognized as property. *See* Opp'n at 11. But the Government's assertion that "*Carpenter* and other cases treat intangible data as valuable property for purposes of the federal wire and mail fraud statutes without looking to state law definitions," is incorrect because the *Carpenter* Court relied on case law from the New York Court of Appeals to establish that confidential business information is property under New York state law. *See* 484 U.S. at 27–28 ("As the New York courts have recognized: '. . . a person who acquires special knowledge or information by virtue of a confidential or fiduciary relationship with another is not free to exploit that knowledge or information for his own personal benefit." (quoting *Diamond*, 248 N.Y.3d at

---

[3] The Government does not concede, however, that this information is *not* a trade secret. *See* Opp'n at 11, n. 5 ("The government does not concede for purposes of this motion, however, that the user data involved in the scheme to defraud is not also a trade secret of Twitter, Inc. as defined in 18 U.S.C. § 1839.").

10

912)).

The other case the Government cites to support its contention that intangible data is always valuable property, *Pasquantino v. United States,* is completely inapposite. 544 U.S. 349, 357 (2005). As an initial matter, *Pasquantino* did not involve a scheme to deprive a victim of intangible data; it involved a tax evasion scheme whereby the defendants drove liquor over the Canadian border without paying Canada the required excise taxes. *Id.* The Court held that defendants deprived Canada of its "property" because "the Government alleged and proved that petitioners' scheme aimed at depriving Canada of *money* to which it was *entitled by law*." 544 U.S. 349, 357 (2005) (emphasis added). Unlike Twitter's confidential user account information, taxes—which are basically money—are not "intangible data."

More importantly, the entire point of the *Pasquantino* decision was to explain that tax revenues are property *under common law*. That is why, to find that Canada's tax revenues were Canada's "property," the Court cited age-old common law principles that "[t]he right to be paid money has long been thought to be a species of property." *Id.* at 356 (citing W. Blackstone, Commentaries on the Laws of England 153–155 (1768); 2 J. Kent, Commentaries on American Law 351). In other words, taxes are "property" as that term is defined in the federal mail and wire fraud statutes precisely because they are also "property" under common law. *Pasquantino* therefore supports the principle—central to *Carpenter* and its progeny—that courts must look to state law to determine whether something intangible is "property" under the federal mail and wire fraud statutes.

Although the government does not allege that Twitter's confidential user account information is a trade secret under CUTSA,[4] its reliance on *Carpenter* is not misplaced. California law defines confidential property appropriated for personal gain as property much in the way New York law did in *Carpenter*. Section 2860 of the California Labor Code, which precedes CUTSA,

---

[4] The Court suspects that this information could have been properly alleged to be a trade secret in the indictment had the Government cited to section 3426.1(d) and explained (1) how it "[d]erives independent economic value, actual or potential, from not being generally known to the public"; and (2) how Twitter's efforts to keep it secret were "reasonable under the circumstances." Cal. Civ. Code § 3426.1(d).

11

states that "[e]verything which an employee acquires by virtue of his employment, except the compensation which is due to him from his employer, belongs to the employer, whether acquired lawfully or unlawfully, or during or after the expiration of the term of his employment." Cal Lab Code § 2860. The California Supreme Court has long held that confidential information—including but not limited to trade secrets—acquired through employment is the employer's property under section 2860. *See Lugosi v. Universal Pictures*, 603 P.2d 425, 450-451 (Cal. 1979) ("[Section 2860] applies to a limited class of cases, primarily involving the exploitation of an employer's confidential information or trade secrets by a former employee to the employer's detriment."); *NetApp, Inc. v. Nimble Storage, Inc.*, No. 5:13-CV-05058-LHK, 2015 WL 400251, at *17 (N.D. Cal. Jan. 29, 2015) ("[Section 2860] is 'but an expression of the familiar principle that forbids an agent or trustee from using the trust property or powers conferred upon him for his own benefit.'" (quoting *Lugosi*, 603 P.2d at 451)). In fact, the property right of employers to their confidential information in California precedes the enactment of section 2860. *See e.g.*, *Bank of Am. Nat'l Trust & Sav. Ass'n v. Ryan*, 24 Cal. Rptr. 739, 744 (Ct. App. 1962) ("An agent who acquires confidential information in the course of his employment or in violation of his duties has a duty not to use it to the disadvantage of the principal." (quoting Restatement (Second) of Agency § 395 (1958)); *By-Buk Co. v. Printed Cellophane Tape Co.*, 329 P.2d 147, 151 (Cal. Ct. App. 1958) ("Every employee is under the implied obligation not to divulge or use confidential information which he acquires by reason of his employment. Such information is the property of the employer and the employee holds that property in trust for the employer and cannot use it in violation of his trust."); *Am. Alloy Steel Corp. v. Ross*, 308 P.2d 494, 496 (Cal. Ct. App. 1957) ("Trade and business secrets and confidential information are the property of the employer and cannot be used by the employee for his own benefit." (quoting *Cal. Intel. Bureau v. Cunningham*, 188 P.2d 303, 306 (Cal. App. 1948)). Thus, as in *Carpenter*, applicable state law is clear: confidential information such as Twitter's user account information at issue in the instant case is property under California common law and section 2860.

Accordingly, Mr. Abouammo's motion to dismiss the wire fraud charges in Counts Five through Nineteen is **DENIED** because the superseding indictment alleges that Mr. Abouammo

1    made several material misrepresentations and omissions, and Twitter's confidential user account

2    information is property under section 2680 of the California Labor Code and California common

3    law preceding that statute.

### IV. HONEST SERVICES FRAUD

To state an offense for honest services fraud the government must allege "a scheme or artifice to 'deprive another,' by mail or wire, 'of the intangible right of honest services." *United States v. Christensen*, 828 F.3d 763, 784 (9th Cir. 2015) (quoting 18 U.S.C. § 1346; then citing 18 U.S.C. §§ 1341, 1343). Importantly, the Ninth Circuit explained in *United States v. Milovanovic*, that Congress passed § 1346 to circumvent the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350, 356 (1987), which held that the government could not charge a person with mail or wire fraud under sections 1341 and 1343 unless it alleged that they deprived the victims of money or property. *See* 678 F.3d 713, 720–21 (9th Cir. 2012) (en banc). The enactment of § 1346 therefore allowed the government to prosecute Defendants for receiving bribes or kickbacks via mail or wire, even if they did not deprive their victim of any property or money. *Id.* at 721. Accordingly, Mr. Abouammo can be charged with honest services fraud even if the Government's charges of wire fraud fail for failure to allege that he deprived Twitter of its money or property.

Mr. Abouammo's contends that the Government has nonetheless failed to state an honest services fraud offense because (1) his alleged misconduct falls entirely outside the scope of his role at Twitter, and (2) the superseding indictment fails to allege a *quid pro quo*. The Court will address each of these arguments in turn. .

A.  <u>Mr. Abouammo's Alleged Misconduct Constituted Honest Services Fraud</u>

Mr. Abouammo relies heavily on *United States v. Czubinski*, 106 F.3d 1069 (1st Cir. 1997), to argue that misconduct falling outside the scope of an employee's official job duties does not undermine the purpose of the employment relationship and thus cannot constitute honest services fraud. Mot. at 8–9. In *Czubinski*, the First Circuit overturned the wire and honest services fraud convictions of an IRS employee who knowingly disregarded IRS rules by searching for, and looking at, confidential taxpayer information he did not need to look at to perform his official duties. 106 F.3d at 1071–72. Mr. Abouammo therefore argues that, like Czubinski, he

cannot be convicted of honest services fraud because his accessing and sharing of Twitter's confidential user account information was not necessary for him to perform his official duties of providing assistance for "notable accounts, including accounts of public interest or belonging to brands, journalists, and celebrities in the [Middle East and North Africa (MENA)] region, with content and Twitter strategy, and with sharing best practices." Superseding Indictment ¶ 12.

Mr. Abouammo misrepresents the holding and reasoning of *Czubinski* in several relevant ways. First, the First Circuit did not overturn Mr. Czubinksi's conviction because his actions were outside the scope of his official duties at the IRS, but because—unlike here—"[n]o evidence suggest[ed], nor d[id] the government contend, that Czubinski disclosed the information he accessed to any third parties." 106 F.3d at 1072; *see also id.* ("There is . . . no evidence that Czubinski created dossiers, took steps toward making dossiers (such as by printing out or recording the information he browsed), or shared any of the information he accessed"). Here, by contrast, the Government is alleging that Mr. Abouammo not only accessed Twitter's confidential user account information but allegedly shared it with the Saudi government for personal gain without Twitter's permission. In other words, Mr. Abouammo's alleged conduct would constitute honest services fraud under *Czubinksi*, even if the information he wrongfully shared had nothing to do with his official duties of assisting notable accounts in the MENA region. In fact, the *Czubinski* court specifically noted that "had there been sufficient proof that Czubinski intended either to create dossiers for the sake of advancing personal causes *or to disseminate confidential information to third parties*, then his actions in searching files *could arguably be said to be a step in furtherance of a scheme to deprive the IRS* of its property interest in confidential information." *Id.* (emphasis added).

Second, the *Czubinski* court also held that Mr. Czubinski's conduct "f[ell] outside of the core honest services fraud precedents" because "[h]e did not receive, nor can it be found that he intended to receive, any tangible benefit" from viewing other taxpayers' information. *Id.* at 1077. Here, by contrast, the superseding indictment alleges that Mr. Abouammo accessed and shared Twitter's confidential user account information with the Saudi government in exchange for $100,000 in cash and a $20,000 luxury watch.

14

Third, Mr. Abouammo takes out of context *Czubinski's* observation that "although [Mr. Czubinski] clearly committed wrongdoing in searching confidential information, there is no suggestion that he failed to carry out his official tasks adequately, or intended to do so." *Id.* at 1077. The reason Mr. Czubinski did not fail to carry out his official tasks adequately was because "the government [] failed to prove that Czubinski intended to use the IRS files he browsed *for any private purposes*, and hence his actions, however reprehensible, [did] not rise to the level of a scheme to defraud his employer of his honest services." *Id.* at 1077 (emphasis added). In other words, Mr. Czubinski's actions were innocuous not because he was still performing his core official duties of "answering questions from taxpayers regarding their returns," but because he did not disclose taxpayers' confidential information or use that information for any private gain. *Id.* at 1071. Indeed, Mr. Czubinski would have committed honest services fraud had the government proved that he had disclosed taxpayers' confidential information to a third party, even if he was still carrying out his official task of answering other taxpayers' questions regarding their returns.

Fourth, and finally, the superseding indictment here is entirely consistent with the central holding of *Czubinski*, namely, that "honest services convictions involving private fraud victims indicate that there must be a *breach of a fiduciary duty* to an employer that involves self-dealing." *Id.* This is also the law in the Ninth Circuit. *See Milovanovic*, 678 F.3d at 721 ("We believe that breach of fiduciary duty is required for honest services fraud, that it does not require a formal fiduciary duty, and that a trust relationship, as existed here, is sufficient."). The superseding indictment alleges that, as an employee of Twitter, Mr. Abouammo was a fiduciary of Twitter because Twitter's policies described "a relationship of confidence and trust" between Mr. Abouammo and the company "with respect to any information of a confidential or secret nature that may be disclosed to [them] by the Company," and required Mr. Abouammo to "keep and hold all such Proprietary Information in strict confidence and trust," including "customer lists and data." *Id.* at ¶ 14. In fact, Mr. Abouammo need not be Twitter's employee to be liable for honest services fraud in the Ninth Circuit, as long as the Government alleges—as it does—that there was a trust relationship between Mr. Abouammo and the Company. *see Milovanovic*, 678 F.3d at 724 ("[A]lthough the bulk of the pre-McNally honest-services cases involved employees, we see no

15

1 reason the principle they establish would not apply to other persons who assume a legal duty of
2 loyalty comparable to that owed by an officer or employee to a private entity." (quoting *United*
3 *States v. Williams*, 441 F.3d 716, 723–24 (2d Cir. 2006)). By disclosing Twitter's confidential
4 user account information to the Saudi government in exchange for money, Mr. Abouammo
5 breached his fiduciary duty to Twitter, which is exactly what *Czubinski* and *Milovanovic* held
6 constitutes honest services fraud.

Accordingly, the Court rejects Mr. Abouammo's argument that his conduct could not constitute honest services fraud because sharing Twitter's confidential user account information had nothing to do with his official duties at the company.

B.   The Superseding Indictment Adequately Alleges a *Quid Pro Quo*

There is no dispute that the federal honest services fraud statute only covers bribes and kickbacks. *Skilling v. United States*, 561 U.S. 358, 408–09 (2010) ("To preserve the statute without transgressing constitutional limitations, we now hold that § 1346 criminalizes *only* the bribe-and-kickback core of the pre-*McNally* case law."). Accordingly, the Government is required to allege a *quid pro quo* in order to properly state a violation of the honest services fraud statute.

Mr. Abouammo first argues that the superseding indictment fails to allege a "*quid*," namely, an outgoing wire transmission from Mr. Abouammo to the Saudi government in which Mr. Abouammo allegedly shared Twitter's confidential user account information. Mot. at 9. But as the Government points out, the superseding indictment "alleges fifteen specific interstate wires, including accesses of user data from abroad, Twitter direct messages, and telephone calls, in furtherance of [Mr. Abouammo's] scheme to defraud Twitter of property and honest services." Opp'n at 15 (citing Superseding Indictment ¶ 38). Mr. Abouammo does not cite to any authority that requires the Government to identify exactly which of the fifteen wire transfers alleged in the superseding indictment provided the Saudi government with this confidential information.

Mr. Abouammo also argues that the Government has failed to allege a "*quo*," namely, that he received a kickback or bribe in exchange for providing Twitter's confidential user account information to the Saudi government. Mot. at 9–10. Again, the superseding indictment specifically states that Mr. Abouammo received "bribes" in the form of a cash payment and a

16

luxury watch while working at Twitter and accessing the company's confidential user account information at the direction of a Saudi official. Superseding indictment ¶¶ 26(f), (j), and (k), 36, 38. These allegations are sufficient because they state the source and amount of each bribe/kickback, as well as how it was wired or transferred to Mr. Abouammo. *See id.*

Finally, Mr. Abouammo argues that the superseding indictment does not allege that the cash and luxury watch the Saudi government gave him were *in exchange for* Twitter's confidential user account information. Mot. at 10–11. But the superseding indictment here "describe[s] payments made to [Mr. Abouammo] to which he knew he was not entitled, accompanied by an express promise to" provide the Saudi government with Twitter's confidential user account information. *United States v. Inzuza;* 638 F.3d 1006, 1019–20 (9th Cir. 2011); *see also* Superseding Indictment ¶¶ 21 ("Foreign Official-1 provided ABOUAMMO and ALZABARAH with gifts, cash payments, and promises of future employment *in exchange for* nonpublic information about Twitter users." (emphasis added)); 24 ("*In exchange for* accessing nonpublic account information of Twitter users, outside the scope of their job duties, and for communicating such nonpublic account information to Foreign Official-1, contrary to Twitter's policies, Foreign Official-1 *rewarded* ABOUAMMO and ALZABARAH including with compensation such as gifts, cash payments, and promises of future benefits, including employment." (emphasis added)); 27(b) ("ABOUAMMO concealed from Twitter his receipt of a watch valued at more than $20,000 from Foreign Official-1, *in exchange for* accessing the nonpublic account information of Twitter User-1 and Twitter User-2, and providing such nonpublic information to Foreign Official-1 and others outside of Twitter." (emphasis added)); 27(c) ("ABOUAMMO concealed from Twitter his receipt of $100,000 from Foreign Official-1, and his expectation of additional payments, *in exchange for* his access and monitoring of Twitter accounts of interest to Foreign Official-1 and other members of the government of KSA and the Saudi Royal Family." (emphasis added)). In sum, the superseding indictment sufficiently alleges a *quid pro quo*.

Accordingly, Mr. Abouammo's motion to dismiss the honest services fraud charges in Counts Five through Nineteen is **DENIED** because the alleged conduct constituted honest services fraud, and the superseding indictment properly alleges a *quid pro quo*.

17

## V. CONSPIRACY AND MONEY LAUNDERING

Mr. Abouammo's motion to dismiss the conspiracy and money laundering charges in Counts Four and Twenty through Twenty-Two is also **DENIED** because those charges are predicated on the validity of the wire and honest services fraud charges, which are sustained. *See United States v. Cogswell*, 637 F. Supp. 295, 300 (N.D. Cal. 1985) ("The conspiracy to defraud fails because it does not allege the particulars of a fraudulent scheme"); *United States v. Garrido*, 713 F.3d 985, 1003 (9th Cir. 2013) ("We REVERSE Robles's § 1957 money laundering convictions with respect to Counts 18 through 21 because they are predicated on the flawed honest services fraud convictions.").

## VI. CONCLUSION

For the foregoing reasons, the Court **DENIES** Mr. Abouammo's motion to dismiss Counts Four to Twenty-Two for failure to state an offense.

This order disposes of Docket No. 84.

**IT IS SO ORDERED**.

Dated: February 24, 2021

EDWARD M. CHEN
United States District Judge