STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

COLIN C. SAMPSON (CABN 249784)
    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    Colin.Sampson@usdoj.gov

JOHN C. DEMERS
Assistant Attorney General
National Security Division

BENJAMIN J. HAWK (NJBN 030232007)
Trial Attorney, National Security Division
    950 Pennsylvania Avenue NW
    Washington, DC 20530-0001
    Telephone: (202) 307-5176
    Benjamin.Hawk@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 19-621 EMC |
| Plaintiff, | UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS |
| v. | Date:  June 9, 2021 |
| AHMAD ABOUAMMO, | Time:  2:30 p.m. |
| Defendant. | Courtroom: 5, 17th Floor |

U.S.' OPP. TO DEF. MOTION TO SUPPRESS,
CASE NO. 19-621 EMC

# **TABLE OF CONTENTS**

I.    BACKGROUND ................................................................................................1

    A.    Summary of the Charges Against Defendant Abouammo .................................1

    B.    The Investigation and Relevant Search Warrants ................................................2

II.   LEGAL STANDARD ........................................................................................5

III.  ARGUMENT .....................................................................................................6

    a.    The August 2016 Search Warrant Was Supported by Probable Cause. .............................7

    b.    Agents Relied in Good Faith on the Validity of the Search Warrant. ...............................11

    c.    The Subsequent Search Warrants Were Supported by Probable Cause. .........................13

    d.    Defendant's Voluntary Statements and Evidence Should Not Be Suppressed ................15

    e.    The October 2018 Search Warrant Was Supported by Probable Cause. ...........................16

        i.    The Government Did Not Have to Prove a Conspiracy. ........................................16

        ii.   Defendant Concedes Search Warrant Was Valid in Certain Respects. ................17

        iii.  Probable Cause Supporting the Search Was Not Stale ................................17

        iv.   The Warrant Makes No Distinction Between Electronic Devices and Physical Files. ................18

        v.    The Warrant Was Particular and Not Overbroad. ..................................19

        vi.   Agents Relied in Good Faith on the Validity of the Search Warrant. ...................20

IV.   CONCLUSION ................................................................................................21

# TABLE OF AUTHORITIES

Page(s)

Cases

*Herring v. United States*,
   555 U.S. 135 (2009)............................................................................................................ 12

*Illinois v. Gates*,
   462 U.S. 213 (1983)................................................................................................... 5, 6, 12

*Illinois v. Krull*,
   480 U.S. 340 (1987)...................................................................................................... 12, 13

*Lyall v. City of Los Angeles*,
   807 F.3d 1178 (9th Cir. 2015) ........................................................................................... 13

*Maryland v. Garrison*,
   480 U.S. 79 (1987)............................................................................................................. 18

*Massachusetts v. Sheppard*,
   468 U.S. 981 (1984)........................................................................................................... 11

*Massachusetts v. Upton*,
   466 U.S. 727 (1984)............................................................................................................. 5

*United States Currency*,
   590 F.3d 942 (9th Cir. 2010) ............................................................................................. 15

*United States v. Angulo-Lopez*,
   791 F.2d 1394 (9th Cir. 1986) ..................................................................................... 5, 6, 7

*United States v. Bishop*,
   910 F.3d 335 (7th Cir. 2018) ............................................................................................. 19

*United States v. Fisher*,
   137 F.3d 1158 (9th Cir. 1998) ........................................................................................... 17

*United States v. Gourde*,
   440 F.3d 1065 (9th Cir. 2006) ............................................................................................. 5

*United States v. Greany*,
   929 F.2d 523 (9th Cir. 1991) ............................................................................................... 5

*United States v. Harrington*,
   681 F.2d 612 (9th Cir. 1982) ............................................................................................. 11

*United States v. Hendershot*,
   614 F.2d 648 (9th Cir. 1980) ............................................................................................... 6

*United States v. Huguez-Ibarra*,
   954 F.2d 546 (9th Cir. 1992) ............................................................................................... 6

*United States v. Hunter*,
   13 F. Supp. 2d 574 (D. Vt. 1998)...................................................................................... 11

*United States v. Johns*,
   948 F.2d 599 (9th Cir. 1991) ............................................................................................... 5

*United States v. Johnson*,
   641 F.2d 652 (9th Cir. 1980) ............................................................................................... 6

*United States v. Kelley*,
   482 F.3d 1047 (9th Cir. 2007) ............................................................................................. 5

*United States v. Lacy*,
   119 F.3d 742 (9th Cir. 1997) ............................................................................................. 17

*United States v. Ladum,*
  141 F. 3d 1328 (9th Cir. 1998) .................................................................. 16
*United States v. Leon,*
  468 U.S. 897 (1984)........................................................................ 11, 12, 20
*United States v. Michaelian,*
  803 F.2d 1042 (9th Cir. 1986) ................................................. 6, 11, 18, 20
*United States v. Morales–Aldahondo,*
  524 F.3d 115 (1st Cir. 2008) ................................................................... 17
*United States v. Motz,*
  936 F.2d 1021 (9th Cir. 1991) ............................................................. 6, 18
*United States v. Pitts,*
  6 F.3d 1366 (9th Cir. 1993) ...................................................................... 5
*United States v. Robinson,*
  62 F.3d 1325 (11th Cir. 1995) .................................................................. 6
*United States v. Ross,*
  456 U.S. 798 (1982)................................................................................. 12
*United States v. Rude,*
  88 F.3d 1538 (9th Cir.1996) ................................................................... 19
*United States v. Schesso,*
  730 F.3d 1040 (9th Cir. 2013) ........................................................... 12, 17
*United States v. SDI Future Health, Inc.,*
  568 F.3d 684 (9th Cir. 2009) .................................................................. 20
*United States v. Seybold,*
  726 F.2d 502 (9th Cir. 1984) .................................................................... 7
*United States v. Taketa,*
  923 F.2d 665 (9th Cir. 1991) ............................................................. 13, 14
*United States v. Taylor,*
  716 F.2d 701 (9th Cir. 1983) .................................................................... 6
*United States v. Wong,*
  334 F.3d 831 (9th Cir. 2003) .................................................................... 6
*United States v. Wright,*
  215 F.3d 1020 (9th Cir. 2000) .................................................................. 5
*Wong Sun v. United States,*
  371 U.S. 471 (1963)........................................................................... passim

Statutes

18 U.S.C. § 951 ........................................................................................... 1
18 U.S.C. § 1349 ......................................................................................... 1
18 U.S.C. § 1519 ......................................................................................... 1
18 U.S.C. § 2703(d) ..................................................................................... 9
18 U.S.C. § 1001 ......................................................................................... 4
18 U.S.C. § 1831 ................................................................................... 2, 16
18 U.S.C. § 1343 ......................................................................................... 1

Rules

Fed. R. Crim. P. 41(d)(1) ............................................................................ 5

The Government respectfully submits its Opposition to Defendant Ahmad Abouammo's ("Abouammo" or "Defendant") Motion to Suppress Evidence [Dkt. No. 117 ("Def. Mot.")].[1]  While Defendant portrays his motion as one to suppress evidence seized pursuant to only two search warrants (dated August 17, 2016, and October 23, 2018), he actually seeks to suppress far more, including evidence seized pursuant to three additional search warrants, as well as his voluntary statements to the FBI, the falsified invoice he produced to obstruct the FBI's investigation, and bank records subpoenaed by the grand jury.  In essence, Defendant argues that nearly every subsequent investigative step following the August 2016 search warrant for his Google account must be suppressed as "fruits of the poisonous tree."  Def. Mot. at 5 (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)). He further argues that the October 2018 search warrant for his residence was overbroad and predicated on stale information.  For the reasons set forth herein, the Court should deny Defendant's motion in its entirety.

## I.      BACKGROUND

### A.      Summary of the Charges Against Defendant Abouammo

Defendant Abouammo and two co-defendants – Ali Alzabarah and Ahmed Almutairi – are charged with acting as agents of a foreign government without notifying the Attorney General, in violation of 18 U.S.C. § 951, conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and wire fraud and honest services wire fraud, in violation of 18 U.SC. §§ 1343 and 1346.  Dkt. No. 42 ("SI").  Defendant is also charged with falsification of records, in violation of 18 U.S.C. § 1519, and international money laundering, in violation of 18 U.S.C. § 1956(a)(2)(B)(i).  *Id*.

As alleged in the Superseding Indictment, between approximately November 2014 and March 2016, the Kingdom of Saudi Arabia (KSA) and its Royal Family, who hold most of the country's governmental posts, sought to identify the users of certain Twitter accounts that posted information critical of, or embarrassing to, the Saudi government and members of the Royal Family, including

---

[1] Defendant's Motion to Suppress and Exhibits A-H were filed under seal, given that it contained information identifying uncharged individuals and Twitter users.  Although this information should not be filed publicly, the arguments and relief sought in the Motion should not be sealed.  Moreover, the Court's Order should likewise not be sealed.  For that reason, the Government files this response without sealing and, as with the charging documents, has masked the names of certain individuals and accounts.

1   "Saudi Royal Family Member-1."  *See* SI ¶¶ 8, 22.  To carry out this scheme, "Foreign Official-1" and

2   Almutairi, both of whom were closely associated with and performed work for Saudi Royal Family

3   Member-1, secretly recruited Defendant and Alzabarah, both of whom worked for Twitter, to access

4   proprietary and confidential Twitter information.  *See id.* ¶¶ 9, 10, 17, 21.  Such protected Twitter

5   information included user-provided names and birthdates, device identifiers, relationships, phone

6   numbers, internet protocol ("IP") addresses and session histories, among other things, all of which could

7   have been used by the Saudi government to identify and locate the individuals behind the accounts.  *See*

8   *id.* ¶ 17.

9        During the course of the scheme, while acting beyond their job duties and contrary to Twitter's

10   policies, Defendant and Alzabarah used their access privileges as employees and fiduciaries of Twitter,

11   to obtain confidential Twitter-user data for the Saudi government in exchange for gifts, cash payments,

12   and promises of future employment.  *See id.* ¶¶ 21, 23-24.  Specific to Defendant, Foreign Official-1

13   provided him with a luxury watch worth at least $20,000 and at least $300,000 in cash.  *See id.* ¶¶ 26(f),

14   26(j), 26(k).  In order to conceal the nature and source of the cash proceeds, Foreign official-1 deposited

15   the money into a Lebanese bank account in the name of Defendant's relative; Defendant then caused the

16   money to be incrementally transferred to his personal Bank of America account in the United States.  *Id.*

17   ¶ 26(j).

18        The Superseding Indictment further alleges that, on October 20, 2018, Defendant falsified and

19   fabricated an invoice for consulting services he purported provided Foreign Official-1.  *Id.* ¶ 46.  He

20   then provided the false invoice to the FBI with the intent to obstruct the FBI's investigation.  *See id.* ¶¶

21   26(j).

22        **B.        The Investigation and Relevant Search Warrants**

23        In the early stages of the investigation, the FBI sought a warrant to search six Google accounts

24   attributed to Alzabarah, Amultairi, "Associate-1," and Defendant for evidence of 18 U.S.C. §§ 1831

25   (Economic Espionage), 1832 (Theft of Trade Secrets), 1343, 1349 (Wire Fraud), and 951 (Agent of a

26   Foreign Government).  Def. Ex. A (hereinafter "Aug. 2016 SW").  On August 17, 2016, U.S. Magistrate

27   Judge Joseph C. Spero determined that there was probable cause to authorize the search warrant.  *Id.*  By

28   that time, Twitter had conducted its own internal investigation, which focused on Alzabarah and another

1  Twitter employee "Twitter Employee-1."[2]  *Id.* ¶¶ 32, 70.  Twitter confronted Alzabarah and Twitter

2  Employee-1 in December 2015, prompting Alzabarah to flee to Saudi Arabia.  *Id.* ¶¶ 35-37, 70.  FBI

3  also obtained information establishing a pattern of telephone and email communications between and

4  among Alzabarah, Amultairi, Associate-1, Foreign Official-1, Defendant, and Twitter Employee-1,

5  particularly during the period that Alzabarah and Twitter Employee-1 were accessing Twitter accounts

6  of interest to the Saudi government and shortly after Twitter confronted Alzabarah and Twitter

7  Employee-1.  *Id.*  ¶ 83.

8        As the FBI's investigation progressed, it developed additional evidence implicating Defendant in

9  the scheme, including, among other things, information provided by Twitter concerning his access of

10  certain accounts of interest to the Saudi government.  *See* Def. Ex. D ¶¶ 40-42 (hereinafter "Sept. 2018

11  SW").  The results of the August 2016 search warrant for Defendant's Google account also revealed that

12  Foreign Official-1 emailed him about "Twitter User-1," which coincided with their meeting in London,

13  Foreign Official-1's gift of a luxury watch to Defendant, Defendant's sudden and frequent access of the

14  Twitter User-1 account, and numerous calls between Foreign Official-1 and Defendant.  *Id.* ¶¶ 37-38.

15        During the ensuing investigation, FBI obtained additional search warrants for other electronic

16  accounts.  Specifically, on September 11, 2018, U.S Magistrate Judge Elizabeth D. Laporte determined

17  that there was probable cause to authorize a search warrant for Apple accounts attributed to Defendant

18  and Almutairi and Google accounts attributed to Foreign Official-1 and Alzabarah.  *Id.*  On November 7,

19  2018, U.S. Magistrate Judge Thomas S. Hixson determined that there was probable cause to authorize a

20  search warrant for Twitter accounts attributed to Defendant, Alzabarah, Amultairi, Foreign Official-1,

21  and Associate-1.  Def. Ex. G (hereinafter "Nov. 2018 SW").  And on May 31, 2019, U.S. Magistrate

22  Judge Sallie Kim, determined that there was probable cause to authorize a search warrant for Defendant

23  Abouammo's Twitter account.

24        Additionally, on October 20, 2018, as part of its investigation, the FBI conducted a voluntary

25  interview of Defendant at his residence in Seattle, Washington.  Def. Ex. E (hereinafter "Def. Interview

26

27       [2] Defendant attempts to conflate Twitter's internal investigation with the FBI's independent
investigation.  While Twitter provided information to the FBI, the FBI took its own steps to investigate

28  the alleged federal crimes, including, among other things, physical surveillance and obtaining toll
records and email header information.

Report").  During the interview, Defendant voluntarily provided information, some of it false, about his employment at Twitter and his relationships with Alzabarah, Almutairi, and Foreign Official-1.  *Id.* Among other things, Defendant admitted that Foreign Official-1 gave him a watch as a gift when they met in London in December 2014, but he falsely claimed that it was "plasticky" and "junky" and worth $500.  *Id.* at 4.  Defendant also described his consulting business, CYRCL, LLC, and falsely stated that Foreign Official-1 paid him a total of $100,000 for consulting services after he had resigned from Twitter.  *Id.* at 5-6.  Defendant agreed to provide the agents with the invoice for that consulting work. *Id.* at 6.  He then went to his bedroom alone and emailed it to them.  *Id.*

At the end of the interview, the agents showed Defendant eight emails and a single photograph. *Id.* at 6-10.  The FBI's report clearly notes when this occurred during the interview.  *Id.* at 6.  Of the eight emails shown to Defendant, only two were from his Google account and only one of bears any mention – a January 17, 2015, email from Foreign Official-1 to Defendant about Twitter User-1's account, which references their discussion and meeting in London.  *Id.* at 10.  Importantly, when shown this email, Defendant denied any wrongdoing and minimized his conduct.  *Id.*  The agents then asked him about the information that Twitter had provided – the fact that Defendant had accessed the account 29 times.  *Id.* 10-11.  Defendant admitted to accessing the account but denied any wrongdoing, claiming that he was simply curious to know why Foreign Official-1 was so determined to shut down the account. *Id.* at 10.  At the conclusion of the interview, the agents asked some final questions and Defendant voluntarily showed the agents certain communications and information about wire transfers.  *Id.*  He later provided them with additional screenshots of certain communications.  *Id.* at 12.

Three days after the interview and Defendant's efforts to obstruct the investigation, on October 23, 2018, US. Magistrate Judge Theiler of the Eastern District of Washington determined that there was probable cause to authorize a search warrant for Defendant's residence in Seattle, Washington.  Def. Ex. F (hereinafter "Oct. 2018 SW").  The warrant authorized the FBI to search Defendant's residence for the same violations noted above, as well as 18 U.S.C. §§ 1001 (False Statements) and 1519 (Falsification of Records).  *Id.*  The warrant further authorized the search and seizure of electronic devices.  *Id.*

## II.     LEGAL STANDARD

A U.S. Magistrate Judge is authorized to issue a search warrant upon receipt of an affidavit that establishes probable cause that a federal crime has been committed.  *See* Fed. R. Crim. P. 41(d)(1).  To establish probable cause, an affidavit must set forth facts demonstrating that there is a "'fair probability' that contraband or evidence is located in a particular place."  *United States v. Kelley*, 482 F.3d 1047, 1050 (9th Cir. 2007) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).  "Whether there is a fair probability depends upon the totality of the circumstances, including reasonable inferences, and is a 'commonsense, practical question.'"  *Id*. (quoting *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006)).

Once a warrant issues, however, "the task of a reviewing court is not to conduct a de novo determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant."  *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984).  The issuance of a search warrant is reviewed for clear error, *United States v. Wright*, 215 F.3d 1020, 1025 (9th Cir. 2000), and the reviewing court should not reverse a prior determination of probable cause absent a finding of clear error, *see United States v. Pitts*, 6 F.3d 1366, 1369 (9th Cir. 1993).  Thus, the reviewing court is "required to accord deference to the . . . finding of probable cause and to uphold the [finding] if there is a substantial basis for concluding that the affidavit in support of the warrant established probable cause."  *United States v. Greany*, 929 F.2d 523, 524 (9th Cir. 1991); *see also Gates*, 462 U.S.at 236 (rejecting de novo standard of review for probable cause determinations and applying deferential "substantial basis" test); *Upton*, 466 U.S. at 733 ("A grudging or negative attitude by reviewing courts toward warrants is inconsistent both with the desire to encourage use of the warrant process by police officers and with the recognition that once a warrant has been obtained, intrusion upon interests protected by the Fourth Amendment is less severe than otherwise may be the case.") (citation and internal quotation omitted).

In marginal, or even "doubtful" cases, the reviewing court should still give preference to the validity of the warrant.  *United States v. Johns*, 948 F.2d 599, 602 (9th Cir. 1991).  The reviewing court's task is simply to ensure that the magistrate or judge had a "substantial basis for concluding that the affidavit in support of the warrant established probable cause."  *United States v. Angulo-Lopez*, 791

1  F.2d 1394, 1396 (9th Cir. 1986).  A reviewing court is generally limited to an examination of the "four

2  corners" of the affidavit.  *United States v. Huguez-Ibarra*, 954 F.2d 546, 552 (9th Cir. 1992).

3        Moreover, it is well established that an affidavit in support of a search warrant need only enable

4  the issuing magistrate or judge to conclude that it would be reasonable to seek the evidence in the place

5  indicated.  *See United States v. Wong*, 334 F.3d 831, 836 (9th Cir. 2003); *United States v. Taylor*, 716

6  F.2d 701, 706 (9th Cir. 1983); *United States v. Johnson*, 641 F.2d 652, 659 (9th Cir. 1980); *United*

7  *States v. Hendershot*, 614 F.2d 648, 654 (9th Cir. 1980).  Thus, the affidavit need not establish that it

8  was "more likely than not" that evidence would be found on the premises to be searched.  *Taylor*, 716

9  F.2d at 705.  Nor must the affidavit preclude other possibilities that the evidence might be found

10  elsewhere or not at all.  *Id.* at 706; *see also United States v. Angulo-Lopez*, 791 F.2d 1394, 1398-99 (9th

11  Cir. 1986) ("[P]robable cause does not demand the certainty we associate with formal trials.") (quoting

12  *Gates*, 462 U.S. at 246).  Importantly, the opinions and conclusions of an experienced agent are a proper

13  factor in the probable cause determination.  *See United States v. Michaelian*, 803 F.2d 1042, 1045 (9th

14  Cir. 1986); *see also United States v. Robinson*, 62 F.3d 1325, 1331 n.9 (11th Cir. 1995), *United States v.*

15  *Motz*, 936 F.2d 1021, 1024 (9th Cir. 1991) (stating that the conclusions of an agent "regarding a set of

16  facts are properly a factor in the probable cause equation under the *Gates* totality of the circumstances

17  approach") (quotations and citations omitted).

18    **III.    ARGUMENT**

19        Defendant's motion mostly relies on a single flawed premise – that the August 2016 search

20  warrant for his Google account was "illegal."  Def. Mot. at 5.  Specifically, Defendant claims that the

21  warrant lacked "probable cause that [he] committed any offense," and therefore, the evidence obtained

22  pursuant to that warrant should be suppressed.  *Id.* at 8-14.  He then argues that the evidence seized

23  pursuant to four subsequent search warrants must also be suppressed, because, according to Defendant,

24  such evidence constitutes "fruits of the poisonous tree."  *Id.* at 14-36.  Incredibly, he pushes this tenuous

25  and meritless argument even further, well past the bounds of the law, claiming that the Court must also

26  suppress his voluntary statements to the FBI, the invoice he fabricated to obstruct the FBI's

27  investigation, and bank records subpoenaed by the grand jury.  *Id.* at 18-22.  In addition, Defendant

28  challenges the October 2018 search warrant for his residence on staleness and particularity grounds.  As

1  discussed below, all of the search warrants were supported by probable cause and the agents relied in

2  good faith on the validity of the warrants.  According, the Court should deny the Defendant's motion in

3  its entirety.

4                 **a.   The August 2016 Search Warrant Was Supported by Probable Cause.**

5       U.S. Magistrate Judge Spero had a substantial basis to conclude that the affidavit supporting the

6  August 2016 search warrant established probable cause to search Defendant Abouammo's Google

7  account.  The affidavit first described efforts by the Saudi government to obtain confidential and

8  proprietary Twitter information.  *See* Aug. 2016 SW ¶¶ 28-29, 32-34.  It then set forth information

9  related to Alzabarah's unauthorized access of such information.  *See id.* ¶¶ 30-39.  While the affidavit

10  focused first on Alzabarah's conduct, given what the FBI knew at the time, it did not foreclose the

11  possibility that others employed by Twitter were also serving as agents of the Saudi government or that

12  Alzabarah and others were working in concert on behalf of the Saudi government.[3]

13       Against that backdrop, the affidavit further detailed a pattern of communications involving three

14  Twitter employees (Alzabarah, Defendant, and Twitter Employee-1), a representative of the Saudi

15  government and Saudi Royal Family Member-1 (Foreign Official-1), and two individuals with ties to

16  Foreign Official-1 and the Saudi government (Almutairi and Associate-1).  *See id* ¶ 83.  Of course, the

17  FBI did not have the contents of the communications specified in the affidavit; it was seeking them

18  through the August 2016 search warrant.  Nor were the contents necessary to establish probable cause to

19  search those same accounts.  The pattern of communications tying Defendant and his Google account to

20  the scheme was sufficient.  *See Anglo-Lopez*, 791 F.2d at 1398 (a single act does not necessarily

21  establish probable cause, but a pattern of such behavior, viewed in conjunction with other evidence, can

22  give rise to probable cause); *United States v. Seybold*, 726 F.2d 502, 504 (9th Cir. 1984) ("[T]hese

23  connections provided useful information that the magistrate could permissibly have considered, along

24  with the other matters in the affidavit, in deciding to issue a search warrant . . . ."); *United States v.*

25  *Alvarez*, No. 14-CR-00120-EMC-1, 2016 WL 69901 (N.D. Cal. Jan. 6, 2016) (a pattern of conduct

26

27       [3] In fact, as discussed throughout the Government's response, the affidavit made it quite clear
that there was reason to believe that Foreign Official-1's communications with Defendant related to the

28  crimes under investigation and that Twitter Employee-1 also may have been acting on behalf of the
Saudi government.

1    viewed in conjunction with other evidence established probable cause).  In sum, based on the totality of

2    the circumstances described in the affidavit, and drawing all reasonable inferences, there was a fair

3    probability that evidence of the crimes under investigation (whether committed by Defendant or those

4    with whom he was in contact) would be found in his Google account.

5           Defendant inexplicably argues that his asserted lack of involvement in the alleged offenses

6    deprived the affidavit of probable cause to search his account.  However, whether Defendant was a

7    suspect or knew that others were committing any of the crimes under investigation (or that they were

8    fleeing or planning to flee the United States) is not part of the legal analysis, despite Defendant's

9    assertions.  In support of his baseless argument, Defendant narrowly focuses only on the portions of the

10   affidavit that identify him by name.  *See* Def. Mot. at 8-14.  Those facts, however, must be viewed in the

11   context of the entire affidavit, as discussed above.  The alleged scheme to obtain Twitter's confidential

12   data, Foreign Official-1's prominent role in that scheme, and Twitter's confrontation of Alzabarah and

13   Twitter Employee-1 form the foundation from which to draw the reasonable inference that Defendant's

14   communications related to the crimes under investigation and that evidence of those crimes would be

15   found in his Google account.

16          Importantly, Defendant "does not dispute that the [August 2016 search warrant] established

17   probable cause that Alzabarah, Almutairi, and [Associate-1] committed the alleged offenses."  Def. Mot.

18   at 7.  He further concedes the following facts, among others:

19
20          1) Between approximately November 2014 and December 2015, the Saudi government, Saudi
             Royal Family Member-1, and Foreign Official-1, who worked for Saudi Royal Family Member-
             1, sought to learn the identities of certain Twitter users, *id.* ¶¶ 28-29, 32-34;

21
22          2) Between approximately January and November 2015, Alzabarah accessed confidential and
             proprietary Twitter data, including data pertaining to accounts of interest to the Saudi
             government, Saudi Royal Family Member-1, and Foreign Official-1, *id.* ¶¶ 32-34;

23          3) Foreign Official-1, Azabarah, Almutairi, and Associate-1 were in Washington, D.C., at the
24           same time in May 2015, *id.* ¶¶ 58-66; [4]

25          4) Alzabarah and Foreign Official-1 were in communication during the relevant period, *see, e.g.*,
             *id.* ¶ 50;

26

27          [4] Defendant's argument that he was not physically in Washington, D.C., at this apparent meeting
     does not detract from the probable cause to search his Google account for evidence of the crimes under
28   investigation.  In fact, that meeting underscores the important role that Foreign Official-1 played in the
     scheme and the significance of his communications with Defendant.

5) On December 2, 2015, Twitter confronted Alzabarah, which prompted him to flee to Saudi Arabia on December 3, 2015, with the help of the Saudi consulate, *id.* ¶¶ 35-37;

6) Associate-1 also helped Alzabarah leave the United States and then helped him resolve his affairs in the United States, *id.* ¶¶ 36, 38, 41, 44-45; and

7) Foreign Official-1 and Associate-1 communicated with one another on December 3, 2015, and then again with Alzabarah after he fled the United States, *id.* ¶¶ 51-53.

Although he vigorously argues that Twitter Employee-1 did not commit a crime, which again is not the standard, Defendant also seemingly concedes that the affidavit set forth the following relevant facts:

8)  Twitter Employee-1 accessed six accounts that were of interest to the Saudi government, including two that Alzabrah also accessed; and

9) In December 2015, after confronting Alzabarah, Twitter also confronted Twitter Employee-1. *Id.* ¶ 70.

As noted above, Defendant's communications must be viewed together with all of the facts contained in the affidavit.  Reading them together shows that there was a fair probability that evidence of a crime would be found in Defendant's Google account: Defendant, a Twitter employee, was in contact with Foreign Official-1, a key figure in the scheme to access confidential and proprietary Twitter data.  Toll records showed that Foreign Official-1 called Defendant once in June 2014, four times in January 2015, and once in December 2015 (shortly after Twitter confronted Alzabarah and Twitter Employee-1).  *Id.* ¶ 75, 77.  Records obtained pursuant to 18 U.S.C. § 2703(d) further showed that Defendant used his personal email account to communicate with Foreign Official-1 between June 2014 and April 2016, including in January 2015, while he was still employed at Twitter.  *Id.* ¶ 76.

Moreover, on the same day that Foreign Official-1 contacted Defendant in December 2015, and "shortly" after Twitter had confronted Alzabarah and Twitter Employee-1, Defendant Abouammo "initiated a series of contacts with Twitter, [Twitter Employee-1], and Saudi officials."  *Id.* ¶¶ 77-78.  Importantly, Defendant was no longer employed by Twitter at the time.  Also in December 2015, Defendant, who was born in Egypt, contacted the Egyptian embassy.[5]  *Id.* ¶ 8.  Given his contacts with

---

[5] Defendant confusingly cites to these facts but then claims that the "warrant does not describe any purported call from [him] to the Egyptian Embassy, at any time."  Def. Mot. at 11.  While the call may only be referenced in an earlier paragraph of the affidavit (¶ 9), it was nonetheless there for Judge Spero to consider.  Moreover, to the extent that Defendant disputes that he called the Egyptian Embassy, such a claim is refuted by the toll records available to agents at the time, which clearly reflect a call with

1   Foreign Official-1 and Twitter Employee-1 and the fact that Alzabarah had also contacted the Saudi

2   embassy before he fled days earlier, it was a reasonable inference that Defendant also became aware of

3   Twitter's internal investigation and contacted the Egyptian embassy to discuss his options.[6]

4         Among other things, Defendant quibbles with the affidavit's use of the word "shortly" to

5   describe a period of eight days.  Def. Mot. at 10.  Regardless of Defendant's personal understanding of

6   the word "shortly," the affidavit set forth a clear timeline from which Judge Spero could have drawn the

7   reasonable inference that Alzabarah's departure and Foreign Official-1 and Defendant's communication

8   were related.

9         Defendant also incorrectly asserts that the affidavit "erroneously claimed" that he contacted

10  Saudi officials.  Id.  But, the affidavit quite clearly stated that "he initiated a series of contacts," which it

11  then described in detail, including the fact that he "brought Saudi officials" into a particular email thread

12  with Twitter Employee-1.[7]  Aug. 2016 SW ¶ 77-78.  None of Defendant's arguments about the language

13  of the affidavit changes the fact that the affidavit established probable cause to believe his

14  communications were connected to the crimes under investigation.

15        Defendant further raises several arguments that are irrelevant to the Court's review.  First, he

16  tries to make much out of the fact that Twitter determined that Twitter Employee-1 had a legitimate

17  business reason to access the data.  Def. Mot. at 11.  That fact alone, however, does not foreclose the

18  reasonable possibility that Twitter Employee-1 was nonetheless accessing the data as an agent of a

19  foreign government, or that he was committing fraud against his employer by providing the data to a

20  foreign government without authorization or conspired with others to do the same.  In fact, the affidavit

21  provides a basis to believe that Twitter Employee-1 may have been involved in the crimes under

22  investigation, separate from Twitter's internal determination.  Taken together, the facts established

23

24  ───────────────

25  the Egyptian Embassy (at (202) 966-6342) on December 11, 2015, which the Government produced to
    Defendant at ATT-00000035 (page 476 of the PDF file).

          [6] Unlike Alzabarah, however, Defendant is (and was at the time) a United States citizen.

26

27        [7] Email header information reflects Defendant's contacts with two other Twitter managers and
    his inclusion of several email accounts using official Saudi government email domains (i.e.,
    @mol.gov.sa, @gaca.gov.sa, and @moci.gov.sa).  Defendant has not presented any facts to dispute the
28  sworn assertions in the search warrant affidavits, and therefore has not presented any dispute of fact that
    to support the evidentiary hearing he requests.

1  probable cause to believe that Twitter Employee-1's communications with Defendant related to the

2  crimes under investigation.

3  Defendant also strays far beyond the four corners of the affidavit when attacking Judge Spero's

4  probable cause determination.  The Court should disregard those claims.  For example, Defendant

5  (wrongly) claims that he had access to account information by virtue of his role as Media Partnerships

6  Manager.  But, the investigation had not yet determined that Defendant had accessed the Twitter User-1

7  account or other accounts, and the affidavit did not allege that he had done so, given what was known at

8  the time.  Instead, among other things, the affidavit described how Defendant was in contact with

9  Foreign Official-1 (including by personal email, even though he still worked at Twitter), Saudi officials,

10 and Twitter employees after he resigned from Twitter and around the time that Twitter's internal

11 investigation became public to Alzabarah and Twitter Employee-1; Defendant conveniently ignores

12 those facts.  In sum, given the early stage of investigation and what was known at that time, the warrant

13 rested on evidence that Alzbarah had accessed numerous accounts and had acted in concert with a

14 number of individuals, some of whom were also in contact with Defendant by telephone and email,

15 which formed a substantial basis for Judge Spero to conclude that probable cause existed to search

16 Defendant's Google account for evidence of a crime.[8]  The description of items to be seized

17 (communications between Defendant, his Codefendants, Foreign Official-1, Twitter Employee-1, and

18 Associate-1, and other communications related to obtaining Twitter users' confidential information) was

19 directly related to the probable cause laid out in the affidavit.

20 ### i.   **Agents Relied in Good Faith on the Validity of the Search Warrant.**

21 The exclusionary rule is meant to be invoked for "exceptional reason[s], typically the protection

22 of a constitutional right." *United States v. Harrington*, 681 F.2d 612, 615 (9th Cir. 1982) (refusing to

23 suppress evidence where it was "seized by an officer who, for some technical reason, should not have

24 conducted the search"); *see also United States v. Hunter*, 13 F. Supp. 2d 574, 585 (D. Vt. 1998)

25 (refusing to suppress, even though DEA agents were participated in search of property in clear violation

26

27 ─────────────────
   [8] Defendant's repeated comparisons of the relative number of accesses by Alzabarah (6,000

28 accounts) and his own accesses of Twitter accounts, which does not appear in the August 2016 search
   warrant affidavit, does not detract from Defendant's actions as an agent of a foreign government and his
   participation in a conspiracy and other fraud against Twitter.

1   of protocol prohibiting their presence, where the violation did not rise to the level of "flagrant disregard"

2   of the warrant). "If the executing officers act in good faith and in reasonable reliance upon a search

3   warrant, evidence which is seized under a facially valid warrant which is later held invalid may be

4   admissible." *United States v. Michaelian*, 803 F.2d 1042, 1046, (9th Cir. 1986), *citing United States v.*

5   *Leon*, 468 U.S. 897, 926 (1984); *Massachusetts v. Sheppard*, 468 U.S. 981, 988 (1984).

6       Assuming *arguendo* that the August 2016 search warrant affidavit failed to establish probable

7   cause, evidence obtained pursuant to the warrant should not be suppressed because the executing agents

8   reasonably relied on the search warrant in good faith. Under the good faith exception to the

9   exclusionary rule, evidence seized pursuant to a search warrant lacking in probable cause remains

10  admissible if law enforcement officers acted in "objective and reasonable reliance" on a warrant issued

11  by a "detached and neutral magistrate." *Leon*, 468 U.S. at 926.

12      In *Leon*, the Supreme Court held that there is a strong presumption that a law enforcement

13  officer acting pursuant to a warrant is acting in good faith. *See Id*. at 922–23. "'Searches pursuant to a

14  warrant will rarely require any deep inquiry into reasonableness.'" *Id*. at 922 (quoting *Gates*, 462 U.S. at

15  267 (White J., concurring in judgment)). "'[A] warrant issued by a magistrate normally suffices to

16  establish' that a law enforcement officer has 'acted in good faith in conducting the search.'" *Id*.

17  (quoting *United States v. Ross*, 456 U.S. 798, 823 n.32 (1982)). Thus, the Court's "good-faith" inquiry

18  is confined to the objective question whether a reasonably well-trained officer would have known that

19  the search was illegal despite the magistrate's authorization. *Leon*, 468 U.S. at 922 n.23; *see also*

20  *Illinois v. Krull*, 480 U.S. 340, 349 (1987) ("It is the judicial officer's responsibility to determine

21  whether probable cause exists to issue a warrant, and, in the ordinary case, police officers cannot be

22  expected to question that determination.").

23      Here, FBI agents conducted multiple searches based on warrants obtained from neutral and

24  detached Magistrate Judges. As discussed above, the affidavit supporting the August 2016 warrant

25  established sufficient probable cause. Moreover, while Defendant nitpicks the meaning of certain

26  words, such as "shortly," there is nothing to indicate that false statements were intentionally included or

27  that other facts were omitted with reckless disregard for the truth. Defendant points to no omissions

28  from the affidavits that would have affected the Judge Spero's finding of probable cause. *See United*

1   *States v. Schesso,* 730 F.3d 1040, 1050-51 (9th Cir. 2013) ("In short, the search warrant affidavit was

2   not, on its face, 'so lacking in indicia of probable cause as to render official belief in its existence

3   entirely unreasonable.'") (quoting *Leon*, 468 U.S. at 923); *see also Herring v. United States*, 555 U.S.

4   135, 143 (2009) (evidence should be suppressed "only if it can be said that the law enforcement officer

5   had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under

6   the Fourth Amendment.") (quoting *Illinois v. Krull*, 480 U.S. 340, 348–49, (1987)).  Should the Court

7   determine that the 2016 Gmail search warrant (and any other challenged search warrant) was invalid, the

8   Court should nevertheless find that the executing agents relied in good faith on the validity of the

9   warrant and decline to suppress the seized evidence.

10                      ii.  **The Subsequent Search Warrants Were Supported by Probable Cause.**

11              Defendant argues that evidence obtained pursuant to the following search warrants must be

12   suppressed as fruits of the poisonous tree: the September 2018 search warrant for his Apple account,[9]

13   the October 2018 search warrant for his residence, and the November 2018 and May 2019 search

14   warrants for his Twitter accounts.  Def. Mot. 14.  Defendant's entire argument is premised on his

15   meritless claim that the August 2016 search warrant was "illegal."  As discussed above, however, Judge

16   Spero had a substantial basis to conclude that the August 2016 search warrant was supported by

17   probable cause.  For that reason alone, the inquiry should end, and the Court should reject all of the

18   Defendant's fruit of the poisonous tree arguments.

19              Nonetheless, even without the evidence from his email account obtained pursuant to the August

20   2016 search warrant, there was ample information to establish probable cause to support the challenged

21   warrants.  By September 2018, the investigation had developed evidence from multiple sources

22   independent of the August 2016 search warrant, including through searches of the other accounts

23   identified in the August 2016 search warrant, open source information, such as public Twitter postings,

24

---

25              [9] To the extent that Defendant argues anything beyond fruit of the poisonous tree as to accounts
    in which he lacked a reasonable expectation of privacy, such as his abandoned Twitter employee email

26   account or the accounts or devices of others (Alzabarah, Almutairi, Foreign Official-1, and Associate-1),
    he lacks standing to mount such a challenge. *See Lyall v. City of Los Angeles*, 807 F.3d 1178, 1186 (9th

27   Cir. 2015) ("a defendant has standing to raise the Fourth Amendment only if it was his person, house,
    paper, or effect searched.") (emphasis in original); *see also United States v. Taketa*, 923 F.2d 665, 670-

28   71 (9th Cir. 1991) (in denying standing, emphasizing fact that defendant was not present at time of
    search).

and from Twitter itself.

A review of the September 2018 search warrant quickly reveals the failings of Defendant Abouammo's "fruits of the poisonous tree" arguments. The warrant included the following facts, among others, which were not derived from the results of the August 2016 search warrant:

1) Defendant had access to a tool that allowed him to view Twitter account data, Sept. 2018 SW ¶ 28;

2) Foreign Official-1 was particularly interested in the Twitter User-1 account, which was critical of the Saudi government and Royal Family, *id.* ¶¶ 39,55;

3) Defendant and Foreign Official-1 met in London in December 2014, *id.* ¶ 37;

4) Shortly after the London meeting, Defendant accessed the Twitter User-1 account multiple times between January 5, 2015, and February 24, 2015, and was in frequent telephonic contact with Foreign Official-1, *id.* ¶¶ 39-41;

5) Alzabarah also accessed the Twitter User-1 account multiple times, *id.* ¶ 55;

6) Foreign Official-1 sent information to Defendant that was marked urgent, secret and private and concerned another "Twitter User-2" that was also critical of the Saudi government and Royal Family, *id.* ¶ 42.

These facts alone provided a substantial basis for Judge Laporte to have concluded that there was probable cause to search Defendant's Apple account. The most prominent piece of evidence derived from the August 2016 search warrant that was included in the September 2018 search warrant was the January 17, 2015, email from Foreign Official-1 to Defendant. *Id.* ¶ 40. While certainly incriminating, that email was not dispositive for Judge Laporte's 2018 probable cause determination, and Defendant ignores the wealth of evidence seized from the searches of other Google accounts in 2016, which he concedes there was probable cause to search. The rest of the challenged search warrants similarly were supported by independent facts that established probable cause regardless of the evidence derived from the August 2016 search of Defendant's Google account.

Defendant does not seriously dispute the above-described facts; in fact, he acknowledges that the affidavit established that he and Alzabarah both accessed Twitter User-1's account. Def. Mot. 18. Instead, Defendant argues that the Government was somehow required to prove that he accessed the account outside of his job responsibilities. *Id.* But, that is not the standard for probable cause. Moreover, he draws his own self-interested inferences from certain facts, while conveniently ignoring offers. Specifically, he claims that the affidavit showed that he developed an innocent relationship with

Foreign Official-1 consistent with his work responsibilities at Twitter.  *Id.* at 17.  But, Judge Laporte clearly drew a different and more reasonable inference based on the totality of the circumstances: Foreign Official-1 developed a relationship with Defendant (and Alzabarah) to obtain confidential Twitter information concerning accounts of interest to the Saudi government, and Defendant accessed the Twitter User-1 account at Foreign Official-1's request for that purpose and using personal channels of communication such as his cell phone and Gmail account.

### iii.  Defendant's Voluntary Statements Should Not Be Suppressed.

As with the search warrants described above, Defendant's argument that his voluntary statements, obstructive conduct, and bank records are fruits of the poisonous tree is entirely without merit.  The Court's inquiry should end there.  Nonetheless, Defendant's statements and the evidence obtained during and after his October 20, 2018, interview were not derived from the August 2016 search warrant, and to the extent they were, any assumed violation was "so attenuated as to dissipate the taint." *United States v. $186,416.00 in United States Currency*, 590 F.3d 942, 951 (9th Cir. 2010) (quoting *Wong Sun v. United States*, 371 U.S. 471, 491 (1963)).

Defendant strains credibility in comparing his voluntary interview with the one described in *United States v. Shelter*.  665 F.3d 1150 (9th Cir. 2011).  The interview in *Shelter* happened close in time to an illegal premises search.  The police seized drugs during a warrantless search, confronted the defendant with the illegally seized drugs, and he confessed.  Here, in stark contrast, the Government searched Defendant's Google account in August 2016.  More than two years later, after further investigation that involved the execution of multiple search warrants and the collection of significant evidence, the FBI conducted a knock-and-talk at Defendant's residence.  He agreed to a voluntary interview.  The FBI appropriately asked him questions about his relationships with various individuals, including Foreign Official-1, as well as his CYRCL, LLC, consulting business and transfers from the Bank Audi account to his Bank of America account, all of which was predicated on the results of a lengthy investigation.  During that questioning, Defendant volunteered that he had an invoice, which he agreed to provide to the FBI.  At the conclusion of the interview, the agents asked him about one email (lawfully) obtained pursuant to the August 2016 search warrant that referenced Foreign Official-1 and the Twitter User-1 account, but they also asked him about information that Twitter had provided,

1 | specifically the fact that Defendant had accessed the Twitter User-1 account 29 times.[10]  In response to

2 | that line of questioning, Defendant minimized his role and conduct.  In no way did the agents "induce a

3 | confession by demonstrating the futility of remaining silent."  Def. at 21 (quoting *Shelter*).  Simply put,

4 | the questioning did not "bear a sufficiently close relationship" to any violation to support suppression of

5 | Defendant's statements and the evidence he produced, including the fabricated invoice.  *United States v.*

6 | *Ladum*, 141 F. 3d 1328, 1336-37 (9th Cir. 1998).  The Court should reject Mr. Abouammo's claim that

7 | his 2018 statements should be suppressed on the basis of any far-attenuated evidence from the 2016

8 | search of his email account.

9 | **b.  The October 2018 Search Warrant Was Supported by Probable Cause.**

10 |     Defendant further challenges the October 23, 2018, search warrant for his residence, arguing that

11 | the information supporting the warrant was stale and that the warrant was overbroad.  He is wrong on

12 | both counts.  Moreover, even if probable cause was somehow lacking, which it was not, the agents

13 | relied in good faith on the validity of the warrant.

14 | **i.  The Government Did Not Have to Prove a Conspiracy.**

15 |     Once again, Defendant asks the Court to apply a heightened and inappropriate standard to its

16 | review of the search warrants.  Def. Mot. at 27.  Here, Defendant argues, without any legal support, that

17 | Judge Theiler's probable cause determination depended upon a showing that "[Defendant], Alzabarah,

18 | and [Associate-1] agreed to commit [a] crime or shared in the same criminal goals."  *Id.*; *see also id.* at

19 | 31 ("[T]he home SW lacked probable cause that [Defendant] was part of a conspiracy with Alzabarah

20 | and [Associate-1] . . . .").  But that is not the standard; the affidavit did not have to establish a conspiracy

21 | between Defendant and Alzabarah or Associate-1.  While acknowledging that the affidavit established

22 | probable cause to believe Foreign Official-1 and Almuitari committed a crime, Defendant otherwise

23 | conveniently ignores their roles in the criminal scheme and his communications with them.  He also

24 | disregards the simple fact that the search warrant was predicated on seven criminal violations: 18 U.S.C.

25 | §§ 1831 (Economic Espionage), 1832 (Theft of Trade Secrets), 1343, 1349 (Wire Fraud), 951 (Agent of

26 |

27 |

---

28 |     [10] *Shelter* further left open that open ended questions may be appropriate, whereas extremely specific questions (such as the exact ingredients for methamphetamine manufacture found in the illegal garage search) did not.

1    a Foreign Government), 1001 (False Statements), and 1519 (Falsification of Records).

2                    ii.    **Defendant Concedes Search Warrant Was Valid in Certain Respects.**

3            As an initial matter, Defendant concedes that probable cause existed to support the October 23,

4    2018, warrant to search his residence for evidence of false statements and falsification of records.  Def.

5    Mot. at 30, 31-32.  Of course, he must make that concession, because he falsified the invoice and lied to

6    the FBI at his residence only three days prior to the warrant.  Defendant also concedes that the warrant

7    properly authorized the search and seizure of specific electronic devices and the watch that he claimed

8    was in his house (but which agents could not find three days after their interview).  *Id.* at 32, 33 ("except

9    the desktop computer and [Defendant's] iPhone X").  Again, he cannot reasonably contest those

10   searches.  Instead, he argues that the agents should have limited their search to evidence of only the

11   crimes committed on October 20, 2018, and only on those two devices.

12           Defendant, however, fails to explain how probable cause to search for evidence of false

13   statements and falsification of records would preclude the agents from seizing evidence related to the

14   things he lied about: the nature of his relationship with Foreign Official-1, his access of the Twitter

15   User-1 account, Foreign Official-1's payments of cash, the valuable watch, all of which occurred during

16   and after Defendant's employment at Twitter.  It stands to reason that evidence of an underlying crime is

17   relevant to proving obstruction.

18           Moreover, Defendant fails to explain how probable cause to search two devices in his home

19   would preclude agents from searching and seizing other devices in his home.  In fact, the opposite is

20   true.  Probable cause to believe evidence of a crime would be found on two devices strengthens the

21   argument that the search and seizure of his other digital devices was proper.  Regardless, as discussed

22   further below case law does not support Defendant's creative argument.

23                   iii.    **Probable Cause Supporting the Search Was Not Stale.**

24           With respect to the other federal violations, Defendant asserts that simply due to the passage of

25   time the search warrant was stale as to evidence of his alleged actions on behalf of the Saudi government

26   while he worked at Twitter and afterwards. "Information underlying a warrant is not stale," however, "if

27   there is sufficient basis to believe, based on a continuing pattern or other good reasons, that the items to

28   be seized are still on the premises." *Schesso,* 730 F.3d at 1047 (quoting *United States v. Lacy,* 119 F.3d

742, 745–46 (9th Cir. 1997)); *see also United States v. Morales–Aldahondo*, 524 F.3d 115, 117–19 (1st

Cir. 2008) ("concluding that the passage over three years since the acquisition of information . . . did not

render the information stale"); *see also United States v. Fisher*, 137 F.3d 1158, 1164 (9th Cir. 1998)

(finding that the good-faith exception would have applied to information that was seven months old

even if it had been stale).

Here, the affidavit provided sufficient reason to believe that evidence of the crimes under

investigation would be found in Defendant's residence, including on digital devices.  The crimes under

investigation involved numerous modes of communication by telephone, email, and Twitter DM, as well

as Defendant's Washington-registered company and records of the business, including bank records and

commercial invoices.  The affidavit also expressly relied on the FBI agent's experience to explain why

there was a reasonable basis to believe that such evidence would be found in Defendant's residence and

on his digital devices: "[b]ased on my knowledge, training, and experience, I know that computer files

or remnants of such files can be preserved (and consequently also then recovered) for months or even

years after they have been downloaded onto a storage medium, deleted, viewed, or accessed via the

internet." Oct. 2018 SW ¶¶ 89(a).  The Ninth Circuit has held that opinions and conclusions of an

experienced agent are a proper factor in the probable cause determination.  *See Michaelian*, 803 F.2d at

1045; *Motz*, 936 F.2d at 1024.

### iv.   The Warrant Makes No Distinction Between Electronic Devices and Physical Files.

Defendant argues that the Government was obligated, presumably under the particularity

requirement, to establish not just that evidence might be found in his house, but apparently on which

specific devices it might be located on inside the house.  *See* Def. Mot. at 32-33.  Defendant's argument,

while creative, is not supported by case law on particularity, absent a showing that the Government

possessed information limiting its expectation on where evidence would be found.  Once the

Government established that evidence might be located in the residence, the analysis should end, as the

case law does not impose different Fourth Amendment standards on digital evidence.  If the evidence, in

any form, is at the place authorized to be searched, it is subject to seizure.

The search warrant accurately described Defendant's residence, and Defendant does not indicate how the agents should have restricted their search or claim that Defendant lacked access to all parts of the house. *See Maryland v. Garrison*, 480 U.S. 79, 86 (1987) ("[I]f the officers had known, or should have known, that the third floor contained two apartments . . . and thus had been aware of the error in the warrant, they would have been obliged to limit their search."). The search warrant permitted law enforcement to seize virtually every electronic file in Defendant's home, as such devices serve the same function as the filing cabinets in a person's home office. *See United States v. Bishop*, 910 F.3d 335, 337 (7th Cir. 2018). "[A]s with filing cabinets, the incriminating evidence may be in any file or folder. That's why courts routinely conclude that warrants with wording similar to the one at issue here are valid. It is enough, these decisions hold, if the warrant cabins the things being looked for by stating what crime is under investigation." *Id*. (citations omitted). Defendant fails to elaborate how the Government was required to believe Defendant's claim that he accessed the purported invoice on a desktop computer (or that there was only one such computer in an area of the residence the agents did not personally observe) on October 20, 2018, particularly given the affiant's belief that Defendant had lied and tried to obstruct the investigation with a false document. The fact that Defendant used any device to perpetuate his crime supports probable cause to search all devices found.

v.  **The Warrant Was Particular and Not Overbroad.**

Defendant generally claims that the warrant was not particular and allowed the searches of devices used by his spouse and children. *See* Def. Mot. at 34-35. "While a search warrant must describe items to be seized with particularity sufficient to prevent a general, exploratory rummaging in a person's belongings, it need only be reasonably specific, rather than elaborately detailed, and the specificity required varies depending on the circumstances of the case and the type of items involved." *United States v. Rude*, 88 F.3d 1538, 1551 (9th Cir.1996). However, Defendant points to no seized evidence that should be suppressed from such devices, because none was. Moreover, particularity challenges are subject to the good faith doctrine. As a result, Defendant's claims that the warrant was not particular, without identifying specific evidence that was seized, should be rejected.

Defendant further complains of overbreadth, however, he merely argues that "the affidavit does not explain what physical evidence related to the alleged 2018 offenses would be found in the home."

Def. Mot. at 34.  Defendant appears to misunderstand the purpose of Attachment B (as opposed to the affidavit), which describes the items to be seized, including "documents, files, or materials, in whatever form . . . that constitute evidence, instrumentalities, or fruits of violations of [the charged crimes and others]."  Exhibit F, p. 143.  The agents were not required to prognosticate what specific devices or locations in the residence they could search or not search.  For example, Defendant appears to assert that the agents had probable cause only to look at one computer in the Defendant's bedroom that had only been described to them by the same person, whom they also had reason to believe had lied to them and sent them a fabricated document.

Similarly, Defendant's argument would appear to suggest that the agents could only search for Defendant's watch, which he said was in an unpacked box in the residence.  Again, Defendant argues agents should have taken Defendant at his word and limited their search accordingly.  However, a full search of the residence three days later failed to turn up Defendant's $35,000 watch, indicating he was either lying about it in the first place or had removed it from the residence to avoid its seizure.  In any event, Defendant points to no case requiring the agents to limit their search of a residence to a specific computer based on the word of a subject, and the Court should not require it here.  Moreover, although Defendant points to no portion of the warrant that was overbroad, any assumed overbroad portions of the warrant are severable and require only partial suppression. *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 707 (9th Cir. 2009) (holding that partial suppression was appropriate where "the lion's share of the [warrant] did not violate the Fourth Amendment").

Finally, Defendant fails to identify evidence that was seized outside the scope of the warrant, or that certain evidence was responsive but based on an overbroad warrant.  As a result, the Court should decline to suppress any evidence on this basis, let alone all evidence seized pursuant to the warrant.

### vi.  **Agents Relied in Good Faith on the Validity of the Search Warrant.**

As with the other warrants, the agents executing the October 2018 search warrant were acting in good faith and in reasonable reliable upon the search warrant. *See Michaelian*, 803 F.2d at 1046.  While the affidavit supporting the warrant established probable cause, even if the Court finds it did not, evidence obtained pursuant to the warrant should not be suppressed. *See id.*; *Leon*, 468 U.S. at 926.

1

IV.     **CONCLUSION**

2          For the foregoing reasons, the government respectfully requests that the Court deny Defendant's

3   Motion to Suppress.

4   DATED:  May 19, 2021.                                          Respectfully submitted,

5                                                                  STEPHANIE M. HINDS
                                                                   Acting United States Attorney
6

7                                                                  */s/ Colin Sampson*
                                                                   COLIN C. SAMPSON
8                                                                  Assistant United States Attorney
                                                                   BENJAMIN J. HAWK
9                                                                  Trial Attorney, National Security Division

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28