GEOFFREY A. HANSEN
Acting Federal Public Defender
Northern District of California
ANGELA CHUANG
CARMEN SMARANDOIU
Assistant Federal Public Defenders
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:    (415) 436-7700
Facsimile:    (415) 436-7706
Email:        Angela_Chuang@fd.org


Counsel for Defendant Abouammo

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No.:** CR 19–00621 EMC |
| Plaintiff, | **DEFENDANT ABOUAMMO'S REPLY IN SUPPORT OF MOTION TO SUPPRESS** |
| v. | |
| AHMAD ABOUAMMO, | **Court:** Courtroom 5, 17th Floor |
| Defendant. | **Hearing Date:** June 9, 2021 |
| | **Hearing Time:** 2:30 p.m. |

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................................i

TABLE OF AUTHORITIES .....................................................................................................iii

INTRODUCTION ........................................................................................................................1

ARGUMENT ................................................................................................................................1

I.    The August, 17, 2016 Google search warrant was so lacking in indicia of probable cause that the good-faith exception does not apply. ........................................................1

    A.    The Google SW is devoid of any evidence that Twitter Employee-1 committed a crime. ......................................................................................................................4

    B.    The Google SW is devoid of any basis that Abouammo used his personal email to communicate about the scheme. ........................................................................6

    C.    The government has not met its burden of proving that the good faith exception applies. .................................................................................................................7

II.    The subsequent search warrants and Abouammo's statements and actions during his questioning by the FBI are the fruits of the illegal Google SW and must be suppressed. 9

    A.    Abouammo's statements and other evidence derived from October 20, 2018 are the fruits of the invalid Google SW and they must be suppressed. .....................9

    B.    The subsequent search warrants targeting Abouammo lack probable cause without the tainted evidence and the evidence obtained therefrom must be suppressed. ..........................................................................................................14

III.    The October 23, 2018, search warrant for Abouammo's residence was invalid. ...........16

    A.    The Home SW lacked probable cause that evidence of the alleged conspiracy would be found in Abouammo's home or devices. ............................................16

    B.    The Home SW indisputably lacked probable cause for the entirety of the requested time period. .......................................................................................16

    C.    The Home SW rested on stale evidence. ..............................................................17

    D.    The Home SW lacked specificity. .......................................................................18

    E.    Suppression, not severance, is the appropriate remedy. .....................................19

    F.    The government has not proved that the good faith exception applies...............20

CONCLUSION............................................................................................................................21

# TABLE OF AUTHORITIES

## Federal Cases

*Brown v. Illinois,*
    422 U.S. 590 (1975)...................................................................................... 12, 13, 14

*Horton v. Cal.,*
    496 U.S. 128 (1990).......................................................................................................... 9

*In re [REDACTED]@gmail.com,*
    62 F.Supp.3d 1100 (N.D. Cal. 2014) ............................................................................. 17

*In re Search of Google Email Accounts Identified in Attachment A,*
    92 F. Supp.3d 944 (D. Alaska 2015) ............................................................................. 17

*Mitchell v. Prunty,*
    107 F.3d 1337 (9th Cir. 1997) ......................................................................................... 7

*Oregon v. Elstad,*
    470 U.S. 298 (1985) ...................................................................................................... 13

*Santamaria v. Horsley,*
    133 F.3d 1242 (9th Cir.1998) (en banc) ......................................................................... 7

*United States v. $186,416.00 in U.S. Currency,*
    590 F.3d 942 (9th Cir. 2010) ......................................................................................... 13

*United States v. Alvarez, No. 14-CR-00120-EMC-1,*
    2016 WL 69901 (N.D. Cal. Jan. 6, 2016)....................................................................... 3

*United States v. Angulo-Lopez,*
    791 F.2d 1394 (9th Cir. 1986) ..................................................................................... 2-3

*United States v. Bocharnikov,*
    966 F.3d 1000 (9th Cir. 2020) ......................................................................................... 9

*United States v. Cerna,*
    2010 WL 3749449 (N.D. Cal. 2010) ............................................................................. 17

*United States v. DeLuca,*
    269 F.3d 1128 (10th Cir. 2001) ................................................................................. 14-15

*United States v. Garcia,*
    151 F.3d 1243 (9th Cir. 1998) ......................................................................................... 7

*United States v. Gourde,*
    440 F.3d 1065 (9th Cir. 2006) (en banc) ......................................................................... 1

*United States v. Holzman,*
    871 F.2d 1496 (9th Cir.1989) ......................................................................................... 9

*United States v. Hove*,
  848 F.2d 137 (9th Cir. 1988) ................................................................................... 7

*United States v. Kow*,
  58 F.3d 423 (9th Cir. 1995) ........................................................................... 17, 20

*United States v. Leon*,
  468 U.S. 897 (1984) ........................................................................... 1, 7, 8, 20

*United States v. Schesso*,
  730 F.3d 1040 (9th Cir. 2013) ............................................................................. 19

*United States v. SDI Future Health, Inc.*,
  568 F.3d 684 (9th Cir. 2009) ......................................................................... 19, 20

*United States v. Sears*,
  411 F.3d 1124 (9th Cir. 2005) ............................................................................. 20

*United States v. Seybold*,
  726 F2d 502 (9th Cir. 2004) ................................................................................. 3

*United States v. Shetler*,
  665 F.3d 1150 (9th Cir. 2011) ................................................................. 10, 12, 13

*United States v. Spilotro*,
  800 F.2d 959 (9th Cir. 1986) ............................................................................... 19

*United States v. Twilley*,
  222 F.3d 1092 (9th Cir. 2000) ............................................................................. 14

*United States v. Underwood*,
  725 F.3d 1076 (9th Cir. 2013) ................................................................. 1, 7, 9, 20

*United States v. Watson*,
  900 F.3d 892 (7th Cir. 2018) ................................................................................. 5

*United States v. Weber*,
  923 F.2d 1338 (9th Cir. 1990) ............................................................................... 8

*Wong Sun v. United States*,
  371 U.S. 471 (1963) ............................................................................................. 9

## Other Authorities

Wayne R. LaFave, *Search And Seizure: A Treatise On The Fourth Amendment*,
  § 11.4(c) (6th ed. Sept. 2020 update)............................................................... 13

**INTRODUCTION**

Mr. Ahmad Abouammo moves for an order suppressing the evidence derived from the unlawful searches of his Google account, pursuant to a warrant issued on August 17, 2016, and his home, pursuant to a warrant issued on October 23, 2018. Because the warrants are so deficient as to render official belief in their validity entirely unreasonable, the Court should hold that the good faith exception does not apply and grant Abouammo's motion.

**ARGUMENT**

**I.    The August, 17, 2016 Google search warrant was so lacking in indicia of probable cause that the good-faith exception does not apply.**

The Google SW lacked probable cause that Abouammo or Twitter Employee-1[1] committed any crime or that evidence of crimes committed by others would be found in Abouammo's Google account. Indeed, the warrant is so lacking in indicia of probable cause that it amounted to a "bare bones" affidavit and cannot be saved by the good-faith exception. *See United States v. Leon*, 468 U.S. 897, 922-23 (1984).

Preliminarily, Abouammo agrees with the government that the probable cause and the "bare bones" determinations must be made within the four corners of the warrant. *United States v. Gourde*, 440 F.3d 1065, 1067 (9th Cir. 2006) (en banc); *United States v. Underwood*, 725 F.3d 1076, 1086-87 (9th Cir. 2013). In keeping with this basic tenet, Abouammo has carefully confined his arguments to the information in the affidavit. The government disagrees, and accuses him of "stray[ing] far beyond the four corners of the affidavit" by claiming, "[f]or example, . . . that he had access to account information by virtue of his role as Media Partnerships Manager." Dkt. No. 133, United States's Opposition to Defendant's Motion to Suppress ("Opp.") at 11. Notably, the government does not provide a citation for its assertion. That is because it cannot: Abouammo clearly stated that the Google SW, aside from including their job titles, "did not offer any information regarding Twitter Employee-1's and Abouammo's job description or responsibilities." Dkt. No. 117, Defendant Abouammo's Motion to Suppress ("MTS") at 8. Indeed, because the Google SW did not allege that

---

[1] For the convenience of the Court, Abouammo has adopted the government's convention for anonymizing various persons' identities. In so doing, Abouammo does not concede any facts pertaining to those persons.

Abouammo accessed any accounts, this affidavit (unlike later ones) had no reason to discuss whether his position allowed him access to account information.

The government also claims, again without a supporting citation, that Abouammo improperly compared the relative number of accesses by Alzabarah to his own accesses of Twitter accounts, "which does not appear in the August 2016 search warrant affidavit." Opp. at 11 n.8. Abouammo made no such comparison. Rather, he appropriately used the number and length of Alzabarah's accesses – over 6,000 during an 11-month period – to point out that affidavit's conclusion that *Twitter Employee-1*'s work-related access of six accounts occurred "'at around the same time as Alzabarah' is meaningless in light of Alzabarah's months-long access and also pure speculation." MTS at 10. [2]

Turning to the information within the four-corners of the affidavit, the government correctly concedes that the Google SW fails to establish probable cause that Abouammo committed any crime. *See* Opp. at 7-11. Rather, its theory is that the affidavit supported probable cause that his Google account contained evidence of other people's crimes. *See id.* (arguing so repeatedly). The government claims that the "pattern of communications" involving Alzabarah, Abouammo, Twitter Employee-1, Almutairi, and Associate-1 "ti[ed] Defendant and his Google account to the scheme was sufficient." *Id.* at 7.

The government's claim of a "pattern of communications" is frivolous. Listing all known contacts among several people for over a year and a half does not make it a "pattern." Indeed, the government does not identify the alleged pattern, and its cases only highlight the weakness of its argument. *Compare United States v. Angulo-Lopez*, 791 F.2d 1394, 1398 (9th Cir. 1986) ("On April 30, 1985, police surveillance units observed the appellant leaving the Lopez residence, arriving at a

---

[2] The government's accusation that Abouammo strayed beyond the four corners of the Google SW is not only wrong, but deeply ironic given its blatant effort to circumvent the very same rule. Under the guise of responding to a purported argument that Abouammo did not make, the government attempts to supplement the affidavit with details of a call to the Egyptian Embassy about which the Google SW merely said that Abouammo made at some point after Alzabarah fled. Opp. at 9-10 & n. 5.
To its credit, the government acknowledges that, unlike Alzabarah, Abouammo is a U.S. citizen, and also refrains from claiming that Abouammo has ever been an Egyptian citizen. *Id.* at 10 n. 6.

1    shopping center, and making an exchange of items with an unidentified individual. The same conduct

2    was repeated on May 7 and May 9, 1985. . . .  Although a single act of exchanging packages or

3    objects at a shopping center does not establish probable cause, a pattern of such behavior, viewed in

4    conjunction with Bessie Lopez's admissions and the other details of drug trafficking supplied by the

5    four informants, does give rise to probable cause to believe that the appellant was engaged in a

6    violation of 21 U.S.C. § 841(a)(1).”); *United States v. Seybold*, 726 F2d 502, 504 (9th Cir. 2004)

7    (there was probable cause for search of residence of already-indicted defendant for personal address

8    and telephone books pertaining to drug conspiracy, where affidavit described “six instances in which

9    address books or similar personal papers seized from others associated with the alleged conspiracy

10   contained the names and telephone numbers of numerous other alleged co-conspirators,” that

11   “telephone numbers ‘linked’ to Seybold were found in the personal address books of two persons

12   who were also indicted with him and had been previously arrested,” and that DEA agent stated that

13   “narcotics dealers invariably have personal address or telephone books containing the names and

14   telephone numbers of others associated with them in the narcotics business.”); *United States v.*

15   *Alvarez*, No. 14-CR-00120-EMC-1, 2016 WL 69901, *2-3 (N.D. Cal. Jan. 6, 2016) (describing *inter*

16   *alia* multiple intercepted telephonic conversations between confidential informant and Sureno gang

17   members arranging drug transactions, followed by delivery of drugs to confidential informant that

18   agent personally observed).

19       The utter lack of a pattern is also obvious when one considers that Twitter Employee-1 did not

20   have any contact with anybody except Abouammo; that Abouammo did not have any contact with

21   Alzabarah or Associate-1 and his contacts with Almutairi and Foreign Official-1 were sporadic – a

22   handful over more than a year and a half. *See* MTS at 9. Undeterred, the government argues that

23   “[t]he alleged scheme to obtain Twitter’s confidential data, [Foreign Official-1’s] prominent role in

24   that scheme, and Twitter confrontation of Alzabarah and [Twitter Employee-1] form the foundation

25   from which to draw the reasonable inference that Defendant’s communications related to the crimes

26   under investigation and that evidence of those crimes would be found in his Google account.” Opp. at

27   8. In other words, the government’s and the affidavit’s theory is that Abouammo communicated with

28

Twitter Employee-1 and Foreign Official-1 regarding their crimes - a theory for which the affidavit provides no factual support.

> **A.**   **The Google SW is devoid of any evidence that Twitter Employee-1 committed a crime.**

A search warrant affidavit must provide *probable cause* that evidence *of a crime* will be found in the place to be searched. The government argues that the affidavit provides probable cause regarding Twitter Employee-1 because he accessed six accounts of interest to KSA (two of them among the over 6,000 accounts that Alzabarah accessed) at some undefined time in 2015, and that Twitter confronted him about it in December 2015 after confronting Alzabarah. *See* Opp. at 9. That might be true, but it is patently insufficient when one considers all the information in the affidavit.

The six accounts "were requested by Saudi Arabia through the Twitter online law enforcement portal and denied by Twitter." Google SW ¶ 70. Critically, submitting account disclosure requests through the online portal is exactly what the FBI trained KSA to do, including in a meeting it hosted in San Francisco in November 2014 between KSA and Twitter representatives. *Id*. ¶¶ 28, 29. And once KSA (or any other government) submitted such a disclosure request through the online portal, Twitter employees would have to investigate and resolve the request. *See id*. After conducting an internal investigation, Twitter concluded that Twitter Employee-1's access of the six accounts was for legitimate business reasons and that he was not engaged by KSA officials to access confidential data. *Id*. ¶¶ 70-71.

As Abouammo has explained, the emails from December 2015 through February 2016 do not alter this conclusion. *See* MTS at 12-14. The affidavit claimed that these emails demonstrate that Twitter Employee-1 was in contact with Abouammo "immediately after [his] confrontation" by Twitter, *id*. ¶ 12, so they must concern Twitter's discovery of Twitter Employee-1's access. *See id*. ¶¶ 83, 83.b.[3] But the affidavit does not provide a basis to believe that Abouammo knew about Twitter's

---

[3] As Abouammo has explained, there is no basis for the affidavit's allegation that Abouammo was in contact with Twitter Employee-1 "immediately" after his confrontation by Twitter. MTS at 10-11 (pointing out several allegations in the affidavit that were wrong or without factual support). While the government seeks to minimize this unsupported allegation by arguing the defense is "nitpicking," Opp. at 12, what is apparent is that the affidavit omitted known relevant information because it contradicted their chosen theory.

investigation of Twitter Employee-1. Notably, Twitter Employee-1 and Abouammo did *not* reach out to each other initially; rather, Twitter Employee-2, Director of Media Partnership at Twitter's United Arab Emirates location, brought Twitter Employee-1 into an email exchange with Abouammo and Twitter Employee-3, Senior Director of Public Policy at Twitter's Dublin location. *Id*. ¶ 77. In other words, the reason why Twitter Employee-1 and Abouammo reinitiated contact in December 2015 was because Twitter Employee-2, a senior employee responsible for Media Partnership at Twitter's location in the Middle East, put them in contact. Consistent with her role, she was also part of the emails with the KSA officials. Because the affidavit does not claim that Twitter Employee-2 (or Twitter Employee-3) was connected with Alzabarah, Foreign Official-1, Almutairi, or Associate-1, it cannot establish that the emails were suspicious, let alone criminal. This conclusion is reinforced by the results of Twitter's investigation and its decision to promote Twitter Employee-1 in April 2016 - well after these emails were exchanged.

Implicitly acknowledging the paucity of any incriminating facts against Twitter Employee-1, the government argues that, given the stage of the investigation, Twitter's determination "does not foreclose the reasonable possibility that [Twitter Employee-1] was nonetheless accessing the data as an agent of a foreign government or that he was committing fraud against his employer." Opp. at 10; *see also id*. at 7 (arguing that although the affidavit focused on Alzabarah, "given what the FBI knew at the time, it did not foreclose the possibility that others employed by Twitter were also serving as agents of the Saudi government or that Alzabarah and others were working in concert on behalf of the Saudi government."). But "unforeclosed possibility" is not the standard for probable cause. *See United States v. Watson*, 900 F.3d 892, 896 (7th Cir. 2018) ("But a mere possibility [of criminal activity] is not sufficient to establish reasonable suspicion," let alone probable cause). Nor does the government get the benefit of a lesser standard because its investigation was in its early stages.[4]

---

[4] The government's excuse about the early stages of the investigation also rings hollow. Nothing prevented the government from conducting additional investigation. For example, the FBI could have obtained any relevant information and records from Twitter, which had an obvious interest in cooperating with them. They could have also interviewed Twitter Employee-2, Twitter Employee-3, or any other people at Twitter, including about the content of any emails in Twitter's possession. The government likely did not pursue these avenues because Twitter's own investigation contradicted their working theory of the case.

1    Thus, absent any facts contradicting Twitter's assessment, the affidavit's claims regarding Twitter

2    Employee-1 were pure speculation.

3        **B.    The Google SW is devoid of any basis that Abouammo used his personal email to communicate about the scheme.**

4

5        The government is therefore left to argue that "given the early stage of investigation and what

6    was known at the time, the warrant rested on evidence that Alzabarah had accessed numerous

7    accounts and had acted in concert with a number of individuals, some of whom were also in contact

8    with Defendant by telephone and email, which formed a substantial basis for Judge Spero to conclude

9    that probable cause existed to search Defendant's Google account for evidence of a crime." Opp. at

10   11. Again, the fact that the investigation was in the early stages does not mean that a lesser standard

11   applies. The government also conveniently ignores the fact that Abouammo did not have any contact

12   with Alzabarah either before or after December 2, 2015, when Alzabarah was confronted by Twitter.

13   He also was not in contact with Associate-1 at any time. And his contacts with Almutairi consisted of

14   two text messages in December 2014. Google SW ¶ 75. In fact, then, the affidavit's claim of probable

15   cause regarding Abouammo's emails rested only on his sporadic contact with Foreign Official-1 over

16   a year and a half and the emails from December 2015 through February 2016.

17       The *entire* universe of Abouammo's connections with Foreign Official-1 was limited to 5 calls,

18   3 emails, and an undefined "contact" spread over a year and a half,[5] most of them in 2014 and

19   January 2015, months before the May 2015, meeting in Washington, D.C. *See id*. ¶¶ 75-77

20   (describing one call on June 14, 2014 and four additional calls through January 2015, *id*. ¶ 75; one

21   email on January 17, 2015 and two emails on September 8, 2015; and one "contact" between their

22   phones on December 11, 2015). These sporadic contacts reveal a tenuous, superficial relationship

23   between the two men. Especially when considered in the context of Abouammo's lack of contact

24   with Alzabarah and Associate-1 and minimal and remote contact with Almutairi, this fails to support

25   a reasonable inference that Foreign Official-1 and Abouammo were communicating regarding

26   Alzabarah's account access or his confrontation by Twitter.

27   _____

28   [5] The government had access to the email headers from January 1, 2014 through April 28, 2016.
     Google SW ¶ 76. So the three emails between Abouammo and Foreign Official-1 were the only
     emails they exchanged over almost 2 and a half years.

The affidavit's speculation regarding the substance of Abouammo's and Foreign Official-1's limited communications "smacks of guilt by association." *Mitchell v. Prunty*, 107 F.3d 1337, 1342 (9th Cir. 1997) (holding that membership in a gang by itself cannot serve as proof of intent, or of the facilitation, advice, aid, promotion, encouragement or instigation needed to establish aiding and abetting actions by other gang members), *overruled in part on other grounds by Santamaria v. Horsley*, 133 F.3d 1242 (9th Cir.1998) (en banc); *United States v. Garcia*, 151 F.3d 1243, 1246-47 (9th Cir. 1998) (holding that gang membership cannot by itself prove conspiracy and that "[a] contrary result would allow courts to assume an ongoing conspiracy, universal among gangs and gang members, to commit any number of violent acts, rendering gang members automatically guilty of conspiracy for any improper conduct by any member."). Without any evidence whatsoever that Abouammo committed any crime or at least had a meaningful relationship with any of the people involved in the scheme, the affidavit's case against Abouammo can be summed up as a Middle Eastern Twitter employee communicating sporadically with a suspect Middle Eastern individual. This is improper "guilt by association" based on shared ancestry and is patently insufficient to support a fair probability that the three emails exchanged by the three men, or any other emails exchanged by Abouammo, concerned Alzabarah's access or his confrontation by Twitter.

In sum, the Google SW was devoid of probable cause that evidence of the scheme would be found in Abouammo's Google account.

**C.    The government has not met its burden of proving that the good faith exception applies.**

It is the government's burden to establish that the good faith exception applies. *Underwood*, 725 F.3d at 1085. An officer does not manifest objective good faith "in relying on a warrant based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *United States v. Leon*, 468 U.S. 897, 923 (1984). "An affidavit is so lacking in indicia of probable cause, or bare bones, when it fails to provide a colorable argument for probable cause." *Underwood*, 725 F.3d at 1085 (citing *United States v. Hove*, 848 F.2d 137, 139-40 (9th Cir. 1988)).

Aside from claiming that the Google SW was supported by probable cause, the government's main argument in support of the good faith exception seems to be that it was reasonable for the

executing officers to rely on the search warrant because it was issued by a neutral and detached

magistrate. *See* Opp. at 11-13. But the inquiry is objective, and the magistrate's signature on the

warrant alone is clearly insufficient to demonstrate good faith. *See Leon*, 468 U.S. at 923 (holding

that an officer does not "manifest objective good faith" when there is a bare-bones affidavit); *United*

*States v. Weber*, 923 F.2d 1338, 1346 (9th Cir. 1990) (holding that the good faith exception did not

apply "[a]lthough we do not question the subjective good faith of the government").

There was no colorable argument of probable cause that evidence of a crime would be found in

Abouammo's Google account by virtue of his communications with Twitter Employee-1 or Foreign

Official-1. Regarding Twitter Employee-1, the affidavit itself acknowledged that it lacked probable

cause that he committed a crime, Google SW ¶ 4, and Twitter also concluded, after its own

investigation, that he was not "engaged by Saudi officials to access confidential data." *Id.* ¶ 71.

Although the affidavit attempted to create suspicion by pointing out to communications between

Abouammo and Twitter Employee-1 after his confrontation by Twitter, any reasonable officer would

know that 1) Twitter Employee-1 and Abouammo were actually brought in contact by a senior

Twitter employee whose job was building Media Partnership in Middle East and whom the affidavit

does not claim that she was in any way involved with the scheme or the people in the scheme; 2) the

same senior employee was involved in the emails with KSA officials, thus dispelling any suspicion of

impropriety; and 3) months after these emails, following its investigation, Twitter actually promoted

Twitter Employee-1. In other words, any reasonable officer would realize that the affidavit failed to

offer any facts to contradict Twitter's determination and that its case against Twitter Employee-1 was

pure speculation.

There was also no colorable argument that Abouammo communicated with Foreign Official-1

regarding Alazabarah's access or his confrontation by Twitter. Abouammo did not have any contact

with Alzabarah himself or Associate-1, who helped Alzabarah leave the United States after his

confrontation by Twitter; only minimal contact with Almutairi in December 2014, thus disproving an

ongoing relationship; and sporadic contact with Foreign Official-1 over a year and a half, most of it

months before the May 2015, Washington, D.C. meeting among Alzabarah, Almutairi, Associate-1,

and Foreign Official-1, after which almost all of Alzabarah's unlawful access happened. Because

Abouammo did not have a meaningful, consistent relationship with Foreign Official-1 and no connection with Alzabarah and Associate-1, there is no basis whatsoever to believe that Abouammo's three emails with Foreign Official-1 or his emails with any other people concerned the scheme.

In essence, the Google SW ignored significant evidence tending to negate the existence of probable cause and invited speculation based on Twitter Employee-1's and Abouammo's Middle Eastern ancestry and Abouammo's tenuous connection with Foreign Official-1, another person of Middle Eastern ancestry. Such an affidavit is so improper and "so deficient as to render official belief in its existence entirely unreasonable." *Underwood*, 725 F.3d at 1086 (good faith exception did not apply where the affidavit provided only the most attenuated support for the conclusion that defendant was a drug courier and no support for the conclusion that evidence of drug trafficking would be found at his home); *see also*, *e.g.*, *United States v. Holzman*, 871 F.2d 1496, 1511 & n.4 (9th Cir.1989) (the good faith exception did not apply to save "tenuous and speculative" nexus between the evidence sought and the item to be searched), *overruled on other grounds by Horton v. Cal.*, 496 U.S. 128 (1990). The Court should therefore hold that the good faith exception does not apply.

## II.   The subsequent search warrants and Abouammo's statements and actions during his questioning by the FBI are the fruits of the illegal Google SW and must be suppressed.

Because the Google SW is invalid as to Abouammo and the good faith exception does not apply, both the direct and the indirect evidence obtained as a result of the search of his Google account must be suppressed as "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963). It is the government's burden to demonstrate that the evidence is not "the fruit of the poisonous tree" or that one of other exceptions to the exclusionary rule applies. *See*, *e.g.*, *United States v. Bocharnikov*, 966 F.3d 1000, 1003 (9th Cir. 2020) (attenuation). The government has not met its burden here.

### A.   Abouammo's statements and other evidence derived from October 20, 2018 are the fruits of the invalid Google SW and they must be suppressed.

The government cannot bear its burden of proving that Abouammo's statements and actions on October 20, 2018, are not the fruits of the invalid Google SW or that the attenuation exception applies.

The government makes no attempt to address these two analyses separately. Instead, it offers a number of red herrings while ignoring the relevant analysis the Ninth Circuit set forth in *United States v. Shetler*, 665 F.3d 1150 (9th Cir. 2011).

The government does not contest that, during their questioning of Abouammo, the agents exploited the fruits of the unlawful Google SW. But it claims that the agents only confronted Abouammo with his personal emails "[a]t the conclusion of the interview," Opp. at 15, thus suggesting that most of Abouammo's statements were not induced or influenced by knowledge of the government's search of his Google account. The government is ignoring the sequence of events that the FBI agents themselves laid out in the FBI 302 report. Thus, even before they confronted Abouammo with his specific personal emails, the agents questioned him about matters that they could have only learned from his personal email.

In the beginning, Abouammo provided general, non-inculpatory information about his personal background and his media relations position at Twitter. *See* Chuang Dec., Ex. E at 1-4. That position included outreach in the Middle East, being a point of contact for KSA officials, and assisting them, *inter alia*, with verification requests. *Id*. at 2-4. Twitter had also appointed him to be the point of contact when a group of visitors from KSA requested a tour of Twitter's headquarters in the summer of 2014, when he met Foreign Official-1. *Id*. at 3. Their relationship was centered on helping the KSA Royal family develop a presence on Twitter, and Abouammo and Foreign Official-1 met overseas on three occasions while travelling for work. *Id*. at 3-4.

The agents then questioned Abouammo about the watch he got from Foreign Official-1 in London in December 2014, which his personal emails showed that he tried to sell for tens of thousands of dollars in late December 2014 and January 2015. *See* Ex. E at 4; *see also*, *e.g.*, Dkt. No. 1 ¶ 33 (Complaint); Chuang Dec., Ex. D ¶ 38. Because the government could have only learned about the watch and the circumstances in which Abouammo acquired it from his personal emails, at that point Abouammo indisputably knew that he was a suspect and that the government had already searched his personal emails, thus "demonstrating the futility of remaining silent." *Shetler*, 665 F.3d at 1158 (internal quotations omitted).

1    This conclusion was reinforced by the agents' questioning regarding Abouammo's relationship

2    with Foreign Official-1 *after* he left Twitter, when Abouammo used exclusively his personal Gmail

3    address email to communicate with Foreign Official-1. *See* Ex. E at 5-6. It was in that context that

4    Abouammo disclosed to the agents his consulting relationship with Foreign Official-1 through his

5    Cyrcl, LLC, company, and provided them with the $100,000 invoice for his services. *Id*.

6    At this point in the interview, the agents confronted Abouammo with a series of emails and a

7    picture of co-defendant Almutairi. Ex. E at 6. Six of those email chains were between Associate-2,

8    Almutairi, or Foreign Official-1 and Abouammo's Twitter work email. *See id*. at 6-9. The other two

9    were sent or received from Abouammo's personal email account. The first was an email chain with

10   Twitter Employee-1. *Id*. at 9. The other is what the government has repeatedly presented as one of its

11   main pieces of evidence against Abouammo: the January 17, 2015 email from Foreign Official-1 that

12   said "as we discussed in London," included the "Twitter User-1" attachment, and claimed that

13   Twitter User-1 was violating both Twitter policy and Saudi law. *See id*.; *see also, e.g.*, Dkt. No. 1 ¶

14   36; Chuang Dec., Ex. F (Home SW) ¶ 48. Afterwards, the agents questioned Abouammo regarding

15   *inter alia* his access of the Twitter User-1 account and Foreign Official-1's interest in it, and he

16   denied sharing any private account information with him. *Id*. at 9-10. He also showed the agents, at

17   their request, a direct message from Foreign Official-1 containing a $100,000 wire confirmation from

18   July 9, 2015, from the National Commercial Bank of Saudi Arabia to Bank Audi in Lebanon. *See id*.

19   at 11. Only after this extensive questioning did the agents conclude the questioning. *See id*. at 12.

20   In short, the agents utilized information learned from the Google SW to question Abouammo

21   early during the interview, and later directly confronted him with evidence obtained from his personal

22   email account, after which they continued to question him on matters at the heart of this case. Thus,

23   contrary to the government's position, the agents' exploitation of the fruits of the unlawful Google

24   SW was not de minimis, but a crucial part of their strategy to obtain inculpatory information from

25   Abouammo.

26   The government claims that the agents "appropriately asked him questions about his

27   relationship with various individuals, including [Foreign Official-1], as well as his Cyrcle, LLC,

28   consulting business and transfers from the Bank Audi account to his Bank of America, all of which

REPLY TO MOTION TO SUPPRESS
*ABOUAMMO*, CR 19–00621 EMC

11

1   were predicated on the results of a lengthy investigation." Opp. at 15. Had the agents limited

2   themselves to asking open-ended questions about Abuammo's relationship with Foreign Official-1,

3   without questioning him about the watch or confronting him with the January 17, 2015, email, the

4   government might have had a point. *Cf. Shelter*, 665 F.3d at 1158 (questions that do not utilize

5   evidence illegally seized not objectionable). But that is not the case here. The government irrefutably

6   confronted Abouammo with evidence obtained from his personal email account, which then lead to

7   his discussing Cyrcle and showing the agents the July 15, 2015, wire transfer conformation –

8   information that the government learned for the first time during the questioning, not as a result of

9   any independent "lengthy investigation."

10       The government also tries to minimize the role that the agents' confrontation of Abouammo

11   with the January 17, 2015, email played in the interview, pointing out that they also asked him about

12   information that Twitter had provided, specifically that he allegedly accessed the Twitter User-1

13   account 29 times. Opp. at 15-16. But the government's charge against Abouammo is not simply that

14   he accessed accounts; rather, it is that he did so at the direction and control of Foreign Official-1, in

15   exchange for money and the luxury watch he got in London. It is unsurprising, then, that the agents

16   first questioned Abouammo about the watch and later confronted him with the January 17, 2015,

17   email, which purportedly shows that his access was at Foreign Official-1's behest. In fact, by the time

18   the agents mentioned the 29 times Abouammo allegedly accessed Twitter User-1, he had already told

19   the agents that he had looked into the account and may have accessed it. *See* Ex. E at 9.

20       In the end, "[t]he government has produced no evidence to demonstrate" that Abouammo's

21   statements, once the agents questioned him about watch, "were not induced or influenced by the

22   illegal search," *Shetler*, 665 F.3d at 1158, and they are therefore the fruits of the unlawful Google

23   SW. Nor has the government met its burden under the attenuation exception. *See Shetler*, 665 F.3d at

24   1159 (citing the factors in *Brown v. Illinois*, 422 U.S. 590 (1975)).

25       The government claims repeatedly that Abouammo's questioning was a "voluntary interview."

26   Opp. at 15. It is debatable whether un-*Mirandized* questioning conducted by two FBI agents and a

27   federal prosecutor, who show up announced at a person's door, is truly voluntary. More importantly,

28   whether statements are voluntary within the meaning of the Fifth Amendment "is merely a 'threshold

requirement' for admissibility." *United States v. $186,416.00 in U.S. Currency*, 590 F.3d 942, 951 (9th Cir. 2010) (quoting *Brown*, 422 U.S. at 604). "Beyond [voluntariness], the prosecution must show a sufficient break in events to undermine the inference that the confession was caused by the Fourth Amendment violation." *Oregon v. Elstad*, 470 U.S. 298, 306 (1985).

The government appears to argue that such a sufficient break occurred here because Abouammo's questioning happened two years after the unlawful search of his Google account. Opp. at 15. However, the "'temporal proximity' factor is of virtually no significance" in the context of statements as fruits of illegal searches. Wayne R. LaFave, *Search And Seizure: A Treatise On The Fourth Amendment* § 11.4(c) (6th ed. Sept. 2020 update). Instead, "[t]he relevant question for attenuation purposes is whether this passage of time would have in any way dissipated [the defendant's] perception that the searches had produced evidence such that his remaining silent would be useless, or decreased the extent to which the government's confronting [the defendant] with the illegally seized evidence induced his statements." *Shetler*, 665 F.3d at 1159. For instance, in *Shetler* "there is no reason to think that the passage of 36 hours would have weakened the causal connection," especially because the agents "may have confronted Shetler with illegally seized evidence during the interview in which he made those statements." *Id.*[6]

So here. Despite the fact that Abouammo's questioning occurred two years after the search of his Google account, Abouammo only learned of the search during the questioning, when he was repeatedly asked regarding matters that the government could have only learned about from his personal emails and also confronted him with personal emails. Accordingly, there was no passage of time that could have dissipated the extent to which the agents' exploitation of his emails induced his statements or his perception that remaining silent would be useless. *Shetler*, 665 F.3d at 1159.[7]

---

[6] *See also $186,416.00 in U.S. Currency*, 590 F.3d at 951 (holding that a two month gap between an illegal search and a defendant's subsequent declaration was not sufficient to render the declaration attenuated from the search).

[7] Any other rule would essentially offer the government a safe harbor from *Shetler* when searches of personal emails or other electronic information are involved. That is because unlike searches of physical property such as homes, such searches bypass the owner of the email account and are executed against the companies providing the email or other electronic communication services, without the account owner's knowledge.

Nor can the government identify any intervening circumstances that might have broken the causal chain, because Abouammo learned about the search contemporaneously with his questioning. Finally, as explained above, the government's conduct involved flagrant illegality: the warrant was so devoid of probable cause that the good faith exception does not apply. *See supra* Section I.C. Because all three *Brown* factors weigh in Abouammo's favor, the Court should exclude his statements and actions during the October 20, 2018, questioning and the evidence derived from them. *See* MTS at 21-22.

**B.   The subsequent search warrants targeting Abouammo lack probable cause without the tainted evidence and the evidence obtained therefrom must be suppressed.**

It is indisputable that the evidence from the Google SW provided a significant portion of the evidence in support of the subsequent search warrants targeting Abouammo. *See* Chuang Dec., Exs. D, F, G, H. Without that tainted evidence, the warrants lack probable cause regarding Abouammo. The government also has not demonstrated that the FBI would have applied for these warrants even if it had not first obtained the Google SW. *See* MTS at 15. The evidence derived from them must be suppressed.

The government challenges Abouammo's "standing" to bring a fruits challenge, arguing that he lacks a reasonable expectation of privacy in Alzabarah's and the others' accounts or devices, and also in this Twitter work email account. Opp. at 13 n.9. But Abouammo did not make a fruits arguments regarding the search warrants to the extent they target other people. *See* MTS at 15-18, 22-24 (arguing that once the fruits are excised, the warrants lack probable cause regarding Abouammo). As to the May 31, 2019 warrant, he need not demonstrate a reasonable expectation of privacy in his work email account, but only that the warrant is the fruit of the unlawful Google SW. *See*, *e.g.*, *United States v. Twilley*, 222 F.3d 1092, 1095 (9th Cir. 2000) (holding that although a passenger in a car does not have "standing" to challenge the search of the car directly, he has "standing" to seek suppression of evidence discovered in a vehicle as the fruit of his unlawful seizure); *United States v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir. 2001) ("[A]lthough a defendant may lack the requisite possessory or ownership interest in a vehicle to directly challenge a search of that vehicle, the

1    defendant may nonetheless contest the lawfulness of his own detention and seek to suppress evidence

2    found in the vehicle as the fruit of the [defendant's] illegal detention.") (internal quotations omitted).

3         On the merits, the government acknowledges that the warrants relied on evidence obtained

4    from his Google account, including the January 17, 2015, email from Foreign Official-1 regarding

5    Twitter User-1. Opp. at 14. But that email, while it might be "the most prominent piece of evidence

6    derived" from the Google SW, was not the only such evidence; the warrants also relied on the emails

7    regarding Abouammo's efforts to sell the watch for tens of thousands of dollars, and all of

8    Abouammo's emails after he left Twitter, because they originated from his personal Google account.

9    *See* MTS at 16. The search warrants following Abouammo's October 20, 2015, questioning also

10   include extensive evidence derived from it, which must also be excised as the fruits of the Google

11   SW. *See* MTS at 23, 25.

12        Without the tainted evidence, all these warrants support, at the most, is reasonable suspicion

13   that Abouammo accessed confidential account data at Foreign Official-1's behest. The crucial reason

14   why the untainted evidence does not raise to the level of probable cause is the warrants' failure to

15   establish that Abouammo's access was outside his job responsibilities. The government claims that

16   this is not the standard for probable cause. Opp. at 14. But an affidavit must demonstrate probable

17   cause of a *crime*, and merely accessing accounts consistent with one's job responsibilities is not a

18   crime, no matter which accounts were accessed. Any other conclusion would mean that the

19   government can rummage through the lives of all Twitter employees whose jobs involved accessing

20   accounts of interest to KSA or communicating with KSA officials regarding such accounts, although

21   the FBI itself facilitated the submission of account disclosure requests by KSA officials to Twitter

22   and Twitter required its employees to handle those requests. That is absurd, and the government

23   knows that. Indeed, part of its theory against Abouammo is that his job responsibilities did not

24   include a need to access confidential account data. *See* Dkt. No. 1 ¶ 23 (criminal complaint); Dkt. No.

25   53 ¶¶ 18, 19 (superseding indictment).

26        Excluding all the tainted evidence, and considering the additional information regarding

27   Abouammo's job responsibilities, the warrants failed to furnish probable cause that Abouammo's

28   account access was outside his job responsibilities, and therefore a crime. Furthermore, the

government has not demonstrated that it would have applied for the warrants had it not first obtained the Google SW. The Court should therefore suppress the evidence obtained from the searches of Abouammo's accounts as the fruits of the unlawful Google SW.

**III.   The October 23, 2018, search warrant for Abouammo's residence was invalid.**

> **A.   The Home SW lacked probable cause that evidence of the alleged conspiracy would be found in Abouammo's home or devices.**

The government misconstrues the significance of the lack of probable cause that Abouammo was part of the conspiracy involving Alzabarah, Almutairi, Associate-1, and Foreign Official-1. In his moving papers, Abouammo presented a compelling argument that the Home SW affidavit proffered no factual basis to support the allegation that he conspired with the other men as the government alleges. Interestingly enough, the government does not dispute this point in its opposition, but rather sidesteps it by asserting that it did not have to prove a conspiracy. *See* Opp. at 16. But the warrant clearly contemplates - wrongly - that such a conspiracy has been established as a basis for its issuance. *See* Chuang Decl., Ex. F, Att. B (listing categories of evidence sought by the warrant, including communications between Alzabarah, Associate-1, Almutairi, Foreign Official-1, and Associate-2, as well as evidence related to "acting, communicating, coordinating, conspiring, planning, and scheming with other persons in activities"); *see also* Home SW ¶ 84 ("I further have probable cause to believe that ABOUAMMO conspired with ALZABARAH and FOREIGN OFFICIAL-1 and others to defraud Twitter . . . ."). However, because the affidavit lacks probable cause that Abouammo was part of the other men's conspiracy, it similarly lacks probable cause to believe that his home and devices - the places to be searched and the things to be seized - would contain evidence related to *other people's* conspiracy.

> **B.   The Home SW indisputably lacked probable cause for the entirety of the requested time period.**

The government does not even attempt to refute Abouammo's argument that the affidavit lacked probable cause as to the entire date range from November 2013 through October 2018, perhaps because it cannot justify such a broad temporal scope given that its own theory alleges that Abouammo's Twitter-scheme-related actions ended in March 2016. The affidavit is utterly devoid of any facts regarding any criminal activity on Abouammo's part between March 2016 and the

interview on October 20, 2018. Therefore, even assuming *arguendo* that probable cause for evidence of the Twitter scheme was otherwise established, the affidavit at best supported a date range half as long, namely a range from November 2013–March 2016 and the discrete date of October 20, 2018 (in relation to the § 1001 and 1519 violations). It certainly did not support what happened here, to wit: an unconstrained fishing expedition through Abouammo's home and the contents of all his and his family's digital devices for documents spanning the entirety of a five-year time period.

Numerous courts have found warrants to be overbroad and/or insufficiently particularized because of a lack of a reasonable date range. *See, e.g.*, *United States v. Kow*, 58 F.3d 423, 427 (9th Cir. 1995) (finding a warrant insufficiently particular where "[t]he government did not limit the scope of the seizure to a time frame within which the suspected criminal activity took place"); *In re Search of Google Email Accounts Identified in Attachment A*, 92 F. Supp.3d 944, 950-51 (D. Alaska 2015) (denying an application for a search warrant for the entirety of six Gmail accounts and explaining that even though "the government appears to promise not to look at any emails outside the applicable date ranges . . . the warrant would not limit its ability to *search* the entirety of the Gmail accounts"); *In re Search of Google Email Accounts Identified in Attachment A*, 92 F.Supp.3d at 950–51; *In re [REDACTED]@gmail.com*, 62 F.Supp.3d 1100 (N.D. Cal. 2014) (denying a search warrant application as overbroad, explaining that "[o]n past occasions, the government at least submitted a date restriction [but h]ere, there is no date restriction of any kind"); *United States v. Cerna*, 2010 WL 3749449, at *17–18 (N.D. Cal. 2010) (finding a search warrant overbroad and insufficiently particularized because it authorized seizure of cell phone records from nine months prior to the homicide that was being investigated without probable cause to justify the date range).

### C. The Home SW rested on stale evidence.

Similarly, because the alleged Twitter scheme ended in March 2016, two-and-a-half years prior to the Home SW in October 2018, large swaths of the affidavit relied on stale information and the government has not argued convincingly otherwise. In its opposition, it focuses almost entirely on the agent's boilerplate recitation of generic digital device capabilities and how electronic files can be preserved and recovered even after deletion. *See* Opp. at 17–18. These vague statements could apply to any suspect in any investigation - if they are sufficient to establish probable cause for all digital

devices, that would give law enforcement free rein to rummage freely through any suspect's devices even in the absence of any facts establishing that the suspect used these devices in connection to criminal activity. The true crux of the issue is whether the affidavit establishes a nexus between the specific devices sought to be seized and the alleged criminal activity. Aside from the iPhone X and the desktop computer, for which the agents had up-to-date information, the government has not pointed to any part of the affidavit containing any facts to establish that there were other devices *still in his possession* from over two-and-a-half years prior when the alleged Twitter scheme ended. In today's increasingly digital world, when technology becomes obsolete in the blink of an eye and new phone models are released every few months, it is extremely unlikely that Abouammo would still have the same personal devices in October 2018 that he had used in 2014-2016. Additionally, the fact that he and his family had also moved twice since 2015 increased the likelihood that he no longer possessed such older devices.[8] And most importantly, the Home SW affidavit presented no facts establishing that that he *did* still possess devices from the relevant time period.

### D.   The Home SW lacked specificity.

The government also claims that the agents were not "required to believe Defendant's claim that he accessed the purported invoice on a desktop computer," Opp. at 19, and then asserts the agent's disbelief in Abouammo's credibility as sufficient justification for a search of every device in the residence. It similarly appears to argue that merely because the agents believed that Abouammo had lied to them in the interview, they then had probable cause to search anywhere and everywhere in his family's home. *See id.* at 19–20. Unsurprisingly, the government does not cite any case law, binding or otherwise, to support this brazen assertion. If law enforcement's subjective opinion as to the credibility of a suspect was enough to establish probable cause to search and seize locations and devices/things that they do not have specific information about, it is difficult to imagine any practical limitation on searches and seizures.[9] Such broad authority is especially concerning when a home is occupied by other people who have their own possessions and devices, such as here, where

---

[8] It also decreases the likelihood that any physical records related to the alleged Twitter scheme would have survived two moves. The government does not address that argument in its opposition.
[9] Presumably, the police and FBI are naturally skeptical of and prone to disbelieve all suspects whom they interview.

Abouammo shared his residence with his wife and three children. For devices in particular, the vast amount of data that they contain necessitates greater caution and detail when law enforcement seeks to access them. *See United States v. Schesso*, 730 F.3d 1040, 1042 (9th Cir. 2013) ("[L]aw enforcement and judicial officers must be especially cognizant of privacy risks when drafting and executing search warrants for electronic evidence.").

Essentially, what the government argues is that when law enforcement does not believe what a suspect tells them about where something might be, that automatically justifies a search of their entire home and seizure of all devices (including those that the government is not even aware of or that belong to other people) because the suspect could be lying to them. This position simply does not comport with the Fourth Amendment and its specificity requirements. Rather, the law demands that the government proffer actual facts establishing probable cause to link *particular items* or *particular categories of things* to criminal activity before it can seize them. It is an axiom that there must be "probable cause to seize the particular things named in the warrant" and that as to categories of things, there must be probable cause "to seize all items of those particular types." *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 702 (9th Cir. 2009). There was no such probable cause here beyond the iPhone X, the desktop computer, and the watch.

As for the government's claim that Abouammo has not identified what evidence should be suppressed, his moving papers requested that the Court suppress all evidence derived from the Home SW and argued that probable cause was lacking for anything other than the desktop computer, the watch, and the iPhone X. *See* MTS at 33-36. And as will be discussed *infra*, severance is inappropriate here, meaning that the iPhone X, the desktop computer, and the watch should be suppressed as well as the other evidence for which there was no probable cause.

###    E.    Suppression, not severance, is the appropriate remedy.

The government argues in a single sentence that if the Court finds that the Home SW is overbroad, severance is the correct remedy. Opp. at 20. The government is wrong. For a court to save an overbroad warrant by severing the valid portions from the invalid ones, as the government suggests, the "identifiable portions of the warrant [must] be sufficiently specific and particular to support severance." *United States v. Spilotro*, 800 F.2d 959, 967-68 (9th Cir. 1986). The "relative

1   size of the valid and invalid portions of the warrant" matter when determining whether to sever.

2   *United States v. Sears*, 411 F.3d 1124, 1130 (9th Cir. 2005). The Ninth Circuit has rejected severance

3   where "all or nearly all the categories of items to be seized were defective." *SDI Future Health, Inc.*,

4   568 F.3d at 707; *see Kow*, 58 F.3d at 428 ("[S]everance is not available when the valid portion of the

5   warrant is a relatively insignificant part of an otherwise invalid search.") (citations and quotations

6   omitted). Here, the lack of probable cause and specificity problems affected the lion's share of the

7   warrant, as it authorized a search and seizure far beyond what was actually supported by probable

8   cause - namely, the Apple iPhone X, the desktop computer, and the watch. The government was

9   essentially given free rein to rummage as they wished through Abouammo's and his family's entire

10  home, trash, refuse, recycling bins, and all of their devices. Suppression is the appropriate remedy

11  here, and all evidence seized pursuant to the Home SW must be suppressed.

12        **F.      The government has not proved that the good faith exception applies.**

13        As previously noted, the government bears the burden of establishing that the good faith

14  exception applies. *Underwood*, 725 F.3d at 1085. The government must "prov[e] that officers relied

15  on the search warrant in an objectively reasonable manner." *SDI Future Health, Inc.*, 568 at 706

16  (quotations omitted). The government has not carried its burden with respect to the Home SW. The

17  good faith exception does not apply "where the affidavit is so lacking in indicia of probable cause as

18  to render official belief in its existence entirely unreasonable" or "where the warrant is so facially

19  deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the

20  executing officers cannot reasonably presume it to be valid." *Underwood*, 725 F.3d at 1085 (citing

21  *Leon*, 468 U.S. at 922–23) (internal quotations omitted). The fact that a magistrate issued a search

22  warrant is insufficient to establish the good faith exception. *Kow*, 58 F.3d at 428-29 ("the oversight of

23  two AUSA's and the approval of a magistrate" are not "sufficient to establish reasonable reliance on

24  the warrant" given overbreadth that rendered it facially deficient).

25        The Home SW affidavit falls outside the ambit of the good-faith exception due to its reliance

26  on stale evidence and its lack of specificity that resulted in its incredibly overbroad scope, the vast

27  majority of which was unsupported by specific facts. The warrant authorized a blanket search and

28  seizure of items far beyond the three items for which the affidavit established probable cause (the

watch, the desktop computer, and the iPhone X). It was not only facially deficient because of its
overbreadth but also largely unsupported by probable cause. The good-faith exception therefore does
not apply.

## CONCLUSION

For the abovementioned reasons, the Court should grant Abouammo's motion and suppress the
evidence derived from the Google SW and the Home SW.


Dated:     June 2, 2021                              Respectfully submitted,

                                                     GEOFFREY A. HANSEN
                                                     Acting Federal Public Defender
                                                     Northern District of California

                                                     _____/S_____
                                                     ANGELA CHUANG
                                                     CARMEN SMARANDOIU
                                                     Assistant Federal Public Defenders