1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7       UNITED STATES OF AMERICA,                Case No.  19-cr-00621-EMC-1

8                          Plaintiff,

9              v.                                **ORDER DENYING DEFENDANT'S
                                                 MOTION FOR JUDGMENT OF
10      AHMAD ABOUAMMO,                           ACQUITTAL (RULE 29), AND
                                                 MOTION FOR NEW TRIAL (RULE 33)**

11                         Defendant.            Docket No. 396

12

13

14                              **I.      BACKGROUND**

15          On August 9, 2022, a jury found Defendant Ahmad Abouammo ("Defendant") guilty of

16   (1) acting as an agent of a foreign government without notice (Count One); (2) conspiracy to

17   commit wire fraud and honest services fraud (Count Two); (3) wire fraud and honest services

18   fraud, or aiding and abetting the same, with respect to a July 9, 2015 Twitter direct message

19   between Defendant's Twitter account and Bader Binasaker's ("Binasaker") Twitter account

20   (Count Five); (4) money laundering related to wire transfers from a bank account in Lebanon

21   (Counts Nine and Ten); and (5) falsification of records (Count Eleven).  *See* Docket No. 391

22   ("Verdict Form").  The jury found Defendant not guilty of five other counts of wire fraud and

23   honest services fraud (Counts Three, Four, Six, Seven, and Eight).  *Id.*

24          Now pending is Defendant's motion for acquittal under Federal Rule of Criminal

25   Procedure 29 and for a new trial under Federal Rule of Criminal Procedure 33.  *See* Mot. at 12, 36.

26   Defendant argues the Court should enter a judgment of acquittal on all counts due to

27   unconstitutional vagueness or insufficient evidence.  *See* Mot. at 13–36.  Defendant argues the

28   Court should order a new trial because (1) the verdict was against the weight of the evidence, (2)

the Government suppressed *Brady* evidence, (3) newly discovered evidence would have changed the outcome of the trial, (4) cumulative prosecutorial misconduct substantially prejudiced Defendant's ability to try its case, and (5) the jury instructions contained various errors. *See* Mot. at 50–56. The Government opposes Defendant's motion in its entirety. *See* Docket No. 399 ("Opp.").

## II.      FACTUAL BACKGROUND

A.      Defendant's Role at Twitter

Defendant worked at Twitter from November 2013 to May 2015 as a Media Partnerships Manager ("MPM") for the Middle East North Africa ("MENA") region. Trial Transcript ("Trial Tr.") 421:17–425:22 (Katie Stanton ("Stanton")). Defendant's role was to expand use of Twitter throughout the MENA region. *Id.* Interaction with the Kingdom of Saudi Arabia ("KSA") was integral to his role, as 50% of MENA Twitter users are located in the KSA. *Id.* at 1008:12–1010:22 (Walker). Part of Defendant's job was to serve as a liaison for influential people in the region, including celebrities, community leaders, and government officials. *Id.* at 421:17–425:22; 449:8–454:11 (Stanton). As liaison, Defendant was expected to respond to partner requests for verification and complaints about abusive accounts and impersonation accounts. *Id.* 421:17–425:22; 449:8–454:11. As an MPM, Defendant could not approve requests himself, he could only escalate requests that met Twitter requirements. *Id.* at 449:8–454:11.

To assess verification requirements and complaints, Twitter gave MPMs access to the "Profile Viewer" tool. *Id.* at 390:8–392:12 (Dr. Yoel Roth ("Dr. Roth")). Profile Viewer allows employees to search specific Twitter users by username, or "handle," and view a user's recent Twitter activity, email address, IP address, and phone number. *Id.* at 392:12–396:5. Twitter's policy, outlined in the Twitter Playbook and Security Handbook, places on each employee a responsibility to protect Twitter's proprietary information, such as that an employee could access using Profile Viewer. *See* Exs. 301, 303, 323, 327. Further, per the Security handbook, users' email addresses and telephone numbers, among other information, was considered nonpublic consumer information. Ex. 323. The Twitter Employee Communication Guidelines prohibits employees from sharing confidential information with non-Twitter employees—leaking such

1    information is grounds for termination.  Ex. 327.  Twitter employees are also prohibited from

2    accepting gifts valued at over $100.  Ex. 325.  Defendant affirmed his responsibility to protect user

3    data when he was hired and when he left Twitter.  Trial Tr. 372:12–381:19 (Dr. Roth).

4    B.    Binasaker and the KSA

5         Bader Binasaker ("Binasaker") was a close advisor of then-Crown Prince of KSA Salman

6    bin Abdulaziz's ("Salman") son Mohammed bin Salman ("MbS").  Trial Tr. 719:24–729:19 (Dr.

7    Kristin Diwan ("Dr. Diwan")).  MbS became the Head of the Private Office of the Crown Prince

8    in March 2013.  *Id.* at 721:7–723:25.  In January 2015, Salman became King of Saudi Arabia and

9    appointed MbS as Minister of Defense and Head of his Royal Court.  *Id.* at 702:17–703:1.  Salman

10   appointed MbS Deputy Crown Prince in April 2015.  *Id.*

11        As MbS rose through the ranks, he brought along close associates, including Binasaker.

12   *Id.* at 719:24–729:19.  Binasaker was the General Supervisor of the Prince Salman Youth Center

13   ("PSYC").  *Id.* at 748:7–749:13.  In 2011, MbS created the Mohammed bin Salman Foundation

14   ("MiSK"), naming Binasaker as its Secretary General.  *Id.* at 753:15–755:12.  According to the

15   Government, "MbS established MiSK to expand KSA's knowledge economy through youth

16   empowerment and to use social media to reflect well on the country as a whole."  Opp. at 11

17   (citing Trial Tr. 714:25-715:17 (Dr. Diwan)).  UNESCO recognizes MiSK as a non-governmental

18   organization ("NGO").  Trial Tr. 746:3–19 (Dr. Diwan).  The Government argues control of social

19   media, and Twitter in particular, was a central goal for MbS in light of Twitter's role in spurring

20   the Arab Spring in late 2010 and early 2011.  *See id.* at 708:11–729:12.  Citing testimony of Dr.

21   Diwan, the Government explains "MiSK's work was [] closely intertwined with several KSA

22   ministries"; "[t]he Royal Family [] brought MiSK on their main diplomatic visits abroad"; and

23   MiSK was viewed "as a main part of this new government agenda that was being run by MbS."

24   *Id.* at 714:25–718:25.

25        In addition to his role with MiSK, Binasaker was MbS's "right-hand-man."  *Id.* at 754:8–

26   17.  He advised MbS, managed MbS's personal finances, and traveled with MbS.  *Id.*  Binasaker

27   also remained in his role as head of PSYC.  *Id.* at 724:1–13.  In February 2015, shortly after MbS

28   became Minister of Defense, Binasaker registered the email domain

United States District Court
Northern District of California

bader.alasaker@hrhpmpo[.]com, which the Government argues was the official domain of His Royal Highness Prince Mohammed's Private Office.  *See* Ex. 699; Opp. at 14.  In May 2015, Binasaker submitted an A-2 visa application, reserved for diplomatic and official travelers, and accompanied King Salman to Camp David.  Trial Tr. 505:17–22 (Sarah Rogers ("Rogers")); *id.* at 510:5–511:6; *id.* at 518:23–528:20; Ex. 203.  On the application, Binasaker described himself as a "foreign official/employee," listed his primary occupation as "government," and his employer as "royal court."  *Id.* at 518:23–528:20 (Rogers).  An A2 visa application must be coupled with a formal diplomatic note from the individual's sponsoring government requesting a visa for one of its officials.  *Id.* at 522:9–13.  The U.S. State Department listed the purpose of the trip as "Official Travel."  *Id.* at 520:1–25.  Customs and Border Protection records confirm that Binasaker ultimately went on this trip, landing at Andrews Air Force Base on May 12, 2015.  *See* Ex. 223; Trial Tr. 647:7–649:25 (Brian Pangelinan ("Pangelinan")).

C.   Defendant and Binasaker

Defendant met Binasaker on June 13, 2014 when a group of Saudi entrepreneurs visited Twitter headquarters in San Francisco.  Trial Tr. 1322:7–1335:25 (Special Agent Letitia Wu ("SA Wu")).  On June 14, 2014, Defendant shared his phone number and Skype account with Binasaker.  *Id.*  In December 2014, Defendant and Binasaker met again at a Twitter meeting in London.  Exs. 424, 427; Trial Tr. 1462:1–1463:2 (SA Wu).  At the meeting, Binasaker gave Defendant a Hublot watch worth around $42,000.  Trial Tr. 1307:1–11 (SA Wu).  According to the Government, "[Defendant] and Binasaker discussed the @multahidd account…a vocal and widely followed critic of the Saudi Royal Family and government."  Opp. at 4 (citing Exs. 466, 610).  About one week after the London meeting, Twitter logs show that Defendant used the Profile Viewer tool to access the @mujtahidd account "and continued to do so over six more days in the following ten weeks."  *See* Exs. 342, 343.

On January 17, 2015, Binasaker emailed Defendant a dossier on @mujtahidd with the statement "as we discussed in london for Mujtahid file."  *See* Ex. 610.  The file accused the account of "violating the KSA 'Anti-Cyber Crime Law' by slandering and damaging the image of several people in the Royal Family, including Crown Prince Salman and MbS."  *Id.*  In February

United States District Court
Northern District of California

4

2015, Defendant used Profile Viewer to access @mujtahidd's telephone number and email address. *See* Exs. 343, 951. In addition to the @mujtahidd account, Binasaker emailed Defendant about a @HSANATT account in February 2015. *See* Exs. 447, 464. The @HSANATT account was suspended for impersonating a KSA government official. *See* Exs. 448, 464. After the suspension, Defendant used the Profile Viewer tool to access @HSANATT's email address. *See* Exs. 342, 448, 951. The Government, citing testimony of Dr. Roth, notes that email addresses and phone numbers can potentially be used to determine a person's identity. Opp. at 5 (citing Trial Tr. 386:11–388:4 (Dr. Roth)). There is no direct evidence that Defendant conveyed the information he accessed to Binasaker. Trial Tr. 1504:9–1505:2 (SA Wu). However, there is a significant amount of circumstantial evidence. Binasaker emailed Defendant about the @mujtahidd and @HSANATT accounts; Defendant subsequently accessed the @mujtahidd and @HSANATT accounts; Defendant admitted Binasaker placed pressure on him to access the accounts, and Defendant was in frequent contact with Binasaker by phone and WhatsApp. *See* Exs. 342, 343; 954; Trial Tr. 1441:23–1443:4 (SA Wu); *id.* at 1460:15–1464:21; *id.* at 1473:9–13.

In February 2015, the same month Defendant viewed @mujtahidd and @HSANATT's profiles, Binasaker wired $100,000 into a Bank Audi account in Lebanon that Defendant recently opened under his father's name. *See* Exs. 23, 24. Later that month, Defendant traveled to Lebanon, withdrew $15,000 from his Bank Audi account, $10,000 of which he deposited in his Bank of America account upon his return to the U.S. Exs. 2, 23. On February 24, 2015, Defendant transferred $10,000 from the Bank Audi account to his Bank of America account with the description "family fund." Ex. 25. On March 8, 2015, one day after a phone call with Binasaker, Defendant sent a direct message ("DM") reading, "proactive and reactively we will delete evil my brother." *See* Ex. 801 at 1. Two days later, Defendant transferred $9,911 from his Bank Audi account to his Bank of America account with the same "family fund" description. *See* Exs. 8, 26.

Defendant left Twitter on May 22, 2015 to take a job at Amazon. Trial Tr. 448:18–448:20 (Stanton). He subsequently started his own social media consulting company called Cyrcl LLC ("Cyrcl"). *See* Trial Tr. 1465:10–1467:8 (SA Wu). Through Cyrcl, Defendant claims he

continued to provide social media services to Binasaker.  *Id.*  On June 11, 2015, Defendant transferred another $10,000 from his Bank Audi account to his Bank of America account with the same "family fund" description.  *See* Exs. 6 at 4, 28.  On July 5, 2015, Defendant wired $30,000 from his Bank Audi account to his Bank of America account with the description "down payment of an apartment in USA."  Exs. 7 at 4, 30.  That same day, Binasaker wired $100,000 into Defendant's Bank Audi account, including a screenshot of the wire confirmation and an apology for "late" payment.  *See* Ex. 801T.  Despite having already left his job at Twitter, Defendant responded "Need anything from Twitter?"  *See* Exs. 33, 801T.  In early 2016, Defendant opened a Chase business account for Cyrcl, where Binasaker eventually wired another $100,000.  *See* Trial Tr. 1291:10–1294:16 (SA Wu).

D.    Ahmed Almutairi ("Almutairi") and Ali Alzabarah ("Alzabarah")

Almutairi was the Managing Director of the Saudi social media company Smaat Co.  Ex. 416T.  In November 2014, Almutairi emailed Defendant requesting a "15 minutes face to face meeting in SF to discuss our mutual interest which should serve your goals in the region."  *See* Ex. 425.  Almutairi informed Defendant he was "the advisor for VVIP 1st degree Member of the Saudi Royal Family for social media."  *Id.*  After meeting with Defendant on November 20, Almutairi stated "I'm quite confident that by both of us cooperating and working together, we'll achieve the goals of Twitter in the region."  *Id.*  Phone records show Binasaker called Defendant two days before Defendant met Almutairi on November 18.  Ex. 425.  Six days after his meeting with Almutairi, Defendant contacted Binasaker asking to meet in London.  Exs. 424, 427.  As noted, Defendant and Binasaker met in London less than two weeks later, where Binasaker gifted Defendant the Hublot watch and discussed the @mujtahidd account.  *See* Ex. 610; Trial Tr. 1307:1–11 (SA Wu).  Binasaker maintained contact with both Defendant and Almutairi throughout early 2015.  *See* Ex. 954; Trial Tr. 1441:23–1443:4 (SA Wu).

Alzabarah was a Site Reliability Engineer at Twitter during and after Defendant's employment at Twitter.  *See* Trial Tr. 861:18–862:9 (Seth Wilson ("Wilson")).  In his role as site manager, Alzabarah could access more user data than Defendant.  *Id.* at 893:20–895:20; Ex. 352.  According to the Government, Defendant and Alzabarah were acquaintances at Twitter and were

6

in contact through WhatsApp and Skype.  *See* Trial Tr. 1457:9–11 (SA Wu); Exs. 702 at 327, 808.

Defendant was aware that Alzabarah sought employment in Saudi Arabia, and introduced

Alzabarah to Binasaker.  *See* Trial Tr. 1456:15–1458:2 (SA Wu).  Alzabarah eventually sent his

C.V. to Almutairi and met with him in February 2015.  Exs. 679, 853.  On May 14, 2015,

Alzabarah traveled to Washington D.C. to meet Binasaker while Binasaker was visiting Camp

David with the Saudi Arabian delegation.  *See* Trial Tr. 1132:9–1136:12 (Scott Larson); Exs.

702T, 954.  On May 21, 2015, one week after his meeting with Binasaker and the day before

Defendant left Twitter, Alzabarah accessed the same @mujtahidd account that Defendant had

repeatedly accessed.  *See* Exs. 312, 352 at 83–84.  Alzabarah continued to access the @mujtahidd

account through at least September 2015.  *See* Trial Tr. 905:11–15 (Wilson).

    In December 2015, Twitter questioned Alzabarah about his repeated access of the

@mujtahidd account.  *Id.* at 1434:10–1436:21 (SA Wu).  The next day, Alzabarah and his family

fled to Saudi Arabia—he is currently employed by MiSK.  *Id.*

E.    FBI Meeting and Indictment

    In October 2018, FBI agents requested a meeting with Defendant, who by this time lived in

Seattle.  *See* Trial Tr. 1452:24–1454:23 (SA Wu).  SA Wu interviewed Defendant about his role at

Twitter and relationship with Binasaker.  *See id.* at 1459:21–1463:2.  Defendant explained he was

a "government liaison between Twitter and the KSA government," and Binasaker was close to

MbS and ran "charitable organizations that were KSA government controlled and owned."  *Id.*

When asked about the watch Binasaker gifted him, Defendant told SA Wu it was only worth $500.

*Id.*  He also told SA Wu he was not paid by Binasaker until after he left Twitter.  *Id.* at 1466:7–22.

SA Wu asked Defendant if Binasaker encouraged him to access the @mujtahidd account, and

Defendant affirmed.  *Id.* at 1464:15–21.  When SA Wu asked Defendant whether he sent

Binasaker Twitter user data, Defendant responded that he had not.  *Id.* at 1465:2–9.

    SA Wu asked Defendant if he had documentation of his work with Binasaker.  *Id.* at

1467:3–1473:2.  He explained there was an invoice, excused himself to retrieve it, and returned 30

minutes later after sending an invoice to another FBI Agent.  *Id.*; Exs. 806, 807, 809.  Metadata

from the invoice showed it was created during that 30-minute period.  *See* Trial Tr. at 1489:8–

1491:9 (SA Wu).

F.     The Peiter Zatko Whistleblower Complaint

On August 23, 2022, the Washington Post reported that Peiter Zatko ("Zatko"), the security lead at Twitter from 2020–2022, submitted a whistleblower complaint to the SEC, FTC, and DOJ in July.  *See* Docket No. 397, Ex. A ("Zatko Complaint").  According to the Government, the complaint, contained in an encrypted hard drive without a password, arrived at DOJ's National Security Division ("NSD") on July 11.  Opp. at 53.  The Government goes on to explain that Zatko's attorneys decrypted the hard drive on August 4, and it was made available to NSD attorneys on August 8.  *Id.*

The Zatko Complaint alleges serious security lapses at Twitter.  *See generally* Zatko Complaint.  Relevant here, it alleges the following: "Twitter tolerated or was complicit in efforts by foreign governments to exploit the Twitter platform and its staff…" and had placed "agents on Twitter payroll."  *Id.* ¶¶2(d), 72, 72(a).  Twitter failed to comply with "a 2011 FTC consent decree that requires Twitter to maintain an information security program reasonably designed to protect nonpublic user information."  *Id.* ¶ 34.  Deficiencies in Twitter's security resulted "in an abnormally high number of security incidents, including 'ignorance and misuse of vast internal data sets.'"  *Id.* ¶¶ 46(a)(i), 47.  "[I]nsider threats were 'virtually unmonitored,'" and "about half of Twitter's 10,000 employees…were given access to sensitive live production systems and user data to do their jobs."  *Id.* ¶¶ 46(b)(iv), 46(c)(ii).  "[A]ll engineers had access to the production environment and '[t]here was no logging of who went into the environment or what they did….There were no logs…'"  *Id.* ¶ 48.  Finally, Zatko alleged he was fired from Twitter after raising these issues to executives and the Board because Twitter prioritizes building its user count over privacy.  *Id.* ¶¶ 101, 116(b)(1).

## III.     **LEGAL STANDARD**

A.     Acquittal

Under Federal Rule of Criminal Procedure 29, a defendant may file a motion for a judgment of acquittal after a jury verdict.  A Rule 29 motion challenges the sufficiency of evidence.  "In ruling on a Rule 29 motion, 'the relevant question is whether, after viewing the

1    evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found

2    the essential elements of the crime beyond a reasonable doubt.'"  *United States v. Alarcon–Simi*,

3    300 F.3d 1172, 1176 (9th Cir. 2002) (emphasis in original).  "[I]t is not the district court's function

4    to determine witness credibility when ruling on a Rule 29 motion."  *Id.*

5    B.    New Trial

6          Under Federal Rule of Criminal Procedure 33, a "court may vacate any judgment and grant

7    a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "A district court's power

8    to grant a motion for a new trial is much broader than its power to grant a motion for judgment of

9    acquittal...."  *United States v. Inzunza*, 638 F.3d 1006, 1026 (9th Cir. 2009) (quoting *United States*

10   *v. Alston*, 974 F.2d 1206, 1211–12 (9th Cir. 1992)).  Accordingly, a district court "'need not view

11   the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing

12   evaluate for itself the credibility of the witnesses.'"  *United States v. Kellington*, 217 F.3d 1084,

13   1095 (9th Cir. 2000) (quoting *Alston*, 974 F.2d at 1211).  This harmless error rule applies to new

14   trial motions.  *United States v. Harmon*, 537 F. App'x 719, 720 (9th Cir. 2013) (citing Fed. R.

15   Crim. Proc. 52 advisory committee's note).  While not as rigorous as the showing needed to

16   satisfy Rule 29, it is a demanding standard nonetheless, and the Ninth Circuit has held that such

17   motions are generally disfavored and should only be granted in "exceptional" cases.  *See United*

18   *States v. Del Toro–Barboza*, 673 F.3d 1136, 1153 (9th Cir. 2012); *see also United States v.*

19   *Camacho*, 555 F.3d 695, 705 (8th Cir. 2009) ("New trial motions based on the weight of the

20   evidence are generally disfavored....").

21                              **IV.    ANALYSIS**

22   A.    Acquittal

23         1.    Violation of 18 U.S.C. §951 (Count One)

24         To convict under 18 U.S.C. § 951(a) the government must prove that the defendant

25   "act[ed] in the United States as an agent of a foreign government without prior notification to the

26   Attorney General." 18 U.S.C. § 951(a).  The statute defines the term "agent of a foreign

27   government" as "an individual who agrees to operate within the United States subject to the

28   direction or control of a foreign government or official."  *Id.* § 951(d).  Thus, for Defendant to

United States District Court
Northern District of California

9

1    have been found guilty of Count One, the Government must have established that Binasaker was

2    (1) a "foreign official"; (2) Defendant knew Binasaker's status as a "foreign official"; (3)

3    Defendant acted subject to the control of Binasaker; and (4) Defendant agreed to access, monitor,

4    and convey information within the United States to Binasaker. *See* 18 U.S.C. § 951.

5           Defendant argues the Court should grant a judgment of acquittal on Count One for two

6    reasons. First, Defendant argues the Government's definition of "foreign official" is

7    unconstitutionally vague, and therefore, per constitutional-avoidance canon, the Court should

8    reject the Government's definition in favor of a more limited construction. *See* Mot. at 13–17.

9    Defendant similarly argues that if the Court finds the Government's definition is vague, the rule of

10   lenity applies, and the statute should be interpreted in his favor. *Id.* at 17. Second, Defendant

11   argues that if the Court determines the Government's definition is not unconstitutionally vague,

12   the Government's evidence was insufficient to prove Binasaker's status as a foreign official,

13   Defendant's knowledge of that status, Binasaker's "direction or control" of Defendant, and

14   Defendant's accessing, monitoring, and conveying of private information to Binasaker. *See id.* at

15   21–25. The Court addresses each argument in turn.

16                  a.   Vagueness & Lenity

17          "Under the constitutional-avoidance canon, when statutory language is susceptible of

18   multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts

19   and instead may adopt an alternative that avoids those problems." *Jennings v. Rodriguez*, 138 S.

20   Ct. 830, 836 (2018). "A statute is void for vagueness when it does not sufficiently identify the

21   conduct that is prohibited." *Lane v. Salazar*, 911 F.3d 942, 950 (9th Cir. 2018) (quoting *United

22   States v. Makowski*, 120 F.3d 1078, 1080–81 (9th Cir. 1997)).

23          The rule of lenity "requires ambiguous criminal laws to be interpreted in favor of the

24   defendants subjected to them." *United States v. Nader*, 542 F.3d 713, 721 (9th Cir. 2008) (internal

25   quotations omitted). The rule applies "only where after seizing everything from which aid can be

26   derived," the court is left with a "grievously ambiguous" statute. *Id.* (quotations omitted).

27          Defendant asserts that Congress left the term "foreign official" undefined in § 951, and that

28   the Government's interpretation of § 951 would render it unconstitutionally vague. *See* Mot. at

13–17.  According to Defendant, the Government categorizes an individual as a "foreign official" based on that individual's "proximity to power," *i.e.*, whether an individual qualifies as a "foreign official" under § 951 depends on how close that individual is to an officer who exercises formal sovereign power.  *See* Docket No. 401 at 8 ("Reply").  Defendant argues that absent "a limitation to the plain meaning of 'official,' prosecutors could use § 951 to assert…that anyone with 'proximity to power' is a foreign official without any discernible limits to how close the 'proximity' must be to trigger liability under the statute." Mot. at 16.  Hence, to save the statute from being unconstitutionally vague, as the Court must do under the constitutional avoidance doctrine, Defendant states "a foreign official for the purposes of § 951 must hold public office and be authorized to exercise some of the government's sovereign powers." Mot. at 15 (citing *Tanzin v. Tanvir*, 141 S. Ct. 486 (2020), *and, Webster's New World Dictionary* (1984)).

The Court is not convinced.  The jury did not base its decision on a "proximity to power" test or any other Government interpretation—the jury based its decision on the Court's instruction, which provides:

> The term "foreign government" includes any person or group of persons exercising sovereign de facto or de jure political jurisdiction over any country, other than the United States, or over any part of such country, and includes any subdivision of any such group or agency to which such sovereign de facto or de jure authority or functions are directly or indirectly delegated.

*See* Docket No. 356 at 20 ("Closing Jury Inst.").  This instruction is sourced directly from DOJ regulations promulgated under § 951.  Definition of Terms, 28 C.F.R. § 73.1(b).  Put plainly, it defines a foreign official as a person exercising sovereign *de facto or de jure* authority, whether that authority is directly *or indirectly* delegated.  *See id.*  Thus, the Government needed to provide sufficient evidence for a rational jury to find, at a minimum, that Binasaker had *de facto* authority to take action on behalf of the KSA.  This definition is not unconstitutionally vague.  As federal courts have found, § 951 "plainly and concretely identifies the conduct which constitutes its violation, and the statute's language is clear and unambiguous," *United States v. Michel*, No. CR 19-148-1 (CKK), 2022 WL 4182342, at *5 (D.D.C. Sept. 13, 2022) (quoting *United States v. Duran*, 596 F.3d 1283, 1291 (11th Cir. 2010)), "and applicable regulations define each relevant

United States District Court
Northern District of California

1   term." *Id.* (citing 28 C.F.R. § 73.1); *see also United States v. Lindauer*, No. S2 03 CR.

2   807(MBM), 2004 WL 2813168, at *4 (S.D.N.Y. Dec. 6, 2004) (concluding § 951 is not

3   unconstitutionally vague); *United States v. Truong Dinh Hung*, 629 F.2d 908, 920 (4th Cir. 1980)

4   (same).  For the same reason, the statute is not so "grievously ambiguous" that the rule of lenity

5   should apply.  *See Nader*, 542 F.3d at 721.

6                          b.    Sufficiency of the Evidence

7           Defendant also argues that if the Court determines the term foreign official is not

8   unconstitutionally vague, the Government provided insufficient evidence for any rational jury to

9   convict on Count One.  *See* Mot. at 21.  To convict under § 951 the Government was required to

10  prove Defendant (1) acted (2) pursuant to an agreement, (3) to operate subject to the direction or

11  control of a foreign government, and (4) failed to notify the Attorney General before taking such

12  action.  *See United States v. Chung*, 659 F.3d 815, 823 (9th Cir. 2011).  Implicit in § 951 is a

13  requirement that the Government proved the alleged foreign official is, in fact, a foreign official.

14  *See* 18 U.S.C. § 951.  Additionally, due to the presumption that "Congress intends to require a

15  defendant to possess a culpable mental state regarding each of the statutory elements that

16  criminalize otherwise innocent conduct," *see United States v. Collazo*, 984 F.3d 1308, 1324 (9th

17  Cir. 2021) (quoting *Rehaif v. United States*, 139 S. Ct. 2191, 2195 (2019)), the Government was

18  required to prove Defendant had knowledge of Binasaker's status as a foreign official.  *Cf. United*

19  *States v. Alshahhi*, No. 21-CR-371 (BMC), 2022 WL 2239624, at *9 (E.D.N.Y. June 22, 2022)

20  (citing *Rehaif*, 139 S. Ct. at 2195 for the proposition that there is a presumption in favor of scienter

21  where Congress does not specify any scienter in the statutory text, and therefore concluding § 951

22  requires knowledge of agent status).

23                          i.    Binasaker's Status as a Foreign Official

24          First, Defendant argues the evidence demonstrating Binasaker is a foreign official was

25  insufficient.  In its briefing and at trial, the Government relied heavily on the testimony of its

26  witness Dr. Diwan to prove Binasaker was a foreign official.  Opp. at 9–14.  Dr. Diwan noted that

27  "proximity to power" is a key aspect of official government status in the KSA, and Binasaker was

28  proximate to power as MbS's "right-hand-man," with long standing ties to MbS and his father

King Salman.  Trial Tr. 754:8–17 (Dr. Diwan).  Dr. Diwan testified that Binasaker was "'very instrumental…in the policies' MbS was pursuing." *Id.* at 755:4–12.  Dr. Diwan also explained that the work of MiSK and PSYC—the organizations Binasaker led—was "closely intertwined with several KSA Ministries" and played a key role in forwarding MbS's agenda of "exerting influence on social media platforms to respond to the cultural and political currents of this time." *Id.* at 714:25–718:25.  Pointing to this goal, the Government notes that "as MbS's influence in the KSA government increased, with Binasaker at his side, the government placed greater restrictions on political discussion," and "engaged in 'increased surveillance' 'in an attempt to silence or control through the media critical views.'"  Opp. at 13 (citing Trial Tr. 732:14-735:5 (Dr. Diwan)). The Government also emphasizes Binasaker's A-2 visa application, where he listed himself as a "foreign official" employed by the "royal court," and Binasaker's eventual trip to Camp David with King Salman.  Trial Tr. at 518:23–528:20 (Rogers); *id.* at 647:7–649:25 (Pangelinan).

All in all, the Government presented a substantial amount of evidence that could allow a rational juror to find Binasaker, at a minimum, exercised *de facto* authority to exercise some portion of the KSA's sovereign power, *e.g.*, his proximity to the Royal Family, involvement in their affairs, and overlapping goals between MiSK and MbS.  Further, Binasaker possibly exercised *de jure* authority, *e.g.*, the A-2 visa application.  Defendant's arguments to the contrary are the same as those reasonably rejected by the jury at trial.  Thus, viewing the evidence in the light most favorable to the Government, the Court declines to second-guess the jury's determination.

ii.    <u>Defendant's Knowledge</u>

Second, Defendant argues he did not know Binasaker was a foreign official.  *See* Mot. at 21.  Defendant notes that Binasaker was introduced to him as "the Secretary General of the PSYC and he had a MiSK NGO email address." *Id.*  Defendant points out that when he discussed Binasaker with other colleagues, he "relayed his belief that MiSK was" an NGO and "PSYC was a 'non-profit.'" *Id.*  Defendant also notes that MiSK is recognized by UNESCO.  Mot. at 6.

The Government argues that Defendant's own statements demonstrate his knowledge of Binasaker's status.  *See* Opp. at 18.  It highlights an email Defendant drafted after King

13

Abdullah's death, stating, among other things, "I have built a strong relationship with the team of HRH Crown Prince Salman bin Abdelaziz Al Saud," and "I am working with His Majesty's team for official announcement on Twitter now." Opp. at 18–19 (citing Ex. 441 at 4). Later in the thread, Defendant confirmed King Abdullah's death, claiming he "spoke with a close person with King Salman." *Id.* "Phone records from that day show that Defendant had several phone calls with Binasaker." *Id* (citing Ex. 954 at 3). The Government also points to Defendant's statements after "Binasaker notified [Defendant] that the @HSANATT account was impersonating a member of the Saudi government." *Id.* (citing Ex. 447 at 1–2). To escalate Binasaker's complaint, Defendant stated '[i]t is a government position in Saudi Arabia and it is not a person' requesting removal." *Id.*

The Government's most convincing evidence is from SA Wu's testimony regarding her 2018 interview with Defendant. According to SA Wu, Defendant stated he left Twitter, "in part, because of 'mounting pressure from contacts within the KSA government,' and specifically mentioned 'Mr. Binasaker' as one of those contacts." Trial Tr. 1459:21–1463:2 (SA Wu). Defendant also allegedly "described himself as a 'government liaison between Twitter and the KSA government' in relation to the requests he fielded from Binasaker." *Id.* Finally, SA Wu testified that Defendant "made generally three characterizations about [Binasaker]": (1) he was close to MbS, (2) he was part of the King's team, and (3) he worked for MiSK and PSYC, both of which were KSA owned and controlled charitable organizations. *Id.*

Viewing the evidence in the light most favorable to the Government, a rational jury could find that Defendant knew of Binasaker's status as a foreign official.

                    iii.     Proof of Control & Agreement to Access, Monitor, and Convey

Finally, Defendant argues that the Government failed to introduce any evidence of an agreement between him and Binasaker providing that he would operate subject to Binasaker's control. Mot. at 22. Instead, Defendant argues the evidence "presented at trial showed that his conduct during the relevant period was entirely consistent with his responsibilities as a MPM at Twitter." *Id.* Likewise, Defendant argues his investigation of user accounts was consistent with his job responsibilities, and "the [G]overnment found no evidence that he ever agreed to provide

1    or actually provided any confidential Twitter information to Binasaker or anyone else." *Id.* at 23.

2    Finally, Defendant argues that confidential user data is always shown when a profile is accessed

3    using Profile Viewer, and there is no proof that he "*actually* looked" at that information. *Id.* at 24

4    (emphasis in original).  In sum, Defendant faults the Government for providing only

5    circumstantial evidence of an agreement to access, monitor, and convey.

6         The Government counters by emphasizing the evidence it believes supports the jury

7    verdict.  It notes Defendant's relationship and frequent communication with Binasaker.  Trial Tr.

8    1322:7–1335:25 (SA Wu); Ex. 954.  Defendant and Binasaker's meeting in London, where they

9    discussed the @mujtahidd account, and Binasaker gifted Defendant an expensive watch.  Trial Tr.

10   1307:1–11 (SA Wu); Exs. 466, 610.  Binasaker's subsequent email to Defendant which included a

11   dossier on @mujtahidd with the statement "as we discussed in london for Mujtahid file[,]" and

12   Defendant's access of the @mujtahidd account shortly thereafter.  *See* Ex. 610; Exs. 343, 951.

13   Binasaker's email to Defendant regarding @HSANATT, and Defendant's subsequent access of

14   the @HSANATT account.  *See* Exs. 342, 343; 954; Trial Tr. 1441:23–1443:4 (SA Wu); *id.* at

15   1460:15–1464:21; *id.* at 1473:9–13.  The $100,000 wire transfers from Binasaker to Defendant,

16   and Defendant's admission to SA Wu that Binasaker pressured him to access the @mujtahidd

17   account.  *See* Exs. 23, 24; Trial Tr. 1291:10–1294:16 (SA Wu); Exs. 33, 801T; Trial Tr. 1464:15–

18   21 (SA Wu).

19        While all of this evidence is circumstantial, the Government, citing *Refiekan*, argues the

20   lack of direct evidence is not significant:

21            The list of evidence that the Government did not produce at trial is
              long. No emails or phone calls between Rafiekan and any Turkish
22            official. No bank records tracing the flow of funds back to
              governmental accounts. No direct evidence clarifying [the co-
23            conspirator's] role vis-à-vis Turkey. No live testimony from
              [Defendant or coconspirators].
24
              But in a § 951 case, such evidence can be hard to come by. . . .
25            **Savvy operatives cover their tracks. So, if the prosecution is to
              prove that a defendant acted as an 'agent of a foreign
26            government,' it may need to rely on circumstantial evidence and
              reasonable inferences to make its case—as it is entitled to do**. . . .
27            And here, the Government lassoed enough stars to reveal a distinct
              constellation.
28

1   *Id.* at 29–30 (emphasis in original) (quoting *Rafiekian*, 991 F.3d at 545).  According to the

2   Government, viewing this circumstantial evidence and using common sense, "a rational juror

3   could have inferred a simple explanation from the record: [Defendant] and Binasaker used phone

4   calls, or potentially other mechanisms, like encrypted messaging on WhatsApp, for passing the

5   private user information."  *Id.* at 31; *see also id.* at 30 (citing Closing Juror Inst. at 6 ("The law

6   makes no distinction between the weight to be given to either direct or circumstantial evidence. It

7   is for you to decide how much weight to give to any evidence [. . . ] you must consider all the

8   evidence in the light of reason, experience, and common sense.")).

9          Considering the above outlined evidence, a rational juror could reasonably infer an

10   agreement to access, monitor, and convey between Defendant and Binasaker.  To acquit based on

11   Defendant's argument, the Court would have to ignore its duty to view the evidence in the light

12   most favorable to the Government.

13          The Court **DENIES** Defendant's motion for acquittal as to Count One.

14          2.       Conspiracy (Count Two)

15          As a preliminary matter, the Superseding Indictment charged a conspiracy between

16   "Ahmad Abouammo, Ali Alzabarah, and Ahmed Almutairi, *and others*."  *See* Docket No. 53 at 13

17   ("Superseding Indictment") (emphasis added).  Further, the Court's conspiracy instruction

18   provided, in part, that the jury must find "there was an agreement between two or more persons to

19   commit one of the charged wire fraud or honest service wire fraud crimes as charged in the

20   Indictment."  Closing Jury Inst. No. 23.  Thus, consistent with the Superseding Indictment and the

21   jury instructions, the Government could have advanced the theory that the alleged conspiracy was

22   only between Defendant and Binasaker, *i.e.*, the "and others" in the Superseding Indictment

23   included Binasaker, and the requisite agreement between two persons was between Defendant and

24   Binasaker.  However, the Government did not advance a conspiracy of such limited scope.

25   Instead, it sought to prove a broad, overarching conspiracy between Defendant, Almutairi, and

26   Alzabarah.  *See* Trial Tr. 335:24–338:10 (Gov't Opening); *id.* at 339:24–340:20; *id.* 1960:2–

27   1970:8; *id.* at Trial Tr. 1972:1–18; *see also id.* at 2049:14–2050:10.  Consequently, the Court will

28   hold the Government to its position at trial that the conspiracy was between Defendant, Almutairi,

United States District Court
Northern District of California

16

1    and Alzabarah.

2         To convict for conspiracy the government must prove that the defendant (1) agreed to

3    accomplish an illegal objective, and (2) had the intent to commit the underlying offense.  *United*

4    *States v. Espinoza-Valdez*, 889 F.3d 654, 656 (9th Cir. 2018) (citing *United States v. Moe*, 781

5    F.3d 1120, 1124 (9th Cir. 2015)).  "Circumstantial evidence can suffice to prove a conspiracy."

6    *United States v. Mendoza*, 25 F.4th 730, 736 (9th Cir. 2022).  "A conspiracy may continue for a

7    long period of time…It is not necessary that all members of the conspiracy join [] at the same

8    time, and one may become a member of the conspiracy without full knowledge of all the details of

9    the unlawful scheme or the…identities…of all [] other members."  Closing Jury Inst. No. 23.  *See*

10   *also Manual of Modern Criminal Jury Instructions for the District Courts of the Ninth Circuit* §

11   11.4 (2019) ("A single conspiracy can be established even though it took place during a long

12   period of time during which new members joined and old members dropped out." (citing *United*

13   *States v. Green*, 523 F.2d 229, 233 (2d Cir. 1975))).  Instead, "the government must produce

14   enough evidence to show that each defendant knew or had reason to know the scope of the

15   (criminal enterprise), and had reason to believe that their own benefits derived from the operation

16   were dependent upon the success of the entire venture."  *United States v. Foster-Torres*, 40 F.

17   App'x 528, 529 (9th Cir. 2002) (quoting *United States v. Perry*, 550 F.2d 524, 528-29 (9th

18   Cir.1977)).

19        Defendant argues that "[o]verall, the evidence did not show beyond a reasonable doubt that

20   [he] agreed…with co-defendants Alzabarah and Almutairi to devise a scheme to defraud Twitter

21   by providing Binasaker with nonpublic account information."  Mot. at 25.  Defendant claims his

22   interactions with Alzabarah and Almutairi were limited and innocuous, that he did not maintain

23   contact with Alzabarah after leaving Twitter, and he was not present for pivotal events, such as

24   Alzabarah and Binasaker's meeting in Washington D.C.  *Id.* at 26.  Defendant also asserts that his

25   decision to cooperate with the FBI rather than flee the country, as Alzabarah did, proves he was

26   not part of the conspiracy.  *Id.* at 25–26.

27        The Court disagrees.  The Government provided enough evidence for a rational juror to

28   find that Defendant knew the scope of the criminal enterprise—providing confidential Twitter user

information to the KSA—and that the benefits he received (payment from Binasaker) were dependent on the conveyance of that information.  A rational juror could find that Defendant, Almutairi, and Alzabarah acted in consort to provide that information to the KSA (through Binasaker) based on the timing of Defendant and Alzabarah's meetings with Almutairi before traveling to meet Binasaker, *see* Exs. 424, 425, 851, 954; Trial Tr. 1456:15–21 (SA Wu); Exs. 679, 853, and Defendant and Alzabarah's subsequent access of the @mujtahidd account.  *See* Exs. 521; 342 at 1; 352 at 284.  A rational juror could infer from this timing that Almutairi facilitated an agreement between Defendant and Binasaker, Ex. 425 at 3; that Defendant facilitated an agreement between Alzabarah, Almutairi, and Binasaker, Trial Tr. 1456:15–1458:2 (SA Wu); Exs. 679, 853; and that their actions with regard to @mujtahidd and @HSANATT showed an unlawful purpose behind the agreement.  Overall, the Government presented enough evidence for a rational juror to believe that this was not mere association, but a scheme to achieve a common unlawful goal.  *See United States v. Lapier*, 796 F.3d 1090, 1095 (9th Cir. 2015) ("The government can prove the existence of the conspiracy through circumstantial evidence that defendants acted together in pursuit of a common illegal goal." (internal citation and quotation marks omitted)).

Admittedly, the lack of direct evidence, as well as the plausibility of innocent explanations for Defendant's contacts with Almutairi and Alzabarah, makes this somewhat of a close call. Almutairi's email requesting a meeting with Defendant could simply pertain to Almutairi's digital media company and participation in "Saudi's Twitter Conference."  And it is certainly possible that Defendant introduced Alzabarah to Almutairi and Binasaker simply because he knew Alzabarah sought employment in Saudi Arabia.  Still, the mere possibility of an innocent explanation does not disprove a conspiracy.  *Cf. United States v. Hussain*, No. 16-CR-00462-CRB, 2018 WL 3619797, at *35 (N.D. Cal. July 30, 2018) ("[a] single conspiracy can include subgroups or subagreements and the evidence does not have to exclude every hypothesis other than that of a single conspiracy").  Moreover, the direct connections between Defendant, Almutairi, and Alzabarah do not stand alone.  Defendant and Alzabarah also accessed the same @mujtahidd account while in contact with Binasaker, *see* Exs. 521; 342 at 1; 352 at 284, and at least with regard to Defendant, a rational juror could find Binasaker paid him for doing so.  Ex. 801T.  Thus,

viewing the evidence in the light most favorable to the Government, a rational juror could find Defendant guilty of conspiracy to defraud Twitter.

For the foregoing reasons, the Court **DENIES** Defendant's motion for acquittal as to conspiracy (Count Two).

### 3. Wire and Honest Services Fraud (Count Five)

Defendant argues his conviction for wire fraud cannot stand because the Twitter user data he allegedly stole does not constitute property for wire fraud purposes. *See* Mot. at 27. Defendant argues his conviction for honest services fraud cannot stand because there was not sufficient evidence of a quid pro quo between him and Binasaker. *See id.* at 30. The Court addresses each argument in turn.

#### a. Wire Fraud

To convict for wire fraud the government must prove that the defendant "knowingly engaged in a scheme or plan to defraud or obtain money or property by means of false or fraudulent pretenses, representations, or promises." *United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020). In *Miller*, the Ninth Circuit held that "the crime of wire fraud requires the specific intent to utilize deception to deprive the victim of *money or property*, *i.e.*, to cheat the victim." *Id.* at 1099 (emphasis added). Defendant argues that the Government failed to prove that he committed wire fraud because Twitter's confidential user account information is not "property" under California law. Mot. at 27.

The Supreme Court has found that confidential business information can be property for purposes of the federal mail and wire fraud statutes. *Carpenter v. United States*, 484 U.S. 19, 25 (1987). In *Carpenter*, journalists at the Wall Street Journal were convicted of mail and wire fraud for sending the contents of a popular and influential investment column to outside investors before the column was published. *Id.* at 21–23. At the time, the Journal's official policy and practice was that, prior to publication, the contents of the column were the Journal's confidential information. *Id.* at 23. The Court held that the journalists were liable for wire and mail fraud because "[t]he Journal had a property right in keeping confidential and making exclusive use, prior to publication, of the schedule and contents of the 'Heard' column." *Id.* at 26.

1       Still, "[w]hile *Carpenter* concluded that 'confidential business information' *could* be

2   property fraudulently acquired under [the wire and mail fraud] statutes, [ ] whether information

3   *actually* constitutes 'property' must be determined by reference to applicable state laws." *Planned*

4   *Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 214 F. Supp. 3d 808, 824 (N.D. Cal.

5   2016) (emphasis added).

6       This Court previously ruled that Twitter's confidential user account information is

7   "property" under California law in denying Defendant's motion to dismiss the wire fraud charge.

8   *See United States v. Abouammo*, No. 19-CR-00621-EMC-1, 2021 WL 718842, at *6 (N.D. Cal.

9   Feb. 24, 2021).  Specifically, the Court held "Twitter's confidential user account information is

10  property under section 2680 of the California Labor Code and California common law preceding

11  that statute":

12              Section 2860 of the California Labor Code… states that
13              "[e]verything which an employee acquires by virtue of his
                employment, except the compensation which is due to him from his
14              employer, belongs to the employer, whether acquired lawfully or
                unlawfully, or during or after the expiration of the term of his
15              employment." Cal Lab Code § 2860.  The California Supreme
                Court has long held that confidential information—including but not
16              limited to trade secrets—acquired through employment is the
                employer's property under section 2860.  *See Lugosi v. Universal*
17              *Pictures*, 603 P.2d 425, 450-451 (Cal. 1979) ("[Section 2860]
                applies to a limited class of cases, primarily involving the
18              exploitation of an employer's confidential information or trade
                secrets by a former employee to the employer's detriment.");
19              *NetApp, Inc. v. Nimble Storage, Inc.*, No. 5:13-CV-05058-LHK,
                2015 WL 400251, at *17 (N.D. Cal. Jan. 29, 2015) ("[Section 2860]
20              is 'but an expression of the familiar principle that forbids an agent or
                trustee from using the trust property or powers conferred upon him
21              for his own benefit.'" (quoting *Lugosi*, 603 P.2d at 451)). In fact, the
                property right of employers to their confidential information in
22              California precedes the enactment of section 2860.  *See e.g.*, *Bank of*
                *Am. Nat'l Trust & Sav. Ass'n v. Ryan*, 24 Cal. Rptr. 739, 744 (Ct.
23              App. 1962) ("An agent who acquires confidential information in the
                course of his employment or in violation of his duties has a duty not
24              to use it to the disadvantage of the principal.").

25  *Id.*

26      Despite this ruling, Defendant again argues that the user data at issue does not constitute

27  property under California law, and therefore under the wire fraud statute.  Mot. at 27.  In support,

28  Defendant relies on *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040 (N.D. Cal. 2012) and

1    *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010 (N.D. Cal. 2012). *Id.* at 27–28.  In each case, the

2    court broadly asserted that "the weight of authority holds that a plaintiff's 'personal information'

3    does not constitute property." *In re iPhone Application Litig.*, 844 F. Supp. 2d at 1075; *Low*, 900

4    F. Supp. 2d at 1030.

5         However, both cases Defendant cites are distinguishable.  In each, the question was

6    whether a business's collection of users' personal information itself constituted conversion.  *In re*

7    *iPhone Application Litig.*, 844 F. Supp. 2d at 1075; *Low*, 900 F. Supp. 2d at 1030.  One element of

8    conversion requires the plaintiff to prove the subject of the claim is "capable of exclusive

9    possession or control." *Low*, 900 F. Supp. 2d at 1030.  Thus, central to the conclusions in *Low* and

10   *In re iPhone Application Litig.*, was the determination that "such a broad category of information"

11   (*e.g.*, a user's location, zip code, device identifier, and other data) is not capable of exclusive

12   possession or control.  *In re iPhone Application Litig.*, 844 F. Supp. 2d at 1075.  In the context of

13   a business's initial collection of user data, this conclusion makes sense—an individual does not

14   have an inherent property right to publicly available personal information because that information

15   is not, and cannot, be under the user's exclusive control.  For example, when a website records a

16   user's email address, the user does not lose exclusive control of the email address.

17        In contrast, this Court determined Twitter's confidential user data constitutes property for

18   wire fraud purposes under California Labor Code § 2860.  *Abouammo*, 2021 WL 718842, at *6.

19   Section 2860 provides "[e]verything which an employee acquires by virtue of his employment,

20   except the compensation which is due to him from his employer, belongs to the employer[.]"  Cal.

21   Lab. Code § 2860.  The employer-employee relationship is essential.  Twitter employed

22   Defendant, and through § 2860, the user data he acquired through that employment belonged to

23   Twitter.  Accordingly, in this case, the question is not whether an individual has a property right to

24   their own personal information, but whether an employer has a property right against its employee

25   in the data it compiles.  In essence, unlike the data collected in *Low* and *In re iPhone Application*

26   *Litig.*, the data Defendant conduct is more appropriately likened to the theft of a customer list,

27   which is clearly included within the ambit of § 2860.  *See*, *e.g.*, *Elevation Point 2 Inc. v.*

28   *Gukasyan*, No. 21-CV-00281-WQH-AHG, 2022 WL 345647, at *6 (S.D. Cal. Feb. 3, 2022);

United States District Court
Northern District of California

21

United States District Court
Northern District of California

*Thrifty-Tel, Inc. v. Bezenek*, 46 Cal. App. 4th 1559, 1565 (1996). Moreover, through its Security Handbook and the Twitter Playbook, Twitter ensures all of its employees are on notice that the type of user data Defendant accessed is confidential and subject to Twitter's exclusive control. *See* Exs. 301, 303, 323, 327. What is more, the court in *Gukasyan* held personal information contained in a customer list can constitute property for conversion purposes based on § 2860. *Gukasyan*, 2022 WL 345647, at *7. In that regard, the holding in *Gukasyan* is consistent with *In re iPhone Application Litig* and *Low* because a customer list, unlike broad swaths of amorphous user data, is capable of exclusive control.

Defendant also claims "the Court's analysis does not account for the difference between *confidential* information over which an employer exercises exclusive possession or control, and *personal* identifiable information over which no one exercises exclusive possession or control." Mot. at 29 (emphasis in original). According to Defendant, the information he accessed constitutes personal information that cannot be made confidential solely by virtue of Twitters possession and designation. *Id.* Again, Defendant's argument ignores the employer-employee context of § 2860 which clearly applies to customer lists that may contain personal, although not technically confidential, information. *See Gukasyan*, 2022 WL 345647, at *6.

Finally, the Court notes that it is aware and has taken account of *United States v. Percoco*, 13 F.4th 158 (2d Cir. 2021), *cert. granted sub nom. Ciminelli v. United States*, 142 S. Ct. 2901 (2022), an arguably related wire fraud case pending before the Supreme Court. After assessing the issues in *Ciminelli*, the Court concludes that its reasoning in this case remains sound regardless of the Supreme Court's ultimate decision. *Ciminelli* arose out of bidding on a significant government contract for a development project in Buffalo, New York. There, public officials secretly worked with defendant Ciminelli to draft selection criteria that would virtually guarantee Ciminelli would be awarded the development contract. *Id.* at 166. Based on this conduct, the government successfully prosecuted Ciminelli for wire fraud on the theory that by rigging the bidding to favor Ciminelli, defendants deprived the state of a "right to control" information allowing it to make a fully informed economic decision. *Id.* at 171. The Second Circuit upheld Ciminelli's conviction, *see id.* at 173, and Ciminelli appealed to the Supreme Court, arguing the "right to control" theory

United States District Court
Northern District of California

of fraud impermissibly expands the wire fraud statute by defining as property the right to complete and accurate information bearing on a person's economic decision.  *See* Brief of Petitioner at 9, *Ciminelli v. United States,* 142 S. Ct. 2901 (2022) (No. 21-1170).

This case is substantially different in nature because it deals with confidential business information.  As discussed above, the Supreme Court in *Carpenter* held that "[c]onfidential business information has long been recognized as property."  484 U.S. at 25–26.  In doing so, the Supreme Court noted that such information is "a species of property to which the corporation has the exclusive right and benefit, and which a court of equity will protect through the injunctive process or other appropriate remedy."  *Id.* (quoting 3 W. Fletcher, Cyclopedia of Law of Private Corporations § 857.1, at 260 (rev. ed. 1986)).  Thus, the Supreme Court concluded that the defendants in *Carpenter* deprived the Wall Street Journal of a property right when they impermissibly utilized unpublished articles for their own benefit.  *Ciminelli*, however, raises a separate question, because "[n]othing analogous can be said about a defendant who deprives a putative victim of economically valuable information bearing on *that* person's decisions."  Brief of Petitioner at 22, *Ciminelli v. United States,* 142 S. Ct. 2901 (2022) (No. 21-1170) (emphasis in original).

Accordingly, the Court maintains that the Government provided sufficient evidence for a rational juror to find Defendant guilty of wire fraud, and **DENIES** Defendant's motion for acquittal as to wire fraud (Count Five).

b.   Honest Services Fraud

To convict for honest services fraud the government must prove that the defendant engaged in "a scheme or artifice to 'deprive another,' by mail or wire, 'of the intangible right of honest services."  *United States v. Christensen*, 828 F.3d 763, 784 (9th Cir. 2015) (quoting 18 U.S.C. § 1346; then citing 18 U.S.C. §§ 1341, 1343).  To prove "honest services fraud in the form of bribery, [the government] must prove *quid pro quo*."  *United States v. Inzunza*, 638 F.3d 1006, 1013 (9th Cir. 2011).  That is, "the scheme or plan consisted of a [bribe] [kickback] in exchange for the defendant's services."  *Manual of Modern Criminal Jury Instructions for the District Courts of the Ninth Circuit* § 5.34 (2021).  While the *quid pro quo* must "be clear and

23

1  unambiguous, leaving no uncertainty about the terms of the bargain[,]" the "understanding need

2  not be verbally explicit.  The jury may consider both direct and circumstantial evidence, including

3  the context in which a conversation took place, to determine if there was a meeting of the minds

4  on a *quid pro quo*."  *Inunza*, 638 F.3d at 1013 (quoting *United States v. Carpenter*, 961 F.2d 824,

5  827 (9th Cir. 1992).  "The *quid pro quo* requirement is satisfied so long as the evidence shows a

6  course of conduct of favors and gifts flowing to [one party] in exchange for a pattern of…actions

7  favorable to the [the other party]."  *United States v. Kincaid-Chauncey*, 556 F.3d 923, 943 (9th

8  Cir. 2009) (internal citation omitted).

9      The Government argues Defendant committed honest services fraud by agreeing to convey

10  confidential Twitter user data to Binasaker in exchange for the Hublot watch and $100,000

11  payments.  Opp. at 35–36.  Defendant argues he must be acquitted because the terms of the

12  bargain were not "explicit."  Mot. at 31.  That is, the Government did not present direct evidence

13  proving he conveyed the user data he accessed to Binasaker, "and its circumstantial evidence fell

14  far short of that required under law."  *Id.*

15      As noted above, in cases such as these, the Government may place heavier reliance on

16  circumstantial evidence.  *Cf. Rafiekian*, 991 F.3d at 545 ("Savvy operatives cover their tracks.  So,

17  if the prosecution is to prove that a defendant acted as an 'agent of a foreign government,' it may

18  need to rely on circumstantial evidence and reasonable inferences to make its case—as it is

19  entitled to do.").[1]  Here, the Government presented more than enough evidence for a rational jury

20  to infer explicit terms of an agreement between Defendant and Binasaker: Binasaker's email to

21  Defendant, including a dossier on @mujtahidd with the statement "as we discussed in london for

22  Mujtahid file[,]" and Defendant's access of the @mujtahidd account shortly thereafter.  *See* Ex.

23  610; Exs. 343, 951.  Binasaker's email to Defendant regarding @HSANATT, and Defendant's

24  subsequent access of the @HSANATT account after the account was suspended.  *See* Exs. 342,

25  343; Ex. 954; Trial Tr. 1441:23–1443:4 (SA Wu); *id.* 1460:15–1464:21; *id.* at 1473:9–13.  The

26  $100,000 wire transfers from Binasaker to Defendant, and Defendant's admission to SA Wu that

27

28  _____

[1] Although *Rafiekian* only dealt with a direct violation of § 951, Defendant's honest services
conviction is derived from the same conduct for which he was convicted under § 951.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Binasaker pressured him to access the @mujtahidd account.  *See* Exs. 23, 24; Trial Tr. 1291:10–

2   1294:16 (SA Wu); Exs. 33, 801T; Trial Tr. 1464:15–21 (SA Wu).  Defendant's statement to

3   Binasaker in March 2015 that "proactive and reactively we will delete evil[,]"  Ex. 801 at 1, and

4   Defendant's admission that Saudis were extravagant gift givers but that they expected something

5   in return.  Trial Tr. 1463:11–18 (SA Wu).  In sum, the timing and structure of Defendant's

6   meetings with Binasaker, Defendant's access of the @mujtahidd account, and subsequent payment

7   by Binasaker shows a course of conduct of favors and gifts flowing to Defendant in exchange for a

8   pattern of…actions favorable to Binasaker.  *See Kincaid-Chauncey*, 556 F.3d at 943.

9           Next, Defendant argues the "evidence adduced by the [D]efense would have caused any

10   rational juror to have at least a reasonable doubt as to whether there was a quid pro quo."  Mot. at

11   32.  The premise of this argument is that the "conspicuous display of wealth was a notable aspect

12   of Saudi culture," and therefore, the Hublot watch and $100,000 transfers to Defendant's account

13   from Binasaker do not demonstrate an expectation of return favors.  *See id.*  Defendant notes that

14   Ana Carmen Neboisa ("Neboisa"), who worked with Binasaker and MiSK in her role with the

15   U.S. Saudi Arabian Business Counsel, "acknowledged receiving wire transfers for bonuses and

16   gifts from employees at MiSK, including a gift of $20,000 from Binasaker for no apparent

17   reason."  *Id.*  And while Neboisa denied receiving other gifts, SA Wu testified that "Neboisa had

18   told her in an interview that she received several other gifts from MiSK, including bracelets, a

19   purse, a pearl necklace, a watch, and earrings."  *Id.*  Further, Defendant argues it was not

20   uncommon for other MPMs at Twitter to receive gifts in violation of Twitter's $100 value policy.

21   *Id.*  Defendant notes his colleague Alexey Shelestenko ("Shelestenko") received signed sports

22   memorabilia, concert tickets, and gaming equipment from his partners in Russia; and Twitter's

23   former Vice President of Global Media, Stanton, accepted "a day of camel rides, a multi-course

24   meal, and a gift bag" while visiting Saudi Arabia with Defendant.  *Id.* at 32–33.

25           Defendant mischaracterizes Neboisa's testimony.  Neboisa testified that MiSK gave her a

26   $9,985 bonus for "short notice extended work"; MiSK transferred roughly $45,000 to the U.S.

27   Saudi Arabian Business Council for facilitating contacts, and MiSK gave her a gift of $20,000

28   when she became a U.S. citizen.  Trial Tr. 1646:13–1647:13 (Neboisa).  Thus, Neboisa did not

receive gifts "for no apparent reason." Each "gift" Neboisa received was given for a readily apparent and valid reason. As to SA Wu's testimony that Neboisa once claimed she received additional gifts without reason, a rational jury could have disregarded SA Wu's claim and taken Neboisa's subsequent denial as true. So too could a rational juror believe Neboisa received additional gifts but that these were also given for a valid reason. Either way, Neboisa's testimony does not render the jury's verdict irrational.

Shelestenko's testimony also proves little. The value of the gifts he received does not reach the level of the gifts and cash payments Defendant received from Binasaker. Nor is there a suggestion that Shelestenko provided anything similar to confidential information to his clients in Russia.

Finally, Defendant mischaracterizes the "gifts" Stanton allegedly received. Accepting camel rides and a multi-course meal from a corporate partner is fundamentally different than accepting $200,000 in cash directed through a foreign bank account. Defendant also fails to mention that while Stanton accepted a gift bag from a client, she did not take it with her when she left Saudi Arabia. Trial Tr. 461:17–464:17 (Stanton).

The Court **DENIES** Defendant's motion for acquittal as to honest services fraud (Count Five).

    4.    <u>Money Laundering (Counts Nine and Ten)</u>

To convict for money laundering under 18 U.S.C. § 1956(a)(1)(B)(i), the government must prove that

> (1) the defendant conducted or attempted to conduct a financial transaction; (2) the transaction involved the proceeds of unlawful activity; (3) the defendant knew that the proceeds were from unlawful activity; and (4) the defendant knew "that the transaction [was] designed in whole or in part—(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."

*United States v. Wilkes*, 662 F.3d 524, 545 (9th Cir. 2011) (internal quotations and citations omitted). Importantly, "a conviction under this provision requires proof that the purpose—not merely effect—of the transportation was to conceal or disguise a listed attribute." *Regalado Cuellar v. United States*, 553 U.S. 550, 567 (2008). "In other words, that a transaction is

1    structured to hide its source is not enough.  The government must prove that the transaction had

2    the purpose of concealing the source."  *United States v. Singh*, 995 F.3d 1069, 1075 (9th Cir.

3    2021).  Defendant argues his money laundering convictions cannot stand because (1) they are

4    inconsistent with the predicate wire fraud counts, and (2) the purpose of the transactions at issue

5    was not to conceal "the nature, the location, the source, the ownership, or the control of the

6    proceeds of specified unlawful activity."  Mot. at 33–34.  The Court addresses each argument in

7    turn.

8                                a.      Inconsistent Verdicts

9           First, Defendant argues the verdict is inconsistent with the predicate conviction of wire

10   fraud for messages sent on July 9, 2015 because "the two money laundering counts of which he

11   was convicted involve transactions that occurred prior to July 9, 2015—one on March 10, 2015,

12   and one on June 11, 2015."  Mot. at 33.  That is, Defendant questions whether a reasonable jury

13   could "convict [him] of laundering the proceeds of an incident of wire fraud that had not even

14   occurred yet[.]"  *Id.*  The Government has two answers: (1) "inconsistent verdicts may stand," *see*

15   Opp. at 38 (citing *United States v. Powell*, 469 U.S. 57, 64–65 (1984)), and (2) the jury may not

16   have found the evidence for money laundering sufficient until the July 9, 2015 messages were

17   sent.  *Id.* at 39.

18          The Court agrees with the Government—inconsistent verdicts may stand.  *See United*

19   *States v. Ares-Garcia*, 420 F. App'x 707, 708 (9th Cir. 2011) ("inconsistent verdicts may not be

20   used to demonstrate the insufficiency of the evidence for the count on which the defendant was

21   convicted").  Moreover, the verdict is not clearly inconsistent.  On July 5, 2015, Binasaker wired

22   $100,000 to Defendant's Bank Audi account in Lebanon and sent Defendant a message

23   apologizing for the late payment.  *See* Exs. 33, 801T.  In response, Defendant sent a message on

24   July 9, 2015, reading, "Need anything from Twitter?"  *See* Exs. 33, 801T.  It is possible that a

25   reasonable jury viewed this evidence and concluded that it confirms Defendant's previous

26   transfers were instances of money laundering, *i.e.*, the jury could have determined that the

27   evidence of wire fraud was insufficient without the July 9 message, but armed with the July 9

28   message, the jury might reasonably have determined the evidence was sufficient and imputed a

United States District Court
Northern District of California

criminal purpose on the previous transfers.

        b.     Concealment Purpose

        Second, Defendant argues he should be acquitted of money laundering because the transfers for which he was convicted were not "designed to conceal or disguise." Mot. at 34 ("Merely engaging in a transaction with money whose nature has been concealed through other means is not in itself a crime…[T]he government must prove [] the specific transactions in question were designed, at least in part, to launder money, not that the transactions involved money that was previously laundered through other means." (quoting *United States v. Garcia-Emmanuel*, 14 F.3d 1469, 1474 (10th Cir. 1994))); *see also Regalado Cuellar*, 553 U.S. 550. According to Defendant, the money at issue was laundered when it was sent to the Bank Audi account by the KSA, but once the KSA to Bank Audi transfer was complete, the laundering ended. *Id.* at 35. Therefore, Defendant argues he did not launder the money when he transferred funds from his Bank Audi account to his Bank of America account because the purpose of those transfers was not to conceal the source of the money. *Id.* at 34. At bottom, Defendant argues he is similarly situated to defendants in cases such as *Regalado Cuellar*.

        The Court disagrees with Defendant. The money laundering statute is violated if the transaction in question is "designed in whole *or in part*" to conceal. 18 U.S.C. § 1956(a)(1)(B)(i) (emphasis added). In *Regalado Cuellar*, the Supreme Court overturned a money laundering conviction because the government proved that the purpose of the transportation was to pay Mexican drug suppliers, but failed to prove a concealment purpose. 553 U.S. at 567. Because the government did not show that the transportation itself had a concealment purpose, it did not matter that the defendant literally concealed the funds to facilitate the transport. *Id.* Here, unlike in *Regalado Cuellar*, the Government provided sufficient evidence to show that the purpose of the transfers from Defendant's Bank Audi account, at least in part, was to conceal that the true source of the funds was Binasaker. *See Singh*, 995 F.3d at 1076. Specifically, the Government demonstrated the purpose of the transfer from Defendant's Bank Audi account was to avoid raising the same suspicion that a direct transfer from Binasaker to Defendant would.

        To that end, this case is more similar to *Wilkes*. There, the defendant was convicted under

§ 1956(a)(1)(B)(i) for paying off a California congressmen in exchange for Government contracts. 662 F.3d at 547.  The Ninth Circuit upheld the conviction, concluding the transactions "which provided additional buffers between the corrupt contract and the [payoffs]" were intended to conceal the source of the funds because they were "convoluted" and not "simple transactions." *Id.* Similarly, a concealment purpose can be divined from Defendant's choice to forego direct transfers from Binasaker to his Bank of America account, and instead set up a foreign bank account in his father's name to facilitate indirect transfers.  Based on those facts, it is entirely rational for a jury to find that the purpose of Defendant's indirect transfers was to conceal that Binasaker was the source of the funds.  True, the Government only charged the transfers from Defendant's Bank Audi account to his Bank of America account and not the initial transfers from Binasaker, but the Court need not isolate charged transfers from their larger context. *Cf. Regalado Cuellar*, 553 U.S. at 566 (stating that efforts to conceal funds in transport "may suggest that the transportation is only one step in a larger plan").

Additionally, although efforts to conceal are insufficient to demonstrate a concealment purpose on their own, they are not irrelevant. *Id.* at 566.  "The same secretive aspects of [a] transportation also may be circumstantial evidence that the transportation itself was intended to avoid detection of the funds[.]" *Id.*  Here, Defendant took multiple measures to conceal the transfer of funds from his Bank Audi account to his Bank of America account.  First, Defendant opened the account in his father's name rather than his own.  Second, Defendant obscured the nature of the funds by using the label "family fund" in the memo of each transfer.  Third, Defendant transferred Binasaker's $100,000 to his Bank of America account in smaller installments of approximately $10,000, which may reasonably be taken as an effort to avoid the suspicion a bulk $100,000 transfer would raise.  Taken together, this evidence provides additional circumstantial evidence tending to prove the purpose of the transfers at issue was to conceal a listed attribute of the funds. *See Regalado Cuellar*, 553 U.S. at 567.

Accordingly, the Court **DENIES** Defendant's motion for acquittal as to his money laundering convictions (Counts Nine and Ten).

5.      Falsification of Records (Count Eleven)

Defendant also requests that the conviction for falsification of records (Count Eleven) be dismissed for lack of venue.  *See* Mot. at 36.  Defendant argues venue is proper in the Western District of Washington because the alleged falsification occurred in Seattle.  *Id.*

Before trial, the Court rejected the same argument:

> The Court [] concludes that venue is proper in this district for [count 11] because the allegedly false document was made "with the intent to obstruct *an actual or contemplated investigation*" by the FBI in this district. *United States v. Singh*, 979 F.3d 697, 715 (9th Cir. 2020) (emphasis added) (quoting *United States v. Katakis*, 800 F.3d 1017, 1023 (9th Cir. 2015)); *see also* 18 U.S.C. § 1519 ("Whoever knowingly . . . falsifies . . . any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration *of any matter* within the jurisdiction of any department or agency of the United States." (Emphasis added.).  As with Sections 1519 and 1001, the crime is tied to the potentially adverse effect upon a specific (pending or contemplated) proceeding, transaction, investigation, etc., and venue may properly be based on the location of that effect.

*See* Docket No. 95 at 2.  Defendant has not presented any new evidence suggesting the Court should alter its decision.

The Court **DENIES** dismissal of Count Eleven for lack of venue.

B.    New Trial

Defendant argues he should be afforded a new trial under Rule 33 on the following grounds: (1) all counts for which he was convicted were against the weight of the evidence; (2) the Government withheld *Brady* evidence; (3) Defendant obtained newly discovered evidence material to the outcome of trial; (4) cumulative prosecutorial misconduct prejudiced Defendant's ability to present its case; and (5) instructional error.  Except for Defendant's arguments pertaining to his conspiracy conviction, which is addressed separately, the Court addresses each ground for a new trial in turn.

1.      Weight of the Evidence

Defendant argues that if he has not met the burden of showing insufficient evidence under Rule 29, the Court should grant him a new trial under the lower Rule 33 standard because the jury's verdict is against the weight of the evidence for "substantially the same reasons" he argues

1    it is insufficient.  Mot. at 37.

2        Even where there exists sufficient evidence to support the verdict, a district court may

3    nonetheless grant a motion for new trial if it "'concludes that…the evidence preponderates

4    sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred.'"

5    *Kellington*, 217 F.3d at 1087 (quoting *Alston*, 974 F.2d at 1211).  While not as rigorous as the

6    showing needed to satisfy Rule 29, it is a demanding standard nonetheless, and the Ninth Circuit

7    has held that such motions are generally disfavored and should only be granted in "exceptional"

8    cases.  *See United States v. Del Toro–Barboza*, 673 F.3d 1136, 1153 (9th Cir. 2012); *see also*

9    *United States v. Camacho*, 555 F.3d 695, 705 (8th Cir. 2009) ("New trial motions based on the

10   weight of the evidence are generally disfavored....").

11       Here, most of Defendant's arguments for a new trial fail for substantially the same reasons

12   as they fail in its motion for acquittal.  First, Defendant's conviction under § 951 (Count One) was

13   not against the weight of the evidence.  Much of the evidence may be circumstantial, but *Rafiekian*

14   is persuasive on the point that heavy reliance on circumstantial evidence should be expected in §

15   951 cases.  *Rafiekian*, 991 F.3d at 545.

16       Second, Defendant's argument regarding wire fraud (Count Five) fails because it relies on

17   the mistaken legal argument that the user data he stole cannot constitute property.  Yet property

18   for wire fraud purposes can, and in this case does, include confidential user data.  *See Abouammo*,

19   2021 WL 718842, at *6.

20       Third, Defendant's conviction for honest services fraud (Count Five) was not against the

21   weight of the evidence.  Defendant principally argues that the weight of the evidence did not

22   demonstrate the necessary finding of a *quid pro quo*.  But as discussed above, the evidence did

23   tend to show a *quid pro quo*, even if it was inferred from the surrounding circumstances.  *See*

24   *Kincaid-Chauncey*, 556 F.3d at 943.

25       Fourth, Defendant's convictions for money laundering (Counts Nine and Ten) were not

26   against the weight of the evidence.  The evidence demonstrated that the purpose of the transfers

27   from Defendant's Bank Audi account to his Bank of America account was to conceal the source of

28   the funds.

United States District Court
Northern District of California

For the foregoing reasons, the Court **DENIES** Defendant's motion for a new trial based on the weight of the evidence with regard to Counts One, Five, Nine, and Ten.

### 2.    *Brady* Violation

Defendant argues he should be afforded a new trial because the prosecution suppressed the Zatko Complaint in violation of *Brady*. *See* Mot. at 37–47. A *Brady* violation has three elements: "(1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued." *United States v. Kohring*, 637 F.3d 895, 901 (9th Cir. 2011).

### a.    Favorable Prong

"Any evidence that would tend to call the government's case into doubt is favorable for *Brady* purposes." *Milke v. Ryan*, 711 F.3d 998, 1012 (9th Cir. 2013). Exculpatory evidence includes any evidence that "if disclosed and used effectively, [] may make the difference between conviction and acquittal." *United States v. Bruce*, 984 F.3d 884, 895 (9th Cir. 2021) (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985)). "This includes information that may be used to impeach prosecution witnesses." *United States v. Mazzarella*, 784 F.3d 532, 538 (9th Cir. 2015) (citing *Giglio v. United States*, 405 U.S. 150, 152–54 (1972)).

### i.    Exculpatory

Defendant argues the Zatko Complaint is favorable exculpatory evidence bearing on the wire and honest services fraud charges (Counts Two and Five). *See* Mot. at 42. According to Defendant, the Zatko Complaint demonstrates that Twitter is "a company deliberately indifferent to the security user data," which calls into doubt whether the user data allegedly taken constitutes Twitter's "property." *Id.* at 43. The Government explains that to prove "Defendant misappropriated Twitter's property, for purposes of the wire fraud conspiracy and substantive wire fraud counts, [it] had to prove the 'specific intent to utilize deception to deprive the victim of *money or property.*'" Opp. at 52 (quoting *United States v. Miller*, 953 F.3d 1095, 1099 (9th Cir. 2020)) (emphasis in original). "To prove that the defendant deprived Twitter of money or property, [the Government] had to show he deprived Twitter of confidential information acquired

through his employment at the company." *Id.*  And the "user data at issue is confidential

information Defendant acquired through his employment, regardless of whether certain

cybersecurity measures were sufficiently robust." *Id.*  Defendant counters that "regardless of

whether reasonable efforts to protect the user data is part of the legal test for "property" or not,

Zatko's complaint undermines *the Government's theory* under which it chose to prove that user

data is Twitter's property."  Reply at 38 (citing *Bundy*, 968 F.3d 1019, 1024–35, 1032–37 (9th Cir.

2020)).

    The Court agrees with the Government.  Whether or not Twitter was successful in

protecting user data, Twitter considers user data confidential, *see* Reply at 38, and therefore

misappropriating user data constitutes wire fraud whether it is easy or difficult to do.

    Further, Defendant's citation to *Bundy* lacks merit.  In *Bundy*, defendants were charged

with numerous crimes after a multi-day stand-off between federal officers and defendants.  *See*

*Bundy*, 968 F.3d at 1024–25.  In its indictment, the government claimed defendants lied about

being surrounded by government snipers in order to recruit a group of anti-government supporters.

*Id.* at 1025.  However, late disclosed *Brady* evidence suggested the government did in fact have

snipers positioned around defendant's ranch.  *Id.* at 1026–27.  Thus, the defendants argued that the

late disclosure hindered its ability to raise the theory that their recruitment efforts were a valid

exercise of self-defense theory, and the court agreed.  *Id.* at 1027.

    However, developing an affirmative self-defense theory is not the same as defining

property for wire-fraud purposes.  Whether a self-defense claim is successful generally depends on

the degree to which the defendant "reasonably believes that [force] is necessary for the defense of

oneself or another against the immediate use of unlawful force."  *Manual of Modern Criminal*

*Jury Instructions for the District Courts of the Ninth Circuit* § 5.10 (2019).  Therefore, in *Bundy*, it

mattered that the government withheld information that would tend to show the defendants feared

for their lives.  In contrast, whether data is property for wire-fraud purposes does not turn on the

degree to which the confidential data is in fact protected.  *See id.* at § 15.35.  Therefore here,

unlike in *Bundy*, it does not matter that the Zatko Complaint might show user data was not

actually inaccessible.

As to the honest services conviction, Defendant argues that the Zatko Complaint creates a "reasonable probability that the jury would have concluded that Twitter could not have been deprived of honest services in relation to [user data] because Twitter itself does not make reasonable efforts to protect such information." Mot. at 42.

The Court does not accept this argument either. Again, that Twitter does a poor job protecting confidential user data does not gainsay Defendant's duty to keep the information confidential pursuant to Twitter policy and thus does not absolve the underlying illegal conduct.

ii.      Impeachment

Defendant also argues the Zatko Complaint is favorable because it tends to impeach Government witnesses. In some sense, this is true. In contrast to the testimony of Dr. Roth and Seth Wilson, the Zatko Complaint strongly suggests that Twitter does not have robust cybersecurity measures. Mot. at 38–39. But Defendant's argument misses the purpose of the testimony it seeks to contradict.

Dr. Roth led Twitter's Trust and Safety Department. Trial Tr. 364:20–22 (Dr. Roth). He testified that he had three main responsibilities: (1) setting Twitter's rules and policies for employees, (2) enforcing those policies at scale, and (3) conducting threat investigations. *Id.* at 365:7–366:8. Dr. Roth went on to describe what those policies are (including data Twitter considers confidential), the training and notice employees receive with regard to the policies, documents demonstrating Defendant agreed to abide by those policies, and the Profile Viewer tool. *Id.* at 369:15–412:15.

However, nothing in the Zatko Complaint negates Dr. Roth's testimony that Twitter has those policies, Defendant agreed to those policies, and Defendant's conduct violated those policies. Rather, the Zatko Complaint suggests, at the most, that those policies are in practice not as effective as one might think. *See* Mot. at 38–40. The following exchange demonstrates the weakness of Defendant's assertion:

> Mr. Cheng: Dr. Roth…if an employee has technical access to a tool, does that entitle them to use that tool to access whatever they want?
> Dr. Roth: It does not. Technical access is not authorization.
> Mr. Cheng: So simply because a door is unlocked, an employee is not necessarily permitted to go through it and see what's inside; is

that right?

    Dr. Roth: I would say that's an apt metaphor.

Trial Tr. 417:6–417:13 (Dr. Roth).  It is of no moment that the Zatko Complaint might have "undermined Roth's professional credibility with the jury," Mot. at 41, because the main purpose of Dr. Roth's testimony was to explain Twitter's written policies.  He did not opine on how well those policies were in fact carried out.

    Wilson led Twitter's Threat Management and Operations team.  Trial Tr. 804:24–805:2 (Wilson).  His responsibilities included keeping Twitter's employee and user databases secure.  *Id.* at 806:7–806:9.  His testimony pertained to security trainings he provided to all new Twitter employees, Twitter's Employee Security Handbook, and data Twitter considers confidential.  *Id.* at 813:12–832:4.  Wilson also described Agent Tools, Profile Viewer, and Guano as the Government exhibited screenshots of pages from those programs.  *Id.* at 854:3–872:3.  He explained that Profile Viewer allows employees to access information about specific Twitter profiles, and that Guano logs instances in which an employee uses Profile Viewer.  *Id.*  Finally, Wilson explained how he used Guano to investigate Defendant and Alzabarah's access of certain accounts.  *Id.* at 870:3–903:13.

    As with Dr. Roth, Defendant asserts the Zatko Complaint, and possible Zatko testimony on Twitter's "faulty data security systems," would have "directly implicated Wilson's area of responsibility and critically undermined his credibility."  Mot. at 40–41.  Defendant argues that Zatko's allegations that "Twitter lacked the ability to know who accessed systems or data or what they did with it in much of their environment," Zatko Complaint ¶¶ 46(b)(iv), 46(c)(ii), 48, and that "Twitter lacked the ability to know who accessed systems or data" calls into doubt the accuracy of the access logs which were critical to the Government's case.  Mot. at 41.

    At the outset, nothing in the Zatko Complaint disproves that Wilson conducted security trainings, the contents of Twitter's Employee Handbook, or that Twitter considers certain user data confidential.  Nor is it a secret that certain employees, like Defendant, had greater access to user data than they needed to fulfill their job duties.

    Further, while Defendant appears to raise a valid point with regard to the access logs, the Court already assessed this matter.  *See* Docket No. 290 ("MIL Order").  Pre-trial, Defendant

United States District Court
Northern District of California

argued the access log exhibits constituted impermissible hearsay.  *Id.*  Specifically, Defendant claimed the exhibits were "selective compilations of the underlying data that [] specifically created and curated in response to [G]overnment requests during the investigation of this case," and "thus materials prepared for litigation rather than permissible business records."  *Id.*  This Court concluded that "the fact that Twitter pulled its user access data into a readable format to respond to the [G]overnment's subpoena does not necessarily move the data from the purview of the business records hearsay exception."  *Id.*  (citing *United States v. Sanders*, 749 F.2d 195, 198 (5th Cir. 1984) ("The printouts themselves may have been made in preparation for litigation, but the data contained in the printouts was not so prepared" and "while the data was summoned in a readable form shortly before trial, it had been entered into the [business's] computers 'at or near the time' of the events recorded.")).  But the existence of the logs themselves was never in question.

Moreover, while the Zatko Complaint does state that Twitter lacks the ability to track who accessed systems or data, it does not mention Guano.  *See* ¶¶ 46(b)(iv), 46(c)(ii), 48.  Thus, the Government persuasively argues that Defendant is mistaken in its assumption "that [Zatko's] allegations concerning engineers' access to the backend production environment means that Twitter had no ability to track employee access of Agent Tools."  Opp. at 52–53.  Defendant's own witness also testified that he used Agent Tools, making it difficult to now credit its claim certain Agent Tools do not exist.  *See* Trial Tr. 1814:13–1815:10 (Shelestenko).  What is more, Wilson was extensively cross-examined on the access logs' reliability, *see* Trial Tr. 908:8–919:24 (Wilson); and Defendant itself relied on the access logs to highlight other employees' access of the @mujtahidd account.  *See id.* at 922:18–924:19.  That the Zatko Complaint could provide further impeachment evidence is speculative, and in any event, considering the dispute regarding the access logs was exhaustively argued at trial, its impeachment value would be cumulative.  *See Morris v. Ylst*, 447 F.3d 735, 740–41 (9th Cir. 2006); *Jacobs v. Cate*, 313 F. App'x 42, 25 (9th Cir. 2009).

In sum, to the extent the Zatko Complaint impeaches Dr. Roth and Wilson, the effect is minimal.

1

            b.     <u>Suppression Prong</u>

2

     Even assuming the Zatko Complaint is favorable to Defendant, the Government

3

successfully argues it was not suppressed.

4

     "In order for a *Brady* violation to have occurred, the favorable evidence at issue must have

5

been suppressed by the prosecution." *See United States v. Olsen*, 704 F.3d 1172, 1182 (9th Cir.

6

2013). The prosecution "has no obligation to produce information which it does not possess or of

7

which it is unaware." *United States v. Cano*, 934 F.3d 1002, 1023 (9th Cir. 2019) (internal

8

citation omitted). But "[p]ossession is not limited to what the prosecutor personally knows." *Id.*

9

The government's *Brady* obligation includes a "duty to learn" of favorable evidence. *See Bruce*,

10

984 F.3d at 895 ("individual prosecutors have 'the duty to learn of any favorable evidence known

11

to others acting on the government's behalf' as part of their 'responsibility to gauge the likely net

12

effect of all such evidence' to the case at hand" (quoting *Kyles v. Whitley*, 514 U.S. 419, 437

13

(1995))). "As a matter of law, the prosecution is 'deemed to have knowledge of and access to

14

anything in the possession, custody or control of any federal agency participating in the same

15

investigation of the defendant.'" *Bundy*, 968 F.3d at 1038 (quoting *United States v. Bryan*, 868

16

F.2d 1032, 1036 (9th Cir. 1989)). "Whether the [g]overnment has 'possession, custody or control'

17

of a document turns 'on the extent to which the prosecutor has knowledge of and access to the

18

documents sought by the defendant in each case.'" *United States v. Posey*, 225 F.3d 665 (9th Cir.

19

2000) (quoting *Bryan*, 868 F.2d at 1036). Still, "a federal prosecutor need not comb the files of

20

every federal agency which might have documents regarding the defendant in order to fulfill his or

21

her obligations…" *Cano*, 934 F.3d at 1023.

22

     The Government claims the National Security Division ("NSD") received the Zatko

23

Complaint on an encrypted hard drive without a password on July 11, 2022, Opp. at 53; Zatko's

24

attorneys decrypted the hard drive on August 4, 2022—the day of closing arguments—and, "due

25

to standard information security protocols within DOJ, the materials were not processed and made

26

available to an NSD attorney until August 8." *Id.* Thus, according to the Government, the Zatko

27

Complaint was not suppressed because it was not in its possession until August 8, 2022, four days

28

after the trial ended.

1    Defendant argues that the Government should have been aware that the Zatko complaint

2    contained favorable evidence because it is likely that it arrived at NSD with the same cover letter

3    with which at arrived at Congress.  *See* Reply at 32.  Therefore, according to Defendant, the

4    Government failed to fulfill its duty to learn by waiting a month to have Zatko's attorneys decrypt

5    the hard drive.  *Id.* at 32–33.  At this juncture, the central question is whether the Government can

6    be said to have had general knowledge of the Zatko Complaint's contents before August 8, 2022,

7    and therefore failed to fulfill its duty to learn of the evidence in the complaint.

8    Assuming the hard drive sent to NSD arrived with the same cover letter as that sent to

9    Congress, the Government did not fail to fulfill its *Brady* obligation.  The majority of the cover

10   letter outlines Zatko's rights as a whistleblower, *see* Zatko Complaint Cover Letter, and the

11   paragraphs that hint at the complaint's contents do not suggest it contains anything relevant to

12   Defendant's defense:

13       1. We are lawyers representing Peiter "Mudge" Zatko, the former
         "Security Lead", member of the senior executive team responsible
14       for Information Security, Privacy, Physical Security, Information
         Technology, and "Twitter Service" (the corporate division
15       responsible for global content moderation enforcement) at Twitter,
         Inc. Mr. Zatko worked at Twitter from November 16, 2020, until the
16       morning of January 19, 2022, when CEO Parag Agrawal terminated
         Mr. Zatko.
17       2. Earlier today on behalf of our client, we filed protected, lawful
         disclosures with the Securities and Exchange Commission ("SEC"),
18       Federal Trade Commission ("FTC"), and Department of Justice
         ("DOJ"), **based on Mr. Zatko's reasonable belief that Twitter
19       has been, at all relevant times including today, in violation of
         numerous laws, and regulations**. For the reasons described in the
20       enclosures, we respectfully request that your Committee initiate an
         investigation into legal violations by Twitter, Inc.
21

22   *Id.* (emphasis added).  Assuming this cover letter arrived with the hard drive when it came into

23   NSD's possession on July 11, 2022, it merely suggests that Zatko "reasonably believed" that

24   Twitter was "in violation of numerous laws, and regulations."  *Id.*  What those laws and

25   regulations were is not specified.  In essence, Defendant believes the Government should have

26   inferred that because Zatko was the "Security Lead" at Twitter, the complaint not only contained

27   violations of laws and regulations pertinent to security of user data, but that those violations were

28   also pertinent to Defendant's defense.  Although the *Brady* obligation is broad, the Court declines

to hold the Government to the high standard advocated by Defendant.  As "a federal prosecutor need not comb the files of every federal agency which *might* have documents regarding the defendant in order to fulfill [*Brady*] obligations," *Cano*, 934 F.3d at 1023 (emphasis added), it likewise need not rush to decrypt a hard drive which *might* have evidence regarding defendant. *See United States v. Stinson*, 647 F.3d 1196, 1208 (9th Cir. 2011) ("A district court need not make [] documents available based on mere speculation about materials in the government's files." (internal citation and quotation marks omitted)).

The remaining question is whether the Government can be said to have had possession or knowledge of the hard drive when it was decrypted on August 4, 2022, the last day of trial.  The Government argues that it did not technically have possession and knowledge of the complaint until August 8, 2022 due to internal operating and security procedures.  *See* Opp. at 53.  While the Government does not cite to the specific procedures it speaks of, it is safe to assume that there would be certain hurdles to providing the complaint to Defendant on the day of decryption.  It is likely the Government had to check for, *inter alia*, national security concerns, conflicts, and privilege issues.  Importantly, the act of decryption occurred on the last day of trial.  Thus, it appears Defendant would require the Government to immediately assess the information on the hard drive, recognize its significance to Defendant, prepare it for disclosure, and provide it to Defendant all on the same day.  Again, the Court declines to hold the Government to such a standard here.

Therefore, the Court finds the Government did not suppress the Zatko Complaint because it did not have possession, knowledge, or access of the Zatko Complaint until after trial.

### c.  Material Prong

Even if suppression were found, it would not justify a new trial in this case because there is an insufficient showing or prejudice.  Suppressed evidence must be material for prejudice to ensue.  *See Benn v. Lambert*, 283 F.3d 1040 (9th Cir. 2002).  Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Maxwell v. Roe*, 628 F.3d 486, 509 (9th Cir. 2010) (quoting *Strickler v. Greene*, 527 U.S. 263, 280 (1999)).  "A reasonable probability is one that is

sufficient to undermine confidence in the outcome of the trial." *Id.* (citing *Kyles*, 514 U.S. at 434). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Strickler*, 527 U.S. at 289–90 (quoting *Kyles*, 514 U.S. at 434).

Considering that the Zatko Complaint is not exculpatory, and its impeachment value is minimal, it is highly unlikely that its inclusion at trial could "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. Especially since Zatko was at Twitter from late 2020 to early 2022, whereas Defendant was convicted of sharing user data in 2014 and 2015.

For the foregoing reasons, the Court **DENIES** Defendant's motion for a new trial based on a *Brady* violation.

> 3.   Newly Discovered Evidence

Defendant argues that even if there is no *Brady* violation with regard to the Zatko Complaint, the Zatko Complaint constitutes newly discovered evidence. *See* Mot. at 47. A defendant seeking a new trial based on newly discovered evidence must prove each of the five *Harrington* factors: "(1) the evidence must be newly discovered; (2) the failure to discover the evidence sooner must not be the result of a lack of diligence on the defendant's part; (3) the evidence must be material to the issues at trial; (4) the evidence must be neither cumulative nor merely impeaching; and (5) the evidence must indicate that a new trial would probably result in acquittal." *United States v. Harrington*, 410 F.3d 598, 601 (9th Cir. 2005). Newly discovered evidence is merely impeaching unless "it refute[s] an essential element of the Government's case, or it is so powerful that, if it were to be believed by the trier of fact, it could render the witness' testimony totally incredible." *United States v. Kerr*, 709 F. App'x 431, 433 (9th Cir. 2017).

Defendant has proven the first two factors, and the Zatko Complaint is fairly material to some issues at trial—particularly Wilson's testimony regarding Guano logs. However, because Defendant already cross-examined Dr. Roth and Wilson on the issues the Zatko Complaint raises, the evidence is cumulative. *See* Trial Tr. 404:14–405:12 (Dr. Roth); *id.* at 908:11–928:3 (Wilson).

United States District Court
Northern District of California

*Cf. Ylst*, 447 F.3d at 740–41 (cumulative impeachment evidence is not material under *Brady*). And even if the Zatko Complaint would provide new impeachment evidence, that evidence would be "merely impeaching";  nothing in the Zatko Complaint renders Dr. Roth's or Wilson's testimony "totally incredible."  *See Kerr*, 709 F. App'x at 433.

For the foregoing reasons, the Court **DENIES** Defendant's motion for a new trial based on newly discovered evidence.

### 4. Cumulative Prosecutorial Misconduct

Defendant argues "repeated late disclosures of *Brady*, *Giglio*, Rule 16, and *Jencks* material severely prejudiced Defendant's ability to mount a complete defense," such that the Court should dismiss the indictment or order a new trial.  Mot. at 47.

A district court may dismiss an indictment or order a new trial "under its inherent supervisory powers '(1) to implement a remedy for the violation of a recognized statutory or constitutional right; (2) to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and (3) to deter future illegal conduct.'"  *United States v. Bundy*, 968 F.3d 1019, 1030 (9th Cir. 2020) (quoting *United States v. Struckman*, 611 F.3d 560, 574 (9th Cir. 2010)).  "To justify exercise of the court's supervisory powers, prosecutorial misconduct must (1) be flagrant and (2) cause substantial prejudice to the defendant."  *United States v. Ross*, 372 F.3d 1097, 1109–10 (9th Cir. 2004).  "Reckless disregard for the prosecution's constitutional obligations is sufficient to give rise to flagrant misconduct."  *Bundy*, 968 F.3d at 1038.  "In some cases, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant."  *Wilkes*, 662 F.3d at 542.  The prejudicial effect of cumulative errors warrants a new trial if it substantially hinders the defendant's ability to present their case.  *See Bundy*, 968 F.3d at 1037 ("Surveying all of the withheld evidence, we agree with the district court that the defendants suffered…substantial prejudice. The district court concluded that the defendants specifically suffered prejudice in not being able to prepare their case fully, refine their voir dire strategy, and make stronger opening statements.").

Defendant alleges numerous instances of prosecutorial misconduct in its briefing.  *See*

1   Reply 45–46.  Among them, Defendant takes particular issue with the handling of witness

2   Neboisa, and disclosure of SA Wu's notes from her 2018 interview with Defendant.  The Court

3   addresses each issue in turn.

4           Neboisa was originally meant to testify for the Government on Monday, July 25.  *See* Trial

5   Tr. 1236:20–1237:4 (Court).  However, the Government chose not to call her because she had

6   cough.  *Id.* at 1239:18–1240:18.  Instead, it flew Neboisa back to Washington, D.C.  *Id.*

7   According to Defendant, the Government made Neboisa unavailable because it "knew Neboisa's

8   testimony would be exculpatory, but withheld such information form the [D]efense.  Specifically,

9   the Government did not disclose…her statements [to SA Wu] that the cash and watch she received

10  from Binasaker were customary gifts and not the result of a 'quid pro quo.'"  Mot. at 2.   The

11  Court determined the Government made Neboisa unavailable and, because the Government

12  asserted it could not locate her, that Defendant could admit the exculpatory statements through

13  cross-examination of SA Wu.  Trial Tr. 1288:22–1290:3 (Court).  After this ruling, the

14  Government swiftly located Neboisa and procured her presence.  *Id.* at 1405:17–1406:12.  In

15  response, the Court ruled that the Government could not use Neboisa to make its case.  *Id.* at

16  1413:12–19.  By the time Neboisa testified for Defendant on August 2, she recanted some of the

17  exculpatory statements she made to SA Wu.  *See id.* at 1646:13–1647:13 (Neboisa).

18          Defendant argues the Government's misconduct—intentionally attempting to make

19  Neboisa unavailable because her testimony would be exculpatory—precluded the use of Neboisa's

20  exculpatory statements "in any part of its trial strategy that preceded the late disclosure."  Mot. at

21  49.  The Government argues that its disclosure of Neboisa's alleged exculpatory statements the

22  day after she made them was not unduly late, and any prejudice was cured because Defendant was

23  "ultimately able to call Neboisa as a witness in its case-in-chief and ask her about the gifts she had

24  received from Binasaker and MiSK."  Opp. at 48.

25          Assuming the Government's handling of Neboisa constitutes flagrant misconduct, any

26  prejudice Defendant suffered as a result was minimal if existent at all.  First, unlike in *Bundy*, even

27  if the Government disclosed Neboisa's statements on the day she made them, it would not have

28  had an effect on Defendant's voir dire or opening statement strategy because opening statements

1   occurred four days before Neboisa's interview, and voir dire well before that. Second, as noted

2   above, when Neboisa did testify, her testimony was minimally exculpatory. *See* Trial Tr.

3   1646:13–1647:13 (Neboisa). Defendant called her to disprove the quid pro quo on his honest

4   services count by eliciting testimony that she received gifts from Binasaker and MiSK without

5   expectation of return. However, her testimony showed that she received each gift for a valid

6   reason.[2] Third, Defendant was able to bring in the statements Neboisa recanted through SA Wu,

7   as well as highlight Neboisa's statements in closing. *See* Trial Tr. 1648:13–1649:10 (SA Wu); *id.*

8   at 2000:14–2001:7 (Defendant's Closing).

9        The Government disclosed SA Wu's hand-written notes from her October 2018 interview

10   of Defendant 10 hours before SA Wu's testimony. Mot. at 48. The Government points out that

11   Defendant had the "finalized FD-302" summary of the interview, but Defendant claims it only had

12   the draft summary and the late disclosure limited its ability to cross-examine SA Wu on

13   inconsistencies between the notes and final summary. Reply at 45.

14        Here, the Government's actions do not constitute flagrant misconduct because Defendant

15   was generally apprised of the content of SA Wu's testimony based on the draft summary. And

16   again, any prejudice Defendant suffered as a result of the late disclosure of SA Wu's hand-written

17   notes was minimal. First, Defendant had a reasonable amount of time to review the notes before

18   SA Wu's testimony. Once the notes were disclosed, the Court afforded Defendant the Friday on

19   which the Government conducted its direct-examination of SA Wu, as well as the following

20   weekend to assess the notes in preparation for its cross-examination of SA Wu. *See* Trial Tr.

21   1224:9–1230:4 (Court). Second, in its briefing, Defendant fails to identify a single material

22   discrepancy between the hand-written notes and the final summary that it did not already bring out

23   at trial. *See* Mot. at 48; Reply at 46–47.

24        Finally, Defendant is unable to specifically identify how any of the other "late" disclosures

25   prejudiced its ability to try the case. Instead, Defendant argues "the [G]overnment's

26

27   ---
     [2] Neboisa received a $9,985 bonus from MiSK for "short notice extended work," MiSK
     transferred roughly $45,000 to the U.S. Saudi Arabian Business Council for facilitating contacts,
28   and MiSK gave her a gift of $20,000 when she became a U.S. citizen. Trial Tr. 1646:13-1647-13
     (Neboisa).

United States District Court
Northern District of California

gamesmanship amounts to death by a million cuts." Reply at 46. But Defendant still must identify how the combined effect of the alleged instances of misconduct constitutes sufficient prejudice to warrant dismissal of the indictment or a new trial—a series of non-prejudicial actions is not enough. *See United States v. Weatherspoon*, 410 F.3d 1142, 1150–51 (9th Cir. 2005). Here, at the most, Defendant suffered two minor cuts due to the Government's conduct (Neboisa and SA Wu), and both were quickly remedied. While the Court does not condone the way in which the Government handled the matter, the Defendant fails to demonstrate sufficient prejudice to warrant dismissal of the indictment or a new trial. *See Wilkes*, 662 F.3d at 543.

For the foregoing reasons, the Court **DENIES** Defendant's motion for dismissal of the indictment or a new trial based on cumulative prosecutorial misconduct.

### 5.   Instructional Error

Defendant argues that he should be granted a new trial because the Court's instruction "on aiding and abetting in connection with Count One constructively amended the Superseding Indictment." Mot. at 50. Specifically, Defendant contends the Government did not indict on an aid and abet theory, did not present evidence to support an aid and abet theory (save a brief remark in closing), and therefore the Court's instruction that he could be found guilty on Count One based on an aid and abet theory impermissibly amended the indictment. *Id* at 50–53.

"The Fifth Amendment's grand jury requirement establishes the 'substantial right to be tried only on charges presented in an indictment returned by a grand jury.'" *United States v. Antonakeas*, 255 F.3d 714, 721 (9th Cir. 2001) (quoting *United States v. Miller*, 471 U.S. 130, 140 (1985)). "A constructive amendment occurs when the charging terms of the indictment are altered, either literally or in effect, by the prosecutor or a court after the grand jury has last passed upon them." *United States v. Ward*, 747 F.3d 1184, 1190 (9th Cir. 2014) (internal quotation marks and citation omitted). Jury instructions constitute a constructive amendment if they "diverge materially" from the indictment, and evidence was "introduced at trial that would enable the jury to convict the defendant for conduct with which he was not charged." *Ward*, 747 F.3d at 1191. "If the possibility exists that 'the defendant's conviction could be based on conduct not charged in the indictment,' then a constitutional violation results because an amendment

44

'destroy[s] the defendant's substantial right to be tried only on charges presented in an indictment.'"  *United States v. Alvarez-Ulloa*, 784 F.3d 558 (9th Cir. 2015).

The Court's instruction on aiding and abetting, in relevant part, provides:

> A defendant may be found guilty of [Count One] even if the defendant personally did not commit the act or acts constituting the crime but aided and abetted in its commission.  To "aid and abet" means intentionally to help someone else commit a crime.  To prove a defendant guilty of [Count One]…by aiding and abetting, the government must prove each of the following beyond a reasonable doubt: First, someone else acted as an agent of a foreign government without prior notice to the attorney general…; Second, the defendant aided, counseled, commanded, induced or procured that person with respect to at least one element of the charged offense; Third, the defendant acted with the intent to facilitate acting as an agent of a foreign government without prior notice to the attorney general…; and Fourth, the defendant acted before the crime was completed.

Closing Jury Inst. No. 21.

According to Defendant, "because the [G]overnment elected to charge exclusively a principal theory of liability in relation to Count One, instructing on aiding and abetting constructively amended the Superseding Indictment."  Mot. at 51.  The Government responds that "under Ninth Circuit law, every indictment that charges a substantive offense automatically implies three ways of committing that offense—as a principal, as an aider and abettor…, and as causer…"  Opp. at 62 (citing *United States v. Gaskins*, 849 F.2d 454, 459 (9th Cir. 1988)).  Defendant replies that "when the government *elects* to charge and proceed solely on a principal theory…the government is bound to its choice and instructing on aiding and abetting constructively amends the indictment...."  Reply at 47–48.

On this point, the Court agrees with the Government.  First, the aid and abet theory was expressly charged in the Superseding Indictment:

> COUNT ONE: (18 U.S.C. §§ 951 **and 2** – Acting as an Agent of a Foreign Government Without Notice to the Attorney General)
>> 29. Paragraphs 1 through 28 are realleged as if fully set forth herein.
>> 30. From on or about December 12, 2014, and continuing until on or about March 1, 2016, in the Northern District of California and elsewhere, the defendant,
>>> AHMAD ABOUAMMO,
>> did knowingly, without notifying the Attorney General as required by law, act as an agent of a foreign government, to wit, the

1    government of the Kingdom of Saudi Arabia and the Saudi Royal
     Family.
2                   All in violation of Title 18, United States Code, Section 951.

3    *See* Superseding Indictment at 12 (emphasis added).

4          Second, the Ninth Circuit has consistently held that "aiding and abetting is embedded in

5    every federal indictment for a substantive crime." *United States v. Dellas*, 267 F. App'x 573, 575

6    (9th Cir. 2008) (quoting *United States v. Garcia*, 400 F.3d 816, 820 (9th Cir. 2005)).  Thus, even

7    if Defendant's indictment did not explicitly charge aiding and abetting, Defendant was on notice

8    that the Government could validly present that theory at trial.  *See id.*

9          Third, Defendant's argument that the Government must elect to charge and proceed on

10   either a principal or aid and abet theory is incorrect.  In the Ninth Circuit, "the government may

11   proceed on the alternative theories that [the defendant] acted as a principal or as an aider and

12   abettor."  *United States v. Morales-Estrada*, 244 F. App'x 138, 140 (9th Cir. 2007) ("Aiding and

13   abetting is not a separate and distinct offense from the underlying substantive crime, but is a

14   different theory of liability for the same offense.... [T]he government had no obligation to elect

15   between charging a substantive offense and charging liability on an aiding and abetting theory...."

16   (quoting *Garcia*, 400 F.3d at 820)).  To that end, the Supreme Court has recognized that "jurors

17   are not required to agree unanimously on the alternative means of committing a crime." *Garcia*,

18   400 F.3d at 819.  "In other words, jurors [can] convict an individual for committing a substantive

19   offense without expressly agreeing on what theory—aider and abettor or principal—each

20   individual juror personally found to support the conviction, if both theories are supported by the

21   evidence." *See Goei v. United States*, No. CR 07-1444 RT, 2012 WL 13075826, at *4 (C.D. Cal.

22   Aug. 29, 2012).  True enough, the Government still must sufficiently argue and support each

23   theory if it seeks to proceed under both, s*ee Garcia*, 400 F.3d at 819, but here, the Government did

24   so by eliciting testimony that Defendant facilitated contact between Alzabarah and Binasaker, *see*

25   Trial Tr. 1456:15–1458:2, and arguing the point in closing.  *See* Trial Tr. 1971:10–19.

26         The Court **DENIES** Defendant's motion for a new trial as to Count One based on the aid

27   and abet jury instruction.

28

United States District Court
Northern District of California

46

6.      Conspiracy

Finally, Defendant argues the Court erred in its decision not to define the charged conspiracy in its jury instructions.  Mot. at 53.  According to Defendant, by failing to instruct the jury that the charged conspiracy in the superseding indictment was that between Defendant, Almutairi, Alzabarah, and others, the jury could have convicted Defendant based on a conspiracy not charged in the indictment (*e.g.*, that involving only Defendant and Binasaker).  *Id.* at 54.  Defendant also argues the failure to identify the charged conspiracy nullified the multiple conspiracies instruction "because it directed a guilty verdict even if the jury found a conspiracy between [Defendant] and Binasaker, separate and distinct from any conspiracy Binasaker had with Alzabarah and Almutairi."  *Id.* at 55.  In support, Defendant highlights that the jury acquitted him of all wire fraud counts premised on conduct by Almutairi and Alzabarah.  Mot. at 55.  Defendant elaborates that if the jury thought he was part of any conspiracy, it was not one involving Almutairi and Alzabarah but one involving only him and Binasaker.  *Id.* at 55–56.  Thus, Defendant claims these verdicts are inconsistent and must have been premised on the Court's failure to instruct in a matter that apprised the jury that the superseding indictment charged a conspiracy between Defendant, Almutairi, and Alzabarah.  *Id.*

The Government asserts that defining the conspiracy was not necessary because the instructions need only include the elements of the charged crime, and any error was harmless because the course of the trial and argument made clear that the charged conspiracy involved Defendant, Almutairi, and Alzabarah.  Opp. at 64–65.

First, the Court agrees with the Government that not identifying the conspiracy was unlikely to result in prejudice because the Government consistently sought to prove a broad, overarching conspiracy between Defendant, Almutairi, and Alzabarah, consistent with that charge in the indictment.  *See* Trial Tr. 335:24–338:10; *id.* at 339:24–340:20; *id.* 1960:2–1970:8; *id.* at Trial Tr. 1972:1–18; *see also id.* at 2049:14–2050:10.  In fact, the only instance in which it is arguable the Government suggested the jury could convict solely based on a conspiracy between Defendant and Binasaker was a vague comment in its rebuttal to Defendant's closing, immediately followed by a clear statement claiming a broader conspiracy.  *Compare id.* at 2046:18–2047:2

("This is a bribed employee, a hopelessly conflicted employee monitoring and conveying valuable information to his new boss.  That is the scheme. That is the fraud. And that is the conspiracy."), *with*, *id.* at 2049:14–2050:10 ("These were not multiple, separate, unrelated conspiracies.  All of the participants had a role in the scheme to recruit employees of Twitter to access nonpublic account information to get it to the people who wanted it, government officials in the kingdom of Saudi Arabia, people who served the royal family.").  Moreover, Defendant consistently countered the Government's argument by claiming the he was not party to the charged conspiracy even if he was part of a separate conspiracy.  *See*, *e.g.*, *id.* at 1986:2–19.  On that very basis, the Court agreed to include a multiple conspiracies instruction as requested by Defendant.  In effect, everything the jury heard suggested that the conspiracy as charged by the Government was between Defendant, Almutairi, and Alzabarah.

Second, it was not necessarily inconsistent for the jury to have acquitted Defendant of the fraud counts premised on conduct by Almutairi and Alzabarah but still convict Defendant of conspiracy arising out of the wire fraud charge based on his own conduct.  For instance, the jury could have found that the evidence of alleged wire fraud by Almutairi and Alzabarah (*i.e.* speaking with each other on 5/21/2015), Alzabarah's access of information on Twitter users (different from the @mujtahidd account accessed by Defendant) on 7/17/2015 and 7/29/2015, and Alzabarah's call with Binasaker on 9/8/15 (after Defendant had already left Twitter) was not part of the alleged overarching conspiracy involving Defendant.  The jury could have also found that Defendant did not join the overall conspiracy until he engaged in wire fraud and honest services fraud himself or that the charged conspiracy did not exist until Defendant joined.  So long as there was some evidence allowing the jury to find that Almutairi and Alzabarah acted in concert with Defendant in some way (other than the specific instances charged in the wire fraud counts as described above), the jury's acquittal on the wire fraud counts involving Almutairi and Alzabarah does not undermine the conspiracy conviction. Though circumstantial, there is such evidence.

In particular, there was evidence that Defendant and Alzabarah both met with Almutairi (the alleged intermediary for Binasaker) before meeting with Binasaker, that Defendant and Alzabarah both accessed the @mujtahidd account after meeting Binasaker; that Alzabarah first

accessed the @mujtahidd account the day before Defendant left Twitter; and that each party had a continuing relationship with Binasaker which involved extensive communications.  The evidence supports an inference that this confluence of events was not a coincidence but the product of an agreement between Defendant, Almutairi, Alzabarah, and Binasaker to achieve a common unlawful goal.  *See Lapier*, 796 F.3d at 1095 ("The government can prove the existence of the conspiracy through circumstantial evidence that defendants acted together in pursuit of a common illegal goal.").  Further, that the *same* actors were engaged in the *same* unlawful conduct during the *same* period of time suggests this evidence is more than sufficient, as a conspiracy may involve multiple actors involved at separate times.  *See Hussain*, 2018 WL 3619797, at *35 ("Evidence that a conspiracy involves a shifting cast of collaborators and transactional structures is not necessarily inconsistent with a single conspiracy." (citing *United States v. Williams*, 673 Fed. App'x 620, 622 (9th Cir. 2016))).  Defendant's claims of an innocent explanation do not negate the Government's evidence of a guilty explanation on which the jury could have based its conviction.  *Id.*

The Court **DENIES** Defendant's motion for a new trial as to Count Two based on instructional error and the weight of the evidence.

## V.        CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's Rule 29 motion for acquittal as to all counts.

The Court **DENIES** Defendant's Rule 33 motion for a new trial based on the weight of the evidence as to Counts One, Two, Five, Nine, Ten, and Eleven.

The Court **DENIES** Defendant's Rule 33 motion for a new trial based on *Brady*, newly discovered evidence, and cumulative prosecutorial misconduct.

///

///

///

///

///

49

The Court **DENIES** Defendant's Rule 33 motion for a new trial due to instructional error as to Counts One and Two.

This order disposes of Docket No. 396.

**IT IS SO ORDERED**.

Dated: December 12, 2022

_____
EDWARD M. CHEN
United States District Judge