JODI LINKER
Federal Public Defender
Northern District of California
ANGELA CHUANG
CARMEN SMARANDOIU
Assistant Federal Public Defenders
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:   (415) 436-7700
Facsimile:   (415) 436-7706
Email:         Angela_Chuang@fd.org

Counsel for Defendant Abouammo

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>AHMAD ABOUAMMO,<br><br>Defendant. | **Case No.:** CR 19–621 EMC<br><br>**DEFENDANT ABOUAMMO'S RESENTENCING MEMORANDUM**<br><br>**Court:**         Courtroom 5, 17th Floor<br>**Hearing Date:** June 26, 2025<br>**Hearing Time:** 9:00 a.m. |

# INTRODUCTION

Following a jury trial in 2022 in which Ahmad Abouammo was acquitted on five counts and convicted on six counts, *see* Dkt. No. 391, this Court sentenced him to 42 months custody with three years of supervised release to follow, Dkt. No. 426 at 2. Mr. Abouammo then appealed his convictions and sentence. As to the latter, the Ninth Circuit vacated his sentence and remanded for resentencing due to an error in the Guidelines loss calculation. *United States v. Abouammo*, No. 22-10348, 2024 WL 4972564, at *2 (9th Cir. Dec. 4, 2024). The matter now comes before this Court for resentencing consistent with the Ninth Circuit's mandate. As of June 5, 2025, Mr. Abouammo has completed his custodial sentence and is now on supervised release. While in BOP custody, he built upon his three-and-a-half years of perfect performance on pretrial supervision by maintaining a spotless disciplinary record. He respectfully requests that the Court resentence him to time served, one year of supervised release, and no restitution.

# ARGUMENT

Having presided over extensive pretrial litigation and a jury trial, the Court is already well-acquainted with the nature and circumstances of the offense, which will not be repeated here. In anticipation of resentencing, Probation submitted a supplemental PSR with new Guidelines calculations. Mr. Abouammo agrees with the calculations therein, with a final Offense Level of 20 and CHC I. Suppl. PSR at 4. The resulting advisory Guidelines range is 33–41 months, which is significantly lower than the previous incorrect Guidelines range of 70–87 months. *See id.* at 1, 4.

## I.   Guidelines Calculations

### A.   The enhancement for 10 or more victims does not apply

The government urges the Court to revisit its prior determination that an enhancement for 10 or more victims pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i) was unwarranted. Govt. Resent. Memo at 2–3. The Court was correct in its finding that the enhancement did not apply to Mr. Abouammo and the government offers no real argument to the contrary. Even aside from that, the prior decision not to include the enhancement must stand under the law of the case doctrine. The law of the case doctrine "is a judicial invention designed to aid in the efficient operation of court affairs." *United States v. Thrasher*, 483 F.3d 977, 981 (9th Cir. 2007). Under the doctrine, "a court is generally precluded from

reconsidering an issue previously decided by the same court, or a higher court in the identical case." *Id*. The government did not appeal the Court's rejection of the 10 or more victims enhancement. It thus became the law of the case and cannot be revisited. Furthermore, to do so would go beyond the scope of the Ninth Circuit's mandate, which was limited to reconsideration of the loss calculation, as will be discussed in more detail *infra* in relation to restitution.

### B. The supplemental PSR's loss calculation is correct

#### 1. The prior gain calculation cannot be used as a loss figure

The government asserts that the Court can still use Mr. Abouammo's gain of $242,000 as the appropriate loss figure based on the Ninth Circuit's opinion in *United States v. Yafa*, 136 F.4th 1194 (9th Cir. 2025). Govt. Resent. Memo at 4. Not so. *Yafa* held that "loss" as used in § 2B1.1 was ambiguous and that the then-Commentary's "instruction to use gain is a reasonable interpretation of 'loss,'" *id.* at 1198. Even so, to use gain as an alternative measure for loss requires that there be a sufficient nexus between the incalculable loss and the resultant gain. Such a connection simply is not present here. In vacating Mr. Abouammo's sentence due to an incorrect loss calculation, the Ninth Circuit explicitly recognized as much: "[W]hatever the full scope of the word 'loss' in former U.S.S.G. § 2B1.1(b)(1) may be, that term at the very least cannot mean a 'gain' that does not purport to approximate a victim's 'loss.' . . . [H]ere, we do not think two $100,000 payments and the value of the watch can be said to reasonably represent the amount of Twitter's loss from Abouammo's scheme. There is too much of a disconnect between the nature of that asserted loss and Acouammo's gain, and the record does not bridge the gap. The claimed relationship between Abouammo's profit and Twitter's loss is thus too tenuous to justify Abouammo's loss enhancement." *Abouammo*, No. 22-10348, 2024 WL 4972564, at *3–*4. This makes clear that even operating under the assumption that "loss" could be substituted with "gain" as a general matter, the Ninth Circuit found that Mr. Abouammo's gain was too disconnected from Twitter's loss to justify doing so in *this* case. That finding, which binds this Court, is undisturbed by *Yafa*.

#### 2. The government has failed to prove that a loss enhancement based on X's purported loss of $156,606 should apply

As a second option, the government asserts that the Court should calculate the loss amount to be $156,606 based on a recent email from Twitter (now X). Govt. Resent. Memo at 5. Circumstances

justifying a sentencing enhancement must be proven by a preponderance of the evidence. *United States v. Mares-Molina*, 913 F.2d 770, 773 (9th Cir. 1990). The government has utterly failed to meet that burden here. The only proof they have offered in support of this loss claim is a single email that contains conclusory assertions that are entirely unsubstantiated by any evidentiary support, records, or documentation demonstrating the bases for those conclusions. They have not produced any of the underlying data, invoices, or other records that underpin the claims in the email, making it impossible for Mr. Abouammo and this Court to determine whether it is founded or not. Tellingly, the email itself explains that determining legal fees was "somewhat challenging" due to the way Twitter's attorneys billed. Dkt. No. 479-1. Such a barebones submission falls far short of the evidence needed to support the loss enhancement that the government seeks.

Relatedly, in part because of the lack of detail and substantiation, the government has not proven that Mr. Abouammo's conduct caused the losses that are being claimed or that such losses were reasonably foreseeable, as required § 2B1.1 (b)(1)(C)(i) (defining "actual loss" as the "reasonably foreseeably pecuniary harm that resulted from the offense"). That is particularly true of the purported $134,756 legal fees/expenses "associated with the Saudi incident" and the $5,000 that Twitter paid a forensic examiner "to respond to the incident." Dkt. Not. 479-1. As the Court knows from presiding over this case, the vast majority of Twitter's response to "the Saudi incident" referred to in the email concerned the actions of Mr. Abouammo's long-gone co-defendant, Ali Alzabarah, who was magnitudes more culpable than Mr. Abouammo. His unauthorized access of hundreds of Twitter accounts far outstripped Mr. Abouammo's access of two accounts. *See* Sent. Tran., Dkt. No. 439, at 62:2–62-12 (noting the disparity in culpability between Mr. Abouammo and his co-defendants). The email that the government has submitted makes no distinction between expenses from the Saudi incident that stemmed from Mr. Alzabarah's actions versus Mr. Abouammo's. That distinction is key to determining what losses were reasonably foreseeable and specifically caused by Mr. Abouammo, particularly since he was acquitted at trial of all the vicarious liability counts based on Mr. Alzabarah's conduct as well as the fact that the overall "Saudi incident" was far greater in scope than Mr. Abouammo's offense. *See id.* at 20:19–20:23 ("I understand the Government's argument that he facilitated all this and there was a general overarching attempt by Binasaker to get

access to a number of these dissidents, but there was no evidence, in my view, to support that Mr. Abouammo agreed to participate in a conspiracy of such a broader scope."). Moreover, the email notes that the legal fees/expenses from "the Saudi incident . . . includes Al-Sadhan," who this Court specifically found was not a victim of Mr. Abouammo's offense. Sent. Tran., Dkt. No. 439, at 20:24–21:2 ("And, therefore, technically this particular putative victim [al-Sadhan] is not a victim of this particular conspiracy for which there was a conviction, nor of the other acts, the specific acts that Mr. Abouammo was convicted of."). Additionally, separate from the offense, since 2011, Twitter has been under a consent order from the FTC stemming from their failure to properly safeguard user data and privacy. Investigations and remedial measure for any breaches of user data would have been independently required by that order as part of their obligation to implement and maintain a comprehensive information security program. *See* https://www.ftc.gov/sites/default/files/documents/cases/2010/06/100624twitteragree.pdf.

The government also has not sufficiently proven that the claimed losses were not incurred to aid the government's investigation and prosecution, which is explicitly excluded from the loss calculation under the Guidelines. U.S.S.G. § 2B1.1 n.3(C)(ii) (stating that "[l]oss shall not include the following: (ii) Costs to the government of, and costs incurred by victims primarily to aid the government in, the prosecution and criminal investigation of an offense"). Twitter's legal fees/expenses included, *inter alia*, representing potential and/or actual witnesses in interviews with government agents/prosecutors and at trial,[1] as well as responding to government requests/subpoenas/warrants for records and other information throughout the investigation and prosecution of the case. The government makes a cursory claim that Twitter's purported loss "did not involve" such costs but again offers no support for its contention. Govt. Resent. Memo at 9. And the email itself suggests the contrary. The first bullet point alleges "$16,850 in legal fees and expenses outlayed [sic] by Twitter that explicitly mention Abouammo." Dkt. No. 479-1. This suggests that this figure was obtained by a simple search for any reference to "Abouammo." There is no indication whatsoever that it excluded any such expenses that were incurred in aid of the government's

---

[1] As the Court is aware, counsel for Twitter and various Twitter-related witnesses was present in the courtroom throughout Mr. Abouammo's trial.

prosecution and investigation. Similarly, Twitter came up with another $134,756 in legal fees/expenses "using a reasonable search for terms and timeframes I believe are associated with the Saudi incident." *Id.* Again, there is no indication that they even tried to exclude expenses that were incurred to assist the government. At the least, the government's woefully inadequate submission makes it impossible for this Court to calculate how much of these costs were incurred to aid the government, which would need to be excluded from the loss calculation. Mr. Abouammo thus agrees with Probation that no loss enhancement applies in his case.[2]

## II.  The Court Should Not Order Restitution

The government asks that the Court "revisit its prior decision not to order restitution to victim X under the MVRA." Gov. Resent. Memo at 6. They suggest that, at sentencing, the Court declined to order restitution to Twitter (as X was then known) "perhaps because the loss was measured by the gain to the Defendant from his KSA handler." *Id.* As previously discussed, the government claims that it has now received evidence of $156,606 in spending by Twitter. *Id.* There are multiple problems with the government's request for the Court to revisit its restitution rulings, including the fact that the Ninth Circuit's mandate is limited to resentencing (on a closed record, with one exception) and does not include revisiting restitution, and that the Court's decision not to order restitution, given that X did not claim any economic loss from the offense, has become the law of the case. Finally, even assuming that the Court has the authority to revisit the issue of restitution, it has not been sufficiently proven up by the government.

### A.  Revisiting restitution is outside the scope of the Ninth Circuit's mandate

As the government acknowledges, the Ninth Circuit vacated Mr. Abouammo's sentence, holding that under *United States v. Castillo*, 69 F.4th 648, 655 (9th Cir. 2023), the term "loss" in U.S.S.G. § 2B1.1(b)(1) cannot mean a "gain" that does not purport to approximate a victim's "loss," and that the government's "claimed relationship between Abouammo's profit and Twitter's loss is thus too tenuous to justify Abouammo's loss enhancement." *Abouammo*, 2024 WL 4972564, at *2.

---

[2] "[O]f course [Mr. Abouammo] will not go scot free merely because the government failed—failed utterly—to prove any loss . . . . It is simply that the Guidelines aware bonus punishment points for different levels of proven loss beginning with $2,000. The government did not earn a bonus in this case." *United States v. Schneider*, 930 F.2d 555, 559 (7th Cir. 1991).

The Court therefore vacated Mr. Abouammo's sentence and remanded "in part" for resentencing, explaining that "[a]lthough the Guidelines are only advisory, a material error in calculating the sentencing range is grounds for resentencing." *Id.* Although Mr. Abouammo's 18 U.S.C. § 951 count was not governed by the Guidelines, resentencing was also required on this count "because of the apparent alignment between the § 951 sentence and the 42-month concurrent sentences that Abouammo received on his other charges following the invalid Guidelines determination." *Id.* Resentencing was the proper course "[a]lthough it is possible that Abouammo's total imprisonment time will remain the same upon re-sentencing." *Id.* The Ninth Circuit explicitly provided that "[o]n the 'loss' issue, resentencing may take place on an open record." *Id.* That is because the government "could have reasonably relied" on prior precedent "allowing a defendant's gain to substitute for § 2B.1.1 'loss' under the then-operative version of the Guidelines," so "it should have a fresh opportunity to demonstrate 'loss' on remand." *Id.*

Of course, the Court is bound by the terms of the Ninth Circuit's mandate. *See, e.g.*, *Thrasher*, 483 F.3d at 981, 982–83. And the Ninth Circuit may "limit[] the scope of the *issues* for which [it] remand[s], and thus limit[] the district court's consideration to evidence and arguments relevant to those issues." *United States v. Matthews*, 278 F.3d 880, 889 (9th Cir. 2002) (en banc) (italics in original). Here, the Ninth Circuit's mandate is clear: the case was only remanded for reconsideration of the "loss" amount for Guidelines purposes and Mr. Abouammo's resulting punishment, not the restitution order. Indeed, when the Ninth Circuit vacates restitution orders and remands for recalculation of restitution, it does so explicitly and distinctly from ordering resentencing. *See, e.g.*, *United States v. Rice*, 776 F.3d 1021, 1026 (9th Cir. 2015) ("[W]e AFFIRM Rice's conviction, but VACATE his sentence, and REMAND to the district court for resentencing and recalculation of restitution and forfeiture."); *United States v. Laurienti*, 611 F.3d 530, 551 (9th Cir. 2010) ("Because the district court erred in calculating loss both for purposes of the Sentencing Guidelines and for purposes of restitution, we vacate Defendants' sentences and restitution orders and remand for resentencing and a recalculation of restitution.").

The Ninth Circuit's instructions on the record on resentencing reinforces this point. As noted, the only issue on which "resentencing may take place on an open record" is the issue of "loss" for

DEF'S RESENT. MEM.
*ABOUAMMO*, CR 19–621 EMC

6

1  Guidelines purposes, and nothing else. *Abouammo*, 2024 WL 4972564, at *2. Because "[t]here is
2  nothing in [the Ninth Circuit's] decision that indicates that [it] issued an open remand" at Mr.
3  Abouammo's resentencing, the Court may not revisit any other issues pertaining to the Guidelines
4  calculation, let alone the distinct issue of the restitution order. *See, e.g.*, *Twentieth Century Fox Film*
5  *Corp. v. Ent. Distrib.*, 429 F.3d 869, 882–83 (9th Cir. 2005), *abrogated on other grounds by Rimini*
6  *St., Inc. v. Oracle USA, Inc.*, 586 U.S. 334 (2019); *United States v. Pimentel*, 34 F.3d 799, 800 (9th
7  Cir. 1994) ("In [prior decision] we expressly limited the scope of our remand to consideration of a
8  single sentencing issue: whether, and to what extent, the district court would exercise its authority to
9  depart based upon Pimentel's extraordinary family circumstances. In light of this clear evidence that
10 the scope of our remand was limited to the single sentencing issue raised in Pimentel's prior appeal,
11 the district court was without authority to reexamine any other sentencing issues on remand.").

12        **B.     Under the law of the case doctrine, X is not entitled to restitution**

13        Related to the rule of mandate, as noted *supra*, under the law of the case doctrine, "a court is
14 generally precluded from reconsidering an issue previously decided by the same court, or a higher
15 court in the identical case." *Thrasher*, 483 F.3d at 981. This Court already decided the issue of
16 restitution in the original proceedings and found that no restitution award was warranted. The
17 government did not appeal the government's restitution ruling, so it has become the law of the case.
18 *See id.*; *see also, e.g.*, *S. Atl. Ltd. P'ship of Tennessee, LP v. Riese*, 356 F.3d 576, 584 (4th Cir. 2004)
19 ("The mandate rule does not simply preclude a district court from doing what an appellate court has
20 expressly forbidden it from doing.  Under the mandate rule, a district court cannot reconsider issues
21 the parties failed to raise on appeal . . . ."); *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*,
22 810 F.2d 243, 250 (D.C. Cir. 1987) ("Under the law of the case doctrine, a legal decision made at one
23 stage of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed,
24 becomes the law of the case for future stages of the same litigation, and the parties are deemed to
25 have waived the right to challenge that decision at a later time.").

26         In any event, the Court correctly denied any restitution award to Twitter. In its resentencing
27 memorandum, the government suggests that, at sentencing, the Court declined to order restitution to
28 Twitter "perhaps because the loss was measured by the gain to the Defendant from his KSA handler."

DEF'S RESENT. MEM.
*ABOUAMMO*, CR 19–621 EMC

7

Gov. Resent. Memo at 6. Not true. The government never argued at sentencing that Twitter was entitled to restitution in the amount of Mr. Abouammo's gain. Rather, as the government itself confirmed in its original sentencing memorandum, Twitter did not "provide[] a calculation of economic losses for purposes of a restitution order, and the government cannot readily calculate such a loss." Dkt. 417 at 11. As the Court is well aware, Twitter's (sophisticated) lawyers observed most of the proceedings and were in close touch with the government throughout the case. Twitter's decision not to submit a restitution request, therefore, was an implicit acknowledgement that it did not incur any losses recoverable via restitution proceedings. Twitter (now X), like any other litigant, must be held to its litigation position.

### C. Even if the Court had the authority to revisit restitution, it has not been sufficiently proven up by the government

Under the MVRA, "[t]he burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." 18 U.S.C. § 3664(e). The same failings that demonstrate why Twitter's expenses should not be included in the Guidelines loss calculation apply equally to the issue of restitution. A single email with unsubstantiated conclusory assertions with no evidentiary support, and scant causal link at best between the amount claimed and Mr. Abouammo's offense, cannot be sufficient to meet the government's burden as to restitution.

## III. A Sentence Of Time Served With One Year Of Supervised Release Is Reasonable And Appropriate

With regard to custody, all parties are in agreement that no further incarceration is warranted beyond that which Mr. Abouammo has already served. *See* Suppl. PSR at 5 (recommending "that Mr. Abouammo be sentenced to time served"); Govt. Resent. Memo at 9 (requesting that Mr. Abouammo be resentenced "to no less than time served"). In fact, the significantly lower Guidelines range that now applies in this matter would have counseled heavily in favor of him serving less time than he did, but the reality is that he has already completed the custodial portion of his original sentence.[3] The

---

[3] Had he not completed his custody time, Mr. Abouammo would have requested significantly less incarceration, given that his correct Guidelines range is 33–41 months instead of 70–87 months. Though the § 951 count does not have a corresponding Guideline, the Ninth Circuit noted the "apparent alignment" between the § 951 sentence and the sentence on the other counts. *Abouammo*, 2024 WL 4972564, at *2. It follows that a lower Guidelines range on the other counts would have similarly resulted in a lower sentence on the § 951 count.

question remains how much supervised release is warranted. Mr. Abouammo submits that one year of supervised release is sufficient.

When deciding how long of a term of supervised release to impose, a court considers most—but not all—of the § 3553(a) sentencing factors. 18 U.S.C. § 3583(c). Notably, the one factor that is *not* relevant to a court's decision regarding supervised release is "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." *Id.*; 18 U.S.C. § 3553(a). That factor was excluded from the supervised release statute "because the primary purpose of supervised release is to facilitate the integration of offenders back into the community rather than to punish them." U.S. Sentencing Comm'n, Federal Offenders Sentenced to Supervised Release, at 8 (July 2010).[4]

Given the Court's familiarity with the facts of this case and with Mr. Abouammo's history and characteristics, which were thoroughly discussed at his original sentencing hearing, undersigned counsel will focus on subsequent developments and post-sentencing conduct.[5] Following his sentencing hearing on December 14, 2022, Mr. Abouammo remained out of custody on pretrial supervision until he surrendered to begin serving his sentence on May 24, 2023. During that time, he continued to fully comply with his conditions of release, as he had for years prior to his sentencing date. In total, he performed perfectly on pretrial release for three-and-a-half years and incurred no pretrial violations at all. His spotless track record continued while he was in BOP custody, where he was a model inmate and never underwent disciplinary proceedings. *See* Declaration of Angela Chuang in Support of Defendant Abouammo's Resentencing Memorandum ("Chuang Decl."), Ex. A (BOP Education Disciplinary Record) at 2. Mr. Abouammo also participated in a number of general education programs while serving his sentence. *See id.* at 1.[6] On December 2, 2024, BOP transferred him to a halfway house in Seattle. Suppl. PSR at 5. He resided there for the next several months with

---

[4] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2010/20100722_Supervised_Release.pdf.
[5] The Supreme Court has held "that when a defendant's sentence has been set aside on appeal, a district court at resentencing may consider evidence of the defendant's postsentencing rehabilitation . . . ." *Pepper v. United States*, 562 U.S. 476, 480 (2011).
[6] Please note that this education record does not include substantial FSA programming that Mr. Abouammo completed, which resulted in his being released significantly earlier than originally projected.

DEF'S RESENT. MEM.
*ABOUAMMO*, CR 19–621 EMC

9

1   no issue, and subsequently was transferred to home confinement on March 18, 2025. *See id.* On June
2   5, 2025, Mr. Abouammo was released from BOP custody and is currently on supervised release.
3   Since December, he has engaged in regular mental health counseling with a therapist contracted by
4   BOP, who reports that he has "followed all recommendations during his treatment." Chuang Decl.,
5   Ex. B (Therapist Letter). She further noted that the frequency of their sessions had been reduced due
6   to the "significant progress he has made." *Id.*
7   With respect to the primary purpose of supervised release, it is clear that Mr. Abouammo has
8   already successfully reintegrated back into the community, where he has been living with no issue
9   since December 2, 2024. He has also availed himself of mental health treatment so fully that it is
10  expected that his therapy sessions will cease by September. Chuang Decl., Ex. B (Therapist Letter).
11  As for deterrence and protecting the public from further crimes, the Court expressed at his original
12  sentencing hearing its belief that Mr. Abouammo had already been deterred from future criminal
13  conduct. Sent. Tran., Dkt. No. 439, at 50:20–50:23 ("[I]n terms of deterrence of this Defendant, I
14  think it's clear that he has learned his lesson and I don't see any likelihood that Mr. Abouammo
15  would reoffend."). That belief has borne out by Mr. Abouammo's flawless record since then. In sum,
16  a term of supervised release beyond one year is unwarranted in light of the significant progress that
17  Mr. Abouammo has already made.

## CONCLUSION

19  For all the reasons set forth above, Mr. Abouammo respectfully requests that the Court
20  resentence him to time served and one year of supervised release. Such a sentence is sufficient but
21  not greater than necessary to achieve the sentencing goals laid out in § 3553(a).

Dated:   June 19, 2025

Respectfully submitted,

JODI LINKER
Federal Public Defender
Northern District of California

　　　　　　　　/S
ANGELA CHUANG
CARMEN SMARANDOIU
Assistant Federal Public Defenders

DEF'S RESENT. MEM.
*ABOUAMMO*, CR 19–621 EMC

11